**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| RUBICON TECHNOLOGIES, LLC. | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 2:26-cv-5611 |
| TOM OWSTON, WILMINGTON PAPER COMPANY, LLC | : | |
| Defendants. | : | |

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES</u>

Plaintiff Rubicon Technologies, LLC ("Rubicon" or "Plaintiff" or "Company"), through its undersigned attorneys, hereby alleges the following against Defendants Tom Owston ("Mr. Owston") and Wilmington Paper Company, LLC ("WPC") in this Verified Complaint for Injunctive Relief and Damages:

## <u>INTRODUCTION</u>

1. This case arises from the departure of Rubicon's prior Chief Commercial Officer, Mr. Owston, who left Rubicon to work for WPC in July 2025.

2. Mr. Owston represented that he resigned from Rubicon to become a division president at WPC for a sector entirely unrelated to Rubicon's business.

3. Based on these representations, Rubicon found that Mr. Owston's new employment did not violate the non-competition or non-solicitation clauses in its employment agreement ("Agreement")[1] with Mr. Owston.

---

1. A true and accurate copy of the Agreement is attached hereto as Exhibit A. Rubicon acknowledges that the Agreement includes a clause mandating arbitration of claims arising from the agreement between Mr. Owston and

4.      However, Mr. Owston failed to disclose that he and WPC were planning to launch "OneWaste", a new business line at WPC with services that mimic and directly compete with Rubicon.

5.      Rubicon's core business is in the field of total waste and recycling management and centralization for companies nationwide, and WPC now directly competes with Rubicon through the illegal conduct of Owston.

6.      On July 7, 2026, WPC launched OneWaste.

7.      Rubicon's investigation following the launch of OneWaste revealed that two of its former, key employees, Directors of Account Management that directly handled client relationships, had actually joined Mr. Owston at WPC and are now directly working with Mr. Owston to solicit former Rubicon customers who they had managed while at Rubicon.

8.      These employees took steps to conceal their intention to compete with Rubicon. For instance, one employee resigned citing health concerns, only to start working directly for Mr. Owston at WPC.

9.      One of those employees also sent Rubicon's proprietary and confidential trade secrets, which were used to launch new customers and would be critical in starting a new business, to himself prior to his departure from Rubicon.

10.      Worse yet, Rubicon also discovered that WPC had already successfully solicited one of Rubicon's key customers to switch some of its waste and recycling management needs from Rubicon to WPC.

---

Rubicon. *See* Agreement at § 38. However, an exception exists specifically for Rubicon to seek injunctive relief: "Notwithstanding the foregoing, [Mr. Owston] and/or the Company may seek any injunctive relief (including without limitation temporary and preliminary injunctive relief) necessary in order to maintain (or restore) the status quo and/or to prevent the possibility of irreversible or irreparable harm during the pendency of any arbitration." Agreement at § 38.8. As such, Rubicon is now seeking a temporary restraining order and injunction based on the underlying claims as set forth below, pending the results of any arbitration proceeding that may follow.

11.     The Agreement includes multiple provisions to protect Rubicon from this exact scenario.

12.     For example, the Agreement includes a non-competition provision, non-solicitation clauses relating to Rubicon's customers and employees, and a confidentiality clause to protect against the misappropriation of its confidential information and trade secrets.

13.     Despite taking these protections, Mr. Owston has and continues to violate the Agreement for the benefit of WPC and himself, causing irreparable harm to Rubicon.

14.     As a result, Rubicon is requesting that this Court issue a temporary restraining order and a preliminary injunction to, among other things, enjoin Mr. Owston from being employed by WPC, enjoin WPC's further misappropriation of Rubicon's confidential information, and prevent the continuing solicitation of Rubicon's employees and its clients.

## THE PARTIES

15.     Plaintiff Rubicon Technologies, LLC is a limited liability company formed under the laws of the state of Delaware, with its principal place of business in Georgia.

16.     Upon information and belief, Defendant Tom Owston is a Pennsylvania citizen residing at 409 McClenaghan Mill Rd., Wynnewood, Pennsylvania 19096.

17.     Defendant Wilmington Paper Company, LLC is a limited liability company formed under the laws of the state of Delaware, with its headquarters located at 35 Waterview Boulevard, Suite 302, Parsippany, NJ 07054.

## JURISDICTION AND VENUE

18.     This is a civil action arising out of, among other things, the Defend Trade Secrets Act of 2016 (DTSA), 18 U.S.C. § 1836, *et seq*, which raises a federal question, pursuant to 28 U.S.C. § 1331. This Court has subject matter jurisdiction over this matter pursuant to 18 U.S.C. §

3

1836(c) and 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States. Rubicon's additional claims fall within the Court's supplemental jurisdiction because the claims are so related to the federal question that they form part of the same case or controversy. *See* 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over Mr. Owston because he is a resident of the Commonwealth of Pennsylvania.

20.     This Court has personal jurisdiction over WPC because it regularly offers its services in Pennsylvania, and it has continuous and systematic contacts with Pennsylvania. Furthermore, this Court has specific personal jurisdiction over WPC since WPC tortiously interfered with Mr. Owston's Agreement in Pennsylvania, the state of Mr. Owston's residence at the time of his employment with WPC, and, upon information and belief, WPC hired Mr. Owston in Pennsylvania.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claims in this Complaint occurred in this District, and Mr. Owston resides in this District.

**STATEMENT OF FACTS**

**Mr. Owston's Employment with Rubicon**

22.     Rubicon is a waste and recycling management consulting company that specializes in providing comprehensive waste, recycling, sustainability, and specialty services to its clients.

23.     Rubicon's business involves connecting services, vendors, data, and operations through a single platform to increase efficiency, reduce costs, and strengthen its clients' sustainability performance.

24. This involves centralizing all of a company's vendor relationships, contracts, and services for waste and recycling across a national platform.

25. There are a very limited number of companies that can provide these services nationwide, and Rubicon is the largest by a significant margin. Rubicon performs "waste audits" as a key part of its business.

26. The waste-consulting industry is a competitive, niche industry with few key players that can provide services to large customers on a national scale. As such, it is vital for a company in the industry to safeguard its confidential information and trade secrets, such as business plans, customer lists, and customer acquisition and onboarding procedures, to prevent the misuse of such information by a rival company looking to break into the industry.

27. Accordingly, Rubicon has spent considerable time, money, and effort to develop and maintain its sales and marketing strategies, customer onboarding strategies, pricing strategies, and business development plans, among other confidential and proprietary information.

28. As a result of these efforts, Rubicon has successfully competed against larger companies in the industry.

29. Rubicon hired Mr. Owston in or around August 2020 to be its Vice President for Sales and Customer Relations.

30. By May of 2021, Rubicon promoted Mr. Owston to the position of Chief Commercial Officer ("CCO").

31. As CCO, Mr. Owston was entrusted with Rubicon's most sensitive commercial information and given responsibility for overseeing and maintaining Rubicon's key clients.

32.    Mr. Owston oversaw a team of approximately 158 full-time employees (nearly two-thirds of Rubicon's entire workforce), including Rubicon's department vice presidents and directors.  He also served as a major contact point to its many nationwide customers.

33.    Rubicon and Mr. Owston executed the Agreement on or about September 13, 2023. *See generally*, Agreement.

34.    Rubicon designed the Agreement, in part, to protect its confidential information and related competitive edge against competitors. *See, e.g.*, Agreement at §§ 14-17.

35.    As Rubicon's CCO, Mr. Owston was paid a $275,000/year salary in addition to a "target bonus amount" of $137,500.

36.    He also received an additional $137,500 in restricted stock units. *See* Agreement at §5.

### Given His Nationwide Duties and Access to Rubicon's Vital Confidential Information, Owston Agrees to Robust Non-Solicitation and Non-Competition Covenants.

37.    Given Mr. Owston's maintenance, oversight, and development of Rubicon's clients in tandem with managing Rubicon's highest level employees, Mr. Owston's Agreement's  non-competition restrictions were critical for Rubicon. Mr. Owston agreed that:

> … during the Restricted Period, [Mr. Owston] shall not, within the Restricted Area, shall not, on [his] own behalf or on behalf of any other Person:
>
> …
>
> (b) hold any position for a Competitor or engage in any activities for a Competitor as an employee, agent, consultant, independent contractor, or in any other capacity if such position or activities involve:
>
>> (i) **responsibilities similar to responsibilities Executive had or performed for any Rubicon Companies** in connection with the Business of Rubicon during the Pre-Termination Period;

(ii) **supervision of employees or other personnel in the provision of services that are similar to or competitive with those offered or provided by the Rubicon Companies** in connection with the Business of Rubicon during the Pre-Termination Period;

(iii) **development or implementation of strategies or methodologies related to the provision of services similar to or competitive with the services offered or provided by the Rubicon Companies** in connection with the Business of Rubicon during the Pre-Termination Period; or

(iv) **responsibilities in which Executive would utilize or disclose Confidential Information**.

Agreement at § 15 (emphasis added); Appendix A (defining "Restricted Period" as twenty-four (24) months after termination, "Pre-Termination Period" as eighteen (18) months prior to termination, and "Competitor" as "any Person that competes with Rubicon in the Business of Rubicon…").

38.     Given the nationwide nature of Rubicon's business and its customers, the Agreement defines "Restricted Area" as:

… the United States of America and any other geographic territory (a) that Executive managed for a Rubicon Companies during the Pre-Termination Period, or (b) in which Executive provided services for a Rubicon Companies during the Pre-Termination Period, or (c) in which Executive directly or indirectly supervised or managed Associates or Contractors during the Pre-Termination Period.

Agreement at Appendix A, p. 20.

39.     This geographic area is both necessary and reasonable to protect Rubicon's legitimate business interests, as Rubicon maintains a nationwide presence and services key customers in all fifty states.

40.     Given his material relationships with Rubicon's key customers, Mr. Owston agreed that he would also not solicit certain Rubicon customers and clients.

7

… [Mr. Owston] shall not, within the Restricted Area, directly or indirectly (for [Mr. Owston] or any other Person, whether as an employee, owner, consultant, independent contractor, or in any other capacity) solicit, market, service, contact, sell to or attempt to sell to any of the below Person(s) for the purpose of providing products or services competitive with those conducted, authorized, offered or provided by the Rubicon Companies in connection with the Business of Rubicon:

(a) Any Persons with whom or which employee dealt on behalf of the Rubicon Companies during the Pre-Termination Period;

(b) Any Persons whose dealings with the Rubicon Companies were coordinated or supervised by [Mr. Owston] during the Pre-Termination Period;

(c) Any Persons about whom [Mr. Owston] obtained Confidential Information during the Pre-Termination Period; and

(d) Any Persons who received products or services authorized by a Rubicon Companies, the sale or provision of which results or resulted in compensation, commissions, or earnings for [Mr. Owston] during the Pre-Termination Period.

Agreement at § 16.

41. Because Mr. Owston was the executive-level employee most responsible for protecting Rubicon's clients, these provisions were critical for Rubicon to employ Mr. Owston, as the CCO would have unfettered access to all Rubicon's client contacts, marketing strategies, pricing strategies, service offerings, and other confidential information that would enable competitors to unfairly compete for Rubicon's clients.

42. Likewise, Mr. Owston—as Rubicon's CCO—had material relationships with and was responsible for overseeing Rubicon's key employees, including its VPs and directors. Thus, Mr. Owston agreed that he would not solicit Rubicon's employees:

…[he] shall not, directly or indirectly, for [himself] or any other Person, whether as an employee, owner, consultant, independent contractor, or in any other capacity:

(i) entice, induce, encourage or solicit or attempt to entice, induce, encourage or solicit any Associate or Contractor then employed or engaged by any Rubicon Companies and with whom [he] has or had work-related dealings or about which [he] has or had access to Confidential Information, to terminate such Executive or Associate's employment or engagement with a Rubicon Companies; or

(ii) induce or attempt to induce any such individual to breach his or her agreement(s) with any Rubicon Companies.

Agreement at § 17.

43.     Finally, as to potential breaches of the Agreement, Mr. Owston stipulated and agreed that Rubicon would suffer immediate and irreparable harm:

> … any breach of this Agreement by [Mr. Owston] will cause Rubicon to suffer immediate and irreparable injury, for which there is no adequate remedy at law. In the event of a breach or threatened breach of any of the terms of this Agreement, Rubicon's remedies for breach of the Agreement shall be cumulative, the pursuit of one remedy shall not be deemed to exclude any other remedies, and the running of the period of the restrictions set forth in this Agreement shall be tolled during the continuation of any such breach by [Mr. Owston] and the running of the period of such restrictions shall commence only upon compliance by [Mr. Owston] with the restrictions in this Agreement. [Mr. Owston] further agrees that, in the event of a breach or threatened breach of any of the terms of this Agreement, Rubicon shall be entitled to seek and obtain enforcement of this Agreement by means of a decree of specific performance, a temporary restraining order, a preliminary or permanent injunction, and any other remedies at law or equity which may be available. [Mr. Owston] shall reimburse Rubicon for all reasonable attorneys' fees and costs incurred by Rubicon in enforcing this Agreement.

Agreement at § 22.

44.     Given Mr. Owston's breaches of the Agreement, as discussed below, the enforceable time period of the restrictive covenants is tolled pursuant to Section 22 of the Agreement. *Id*.

9

**Owston Also Agrees to Protect Rubicon's Confidential Information**

45.    By nature of his position, Mr. Owston had near unfettered access to Rubicon's Confidential Information. The Agreement defines "Confidential Information" as:

> … any information (in whatever form and whether or not recorded in any media) relating to Rubicon (whether constituting a trade secret or not) and including, but not limited to, information regarding research, development, inventions, manufacturing, purchasing, accounting, engineering, marketing, merchandising, selling, source codes, software programs, computer systems, logos, designs, graphics, writings or other materials, algorithms, formulae, works of authorship, techniques, documentation, models and systems, products, sales and pricing techniques, procedures, inventions, products, improvements, modifications, methodology, processes, concepts, records, files, memoranda, reports, plans, proposals, price lists, services, client, customer and supplier lists, and client, customer and supplier information, which (i) is or has been disclosed to [Mr. Owston] (or of which [Mr. Owston] became aware) as a consequence of or through his employment with a Rubicon Companies, (ii) has value to Rubicon or would be of value (actual or potential) to a Competitor, and (iii) is not generally known, or readily available by lawful means, to the public (including compiled information that is not publicly available in such a consolidated form).

Agreement at Appendix A, at 18-19.

46.    At all relevant times, Rubicon owned and lawfully possessed the Confidential Information and did not authorize Mr. Owston to disclose or use it outside of Mr. Owston's employment obligations at Rubicon.

47.    Rubicon's Confidential Information provides it with an economic advantage, is not generally known in the industry or otherwise, and is the result of significant expenditures of resources and effort.

48.    The economic advantage derived from the Confidential Information is valuable precisely *because* of its confidentiality and secrecy.

10

49. If Confidential Information is obtained by a competitor, it could be used to replicate Rubicon's proprietary processes and services, interfere in customer relationships, or otherwise threaten Rubicon's existing or prospective business relationships.

50. Given its value, Rubicon undertakes significant efforts to safeguard its Confidential Information by, including but not limited to, requiring certain key employees to sign employment agreements restricting the use and disclosure of the Confidential Information.

51. As part of its efforts to safeguard its Confidential Information, the Agreement requires that:

> [a]t no time, either during or after the termination of employment, shall [Mr. Owston] directly or indirectly obtain, disclose or use for [Mr. Owston] or any Person, or aid others in obtaining, disclosing or using any Confidential Information of Rubicon, other than as may be required in the performance of duties for and as authorized by Rubicon. All Confidential Information is and shall remain the sole property of Rubicon.

Agreement at § 13.

52. Rubicon maintains other safeguards as well, including, but not limited to, restricting company computers so that they cannot accept USB connections, and requiring all employees to sign confidential information policies in their employee handbooks.

53. As an additional safeguard for its Confidential Information, Mr. Owston signed a Code of Ethics on September 4, 2020, which confirmed that his obligations to protect the Confidential Information extended even after his employment with Rubicon. *See* Rubicon Code of Ethical Conduct for Officers and Employees at 2, attached hereto as **Exhibit B**.

54. In regard to the Confidential Information, Mr. Owston also represented that:

> … in [his] position with Rubicon, [he] will be responsible for: (i) actively conducting Rubicon's business, (ii) overseeing Rubicon's activities, (iii) developing and implementing strategies on behalf of Rubicon, and (iv) affecting customers everywhere that Rubicon

11

conducts the lines of business within [his] areas of responsibilities. Accordingly, [Mr. Owston] acknowledges and agrees that the promises set forth in this Agreement are intended to protect Rubicon's legitimate interests, including its Confidential Information, business relationships, goodwill, and workforce, and that the terms of this Agreement (i) are reasonable and necessary to protect Rubicon's legitimate interests; (ii) will not prevent [him] from earning or seeking a livelihood; and (iii) shall apply wherever permitted by law. [Mr. Owston] further recognizes that, given Rubicon's providing [him] with access to its Confidential Information and its longstanding customer relationships, [he] possesses information allowing him to unfairly convert Rubicon's business, customer accounts, vendor relationships and goodwill of customers, vendors and employees for use by [him] and other persons or entities in competition with Rubicon, and that this would cause Rubicon to suffer immediate and irreparable injury, for which monetary damages will not be sufficient to make Rubicon whole.

Agreement at § 12.

55.     In addition to agreeing that the Confidential Information belongs solely to Rubicon, Mr. Owston agreed to return all of Rubicon's property, which includes the Confidential Information, to Rubicon in the event of termination. *See* Agreement at § 14.

56.     Importantly, Mr. Owston also agreed to certain procedures in the event of suspected misappropriation of Confidential Information or other property:

> Without limiting the foregoing, Executive agrees to provide Rubicon with access to any of Executive's personal electronic devices, including computers and computer equipment, mobile devices, external storage devices, smart phones, tablets, and USB devices, that contain any Rubicon Property to remove said property and/or investigate suspected misappropriation of said property at time of termination and it is the Executive's express obligation to provide Rubicon access to such personal electronic devices to accomplish the same.

 *See* Agreement at § 14.

## Mr. Owston Leaves Rubicon and Joins WPC

57.     On or about June 13, 2025, Mr. Owston resigned from his position at Rubicon.

12

58.    Mr. Owston stated that he was leaving Rubicon to join WPC as a division president in a sector entirely unrelated to Rubicon's business.

59.    Based on the publicly available information at the time, WPC represented that it was a company that specialized in offering services to clients to identify and divert certain types of waste—namely, fiber scrap—to WPC's recycling facilities in exchange for compensation.

60.    WPC's own facilities then processed that fiber scrap and sold it to companies that used it to manufacture paper products.

61.    Mr. Owston represented that his new position would involve managing and overseeing WPC's hands-on recycling process.

62.    Via his LinkedIn profile, Mr. Owston announced that he would be staying in the waste and recycling industry but "focusing on a **different** approach":



A true and accurate copy of Mr. Owston's LinkedIn post is attached hereto as **Exhibit C**.

63.     A short time later, Mr. Owston posted a more detailed explanation of his new role

at WPC:



A true and accurate copy of Mr. Owston's LinkedIn post discussing The Program is attached hereto

as **Exhibit D**.

64.     Importantly, Mr. Owston's description of "The Program" confirmed what he had

previously told Rubicon—that it involved the recycling of "fiber scrap":



**WHAT IS *THE PROGRAM*™?**

*The Program* is a series of procedures and practices originally developed to maximize revenue while efficiently managing the recycling of fiber scrap at Folding Carton and Converting Plants in multiple locations.

*Id.*

65.     Based on Mr. Owston's representations regarding his role with WPC and its "The Program" offering, Rubicon determined that Mr. Owston's activities complied with his covenant not to compete.

66.     Although Rubicon's waste-audit offerings may identify and assist with the implementation of certain recycling strategies (including diversion of certain recyclable material for compensation), and may even identify companies like WPC that compensate businesses for certain types of recyclable trash, Rubicon does not actually perform those downstream recycling services nor does it own or operate recycling facilities.

67.     Even as recent as May or June 2026, Mr. Owston posted photographs showing WPC's focus on the hands-on recycling process:



A true and accurate copy of Mr. Owston's LinkedIn post depicting the hands-on recycling process is attached hereto as **Exhibit E**.

## Less Than a Year After Owston's Departure from Rubicon, Mr. Owston and WPC Launch a Directly-Competing Business Division Named "OneWaste"

68. Through June 2026, Rubicon continued to believe that, based on Mr. Owston's prior representations and ongoing public activity, that he was duly abiding by his Agreement's non-competition and non-solicitation covenants.

69. That all changed on July 7, 2026, when WPC launched a new business line with Mr. Owston at the helm: its new "OneWaste" business.

70. On or about that same date, Mr. Owston himself posted on his LinkedIn profile confirming the launch of OneWaste:

16



A true and accurate copy of Mr. Owston's LinkedIn post announcing the launch of OneWaste is attached hereto as **Exhibit F**.

71.    Mr. Owston's post linked to a WPC press release announcing the OneWaste business line:

> The Wilmington Group, a leading recycling, secure destruction, and managed waste services provider, today announced the launch of OneWaste<sup>SM</sup>, <u>**a fully managed waste and recycling service for organizations operating across multiple locations. OneWaste centralizes vendor relationships, contracts, and service issues under one dedicated partner, eliminating the complexity that has long made waste management a drain on multi-site businesses.**</u>
>
> . . . .
>
> "OneWaste is the natural next step for everything we've built over the past five decades," said Jeff Snyder, CEO of The Wilmington Group. "Our competitors are racing to replace people with technology, not empower them. We think that's the

wrong race to run. Relationships built on trust and accountability outlast any contract."

. . . .

OneWaste℠, powered by The Wilmington Group, is a fully managed waste and recycling service for multi-site operators, centralizing every vendor relationship, contract, and service issue under one accountable partner, combining broker-level flexibility with the credibility of an actual plant operator.[2]

A true and accurate copy of the WPC Press Release is attached hereto as **Exhibit G**.

72.     Notably, Rubicon is *also* a "a fully managed waste and recycling service for organizations operating across multiple locations" that "centralizes vendor relationships, contracts, and service issues under one dedicated partner, eliminating the complexity that has long made waste management a drain on multi-site businesses."

73.     WPC quickly rolled out its new website to promote its OneWaste business—www.onewaste.com—in which it touted "[c]redible waste audits" as a component of the OneWaste program.

74.     The description of OneWaste is effectively identical to what Rubicon does, as illustrated by the chart below:

|  | National Scope | Managing All Waste Services | Consolidated Billing | Invoice Auditing | Commodities & Recycling | Waste Audits |
|---|---|---|---|---|---|---|
| Rubicon | X | X | X | X | X | X |
| OneWaste | X | X | X | X | X | X |

75.     Rubicon's website states that it specializes in "comprehensive waste management solutions for one location or thousands."

---

[2] https://thewilmingtongroup.com/news/the-wilmington-group-launches-onewaste/

76.     Mimicking Rubicon, OneWaste promotes its services as the "one accountable partner" across every location and waste stream.

77.     Rubicon's website encourages customers to "consolidate your waste services with a single partner, so you can reduce costs and gain visibility across your entire organization."

78.     Perhaps most telling is a recent post from OneWaste on LinkedIn that boasts that OneWaste is not a "startup" but rather a "new model built on top of nearly five decades of real relationships, expertise, and commitment to recycling and sustainability." A true and accurate copy of OneWaste's LinkedIn post is attached hereto as **Exhibit H**.

79.     The timing of Mr. Owston's departure from Rubicon now makes sense because Mr. Owston—upon information and belief—took advantage of leadership changes at Rubicon, masking his competitive intent behind his departure.

80.     In the first part of 2025, Rubicon's leadership underwent significant changes, reaching all the way up to the CEO.

81.     Mr. Owston was a trusted advisor to the new leadership team during the review of Rubicon's existing key employees at the helm.

82.     In this time of change, Mr. Owston was also keenly aware of the new leadership's need for time to fully process and grasp the business, giving him a keen vantage point to advise about personnel changes, cost reductions, downsizing, and overall implementation of new business strategies.

83.     In the midst of the development of these plans, Mr. Owston resigned, leaving the new leadership unsuspecting about his intentions since there were already significant personnel changes afoot.

84. Upon information and belief, and given the timing of Mr. Owston's departure from Rubicon and the WPC's launch of OneWaste with Mr. Owston at the helm, Mr. Owston played a pivotal role in the development and launch of OneWaste.

85. OneWaste now also offers waste-related audits to retailers nationwide, which is a critical business line for Rubicon.

86. With the development and launch of OneWaste, WPC is a competitor to Rubicon as defined in the Agreement. *See* Agreement at Attachment A (defining "Competitor" as "any Person that competes with Rubicon in the Business of Rubicon.").

87. The Agreement defines "Business of Rubicon" as encapsulating "activities, products, or services of the type conducted, authorized, offered, or provided by the Company or its Affiliates in the waste and recycling industry."

88. Therefore, Mr. Owston violated, and continues to violate, the non-competition provision in the Agreement through his planning, launch, and management of OneWaste. *See* Agreement at § 15.

89. As a Division President, Mr. Owston now has responsibilities at WPC similar to his responsibilities at Rubicon, which is in violation of the Agreement. *See* Agreement at § 15.

90. Upon information and belief, Mr. Owston now supervises personnel in the provision of services competing with Rubicon and is involved in the development and implementation of strategies and methodologies for services that directly compete with Rubicon, in violation of the Agreement. *See* Agreement at § 15.

91. Upon information and belief, Mr. Owston's has also undertaken responsibilities in which he is likely to utilize or disclose Confidential information, in violation of the Agreement. *See* Agreement at § 15.

92.     With depth and breadth of Confidential Information and client contacts known to him in his many years of employment with Rubicon, Mr. Owston's use of Confidential Information is inevitable.

93.     Indeed, within weeks of OneWaste's launch, at least one of Rubicon's large, long-time customers was doing work with WPC's OneWaste through relationships fostered by Ryan Brown.

94.     WPC knew or should have known that Mr. Owston, a former c-suite executive at Rubicon, would likely have signed an employment agreement with restrictive covenants protecting Rubicon's business interests.

95.     Upon information and belief, and because WPC stood to benefit financially from the OneWaste, WPC either willfully ignored the Agreement or deliberately encouraged Mr. Owston to violate the Agreement.

96.     Ignoring the Agreement or otherwise encouraging Mr. Owston to violate the Agreement also had the additional benefit of directly harming Rubicon.

### Aman Malhotra, Taylor Wall, Ryan Brown Leave Rubicon and Join WPC

97.     Unfortunately, Rubicon's investigation revealed further violations of the Agreement well beyond the non-competition, non-solicitation, and non-disclosure clauses.

98.     The Agreement specifically states that Mr. Owston could not, within the Restricted Period, solicit Rubicon's employees who he had work-related dealings with while at Rubicon. *See* Agreement at § 17.

99.     Rubicon hired Aman Malhotra ("Mr. Malhotra") in November 2015 to develop and design its proprietary platform for providing its comprehensive waste and recycling services to its

21

clients. A true and accurate copy of the Employee Agreement between Mr. Malhotra and Rubicon is attached hereto as **Exhibit I**.

100. By 2025, Mr. Malhotra had risen to Rubicon's vice president of product development.

101. As a key architect of Rubicon's proprietary systems, Mr. Malhotra had access to Rubicon's Confidential Information and intimate knowledge of the technology and tools used to optimize its services and manage client experiences.

102. On September 19, 2025, Rubicon terminated Mr. Malhotra as part of a restructuring of its workforce. A true and accurate copy of the Confidential Separation and General Release between Mr. Malhotra and Rubicon is attached hereto as **Exhibit J**.

103. Approximately one month later, in October 2025, Mr. Owston called Rubicon's chief executive officer, Michael Dulin ("Mr. Dulin"), to ask for permission to extend an offer to Mr. Malhotra to work temporarily for WPC.

104. Mr. Owston represented that Mr. Malhotra would only be needed for approximately one month at WPC, for minor development fixes related to WPC's specialized recycling services that did not compete with Rubicon's services.

105. Since Rubicon did not consider WPC a competitor, Mr. Dulin agreed that WPC could hire Mr. Malhotra for a temporary period.

106. Upon information and belief, Mr. Malhotra began working for WPC in or about October of 2025.

107. As it turns out, nearly one year later, Mr. Malhotra continues to be employed by WPC.

22

108.    Upon information and belief, Mr. Owston concealed the true purpose of WPC's solicitation of Mr. Malhotra, which was to leverage Mr. Malhotra's in-depth knowledge of Rubicon's internally developed proprietary software and programs for use in building WPC's OneWaste.

109.    Upon information and belief, Mr. Owston and WPC also solicited two of Rubicon's senior employees with key knowledge of Rubicon's clients and operations.

110.    Rubicon hired Taylor Wall ("Mr. Wall") in October 2016 as a Director of Key Accounts ("Director").

111.    Rubicon also hired Ryan Brown ("Mr. Brown") in May 2014, also as a Director.

112.    In their role as Directors, Mr. Brown and Mr. Wall were responsible for managing and overseeing several of Rubicon's largest and most critical customer relationships.

113.    Both Mr. Brown and Mr. Wall also reported directly to Mr. Owston as CCO.

114.    Both Mr. Wall and Mr. Brown had business-related dealings with Mr. Owston while he was at Rubicon, making any attempts by Mr. Owston to solicit them a violation of the Agreement. *See* Agreement at § 17.

115.    Given Mr. Wall and Mr. Brown's access to Rubicon's sensitive and Confidential Information as Directors, they both signed a Non-Disclosure, Non-Solicitation, and Confidentiality Agreement (the "Director Agreements") in addition to their employment agreements. True and accurate copies of the Director Agreements for Mr. Wall and Mr. Brown are attached hereto as **Exhibits K and L**.

116.    Mr. Wall resigned from his position as Director at Rubicon on March 27, 2026, while on paternity leave after continually mentioning his desire to remain at Rubicon.

117.    Rubicon later learned that Mr. Wall was hired by WPC.

118.     According to Mr. Wall's LinkedIn page, he started work for WPC in April 2026 as an account executive. A true and correct copy of Mr. Wall's LinkedIn page is attached as **Exhibit M**.

119.     In July 2026, Mr. Wall changed his employer on LinkedIn to OneWaste, and began promoting its services as a comprehensive waste management partner.

120.     On LinkedIn, Mr. Wall describes his duties for OneWaste as "serv[ing] as the primary business parter to executive decision-makers, responsible for driving both top- and bottom-line growth across a national portfolio," and that he "build[s] and deliver[s] strategic programs that achieve real reliability, real efficiency, and real accountability – reducing cost, optimizing operations, and ensuring our customers get consistent, measurable results." *Id*.

121.     Parts of Mr. Wall's description—promising "real reliability, real efficiency, and real accountability" are taken verbatim from Rubicon's own marketing materials and sales pitches.

122.     On the day of OneWaste's launch, Mr. Wall re-posted the announcement and further stated that "**I've been part of the team building OneWaste** and today it official launches . . . I'm proud of what we build.  A program that streamlines waste and recycling operations, so businesses can stop juggling multiple vendors, signing endless contracts, and sitting on hold waiting for someone to help." (emphasis added).  A true and accurate copy of Mr. Wall's LinkedIn Repost is attached hereto as **Exhibit N.**

123.     Around the same time as Mr. Wall, Mr. Brown also left Rubicon for WPC.

124.     Mr. Brown resigned from his position at Rubicon in February 2026, claiming that he was resigning for "health reasons."

125.     Upon information and belief, this was misdirection to conceal his intention to join Owston in competing with Rubicon.

126.    According to Mr. Brown's LinkedIn page, Mr. Brown joined WPC as an account executive in March 2026. A true and correct copy of Mr. Brown's LinkedIn page is attached as **Exhibit O**.

127.    Like Mr. Brown, in July 2026 Mr. Brown changed his employer on LinkedIn to OneWaste and began promoting its competing services. *Id.*

128.    Upon information and belief, Mr. Wall and Mr. Brown both report to Mr. Owston at WPC.

129.    Based on the timing and circumstances of their departure in the lead-up to launching the OneWaste, upon information and belief, Mr. Owston solicited Mr. Wall and Mr. Brown to terminate their employment with Rubicon and join WPC.

130.    Rubicon also discovered that on November 12, 2025, Mr. Brown sent an email from his Rubicon email account (ryan.brown@rubicon.com) to his personal email address (rbrowny6@gmail.com). A true and accurate copy of the November 12, 2025, email is attached hereto as **Exhibit P**.[3]

131.    This November 12, 2025, email attached Rubicon's proprietary and confidential Implementation Project Plan, which sets forth a detailed ~110 point workflow of how Rubicon onboards and services its customers.

132.    Mr. Brown sent the Implementation Project Plan to his personal email less than one month after Mr. Owston hired Mr. Malhotra.

133.    Rubicon did not authorize Mr. Brown to send the Implementation Project Plan, or any other Confidential Information, to his personal email account.

---

[3] The attachment to Exhibit P is not included because it consists entirely of Rubicon's proprietary and Confidential Information.

134. The Implementation Project Plan qualifies as Confidential Information under the Agreement.

135. There is no legitimate employment reason for Mr. Brown to send himself the Implementation Project Plan or other Confidential Information.

136. Based on the circumstances and timing between Mr. Owston's solicitation of Mr. Malhotra and Mr. Brown's email, upon information and belief, Mr. Brown sent the Implementation Project Plan to his personal email address in anticipation of sharing it with WPC to assist it with the implementation and launch of OneWaste.

137. Upon information and belief, Mr. Owston and WPC sought to hire Mr. Brown and Mr. Wall in part because of their access to or possession of Confidential Information, including their intimate knowledge of client relationships.

138. Upon information and belief, and as discussed more below, Mr. Owston and WPC misappropriated the Implementation Project Plan and other Confidential Information, using them to directly and unlawfully compete with Rubicon.

139. Based on the timing and circumstances of Mr. Wall and Mr. Brown's departure from Rubicon, upon information and belief, Mr. Owston and WPC purposefully hired Mr. Wall and Mr. Brown around the time OneWaste's development was in its final stages, so that WPC could immediately access and onboard the clients that Mr. Wall and Mr. Brown worked with at Rubicon.

140. Mr. Owston's solicitation of Rubicon's employees alone is a violation of Section 17 of the Agreement. *See* Agreement at § 17.

141. Presently, certain key Rubicon employees continue to report that they are often solicited by Mr. Owston or WPC.

142.    By soliciting employees with key customer relationships, WPC can also improperly compete for Rubicon's clients.

143.    Mr. Owston's violations of the non-solicitation clauses of the Agreement, and WPC's direct encouragement of those same violations, have caused Rubicon significant and irreparable harm.

### WPC Successfully Solicits Rubicon's Customers

144.    Shortly before the launch of OneWaste, Rubicon also learned that WPC had already begun soliciting Rubicon's customers with the assistance of its former employees.

145.    On June 26, 2026, Rubicon's chief executive officer, Mr. Dulin, received an email forwarding a thread showing that one of its largest clients ("Client 1"), a popular nationwide chain, had awarded a waste audit project to WPC. A true and accurate copy of the June 26, 2026, email is attached hereto as **Exhibit Q**.

146.    Client 1 is a longtime waste audit client of Rubicon that generated significant revenue every month.

147.    The email specifically noted that Mr. Brown and Mr. Wall were assigned to Client 1's account. *See id*. ("@Taylor Wall @Ryan Brown please jump in here and continue the conversation").

148.    Both Mr. Wall and Mr. Brown had relationships with Client 1 while working as Directors for Rubicon.

149.    Upon information and belief, Mr. Owston, with the assistance of Mr. Wall and Mr. Brown, solicited Client 1 in violation of the non-solicitation clause of the Agreement, notwithstanding the additional violations of Mr. Wall and Mr. Brown's Director Agreements. *See* Agreement at § 16.

150. WPC directly benefited from the unlawful solicitation of Client 1.

151. Upon information and belief, both Mr. Owston and WPC have and continue to benefit from the unlawful solicitation of Rubicon's clients.

152. Upon information and belief, Mr. Owston and WPC also misappropriated and used Confidential Information in the solicitation of Client 1 and other Rubicon customers.

153. The continued solicitation of Rubicon's customers, in violation of Mr. Owston's Agreement (and also in violation of Mr. Wall and Mr. Brown's own agreements), has caused, and continues to cause, significant and irreparable damage to Rubicon.

154. For the foregoing reasons, Rubicon now seeks injunctive relief against Mr. Owston and WPC as is necessary to prevent ongoing and future violations of the Agreement, together with monetary compensation for the damages caused by such violations.

## COUNT I

### BREACH OF CONTRACT
### (Against Mr. Owston)

155. Rubicon incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

156. On September 13, 2023, Mr. Owston executed the binding and enforceable Agreement with Rubicon.

157. Under the Agreement, Mr. Owston agreed that "[a]t no time, either during or after the termination of employment, shall [Mr. Owston] directly or indirectly obtain, disclose or use for [Mr. Owston] or any Person, or aid others in obtaining, disclosing or using any Confidential Information of Rubicon, other than as may be required in the performance of duties for and as authorized by Rubicon." Agreement at § 13.

158.    Mr. Owston also agreed that for twenty-four (24) months following his termination from Rubicon, he would not

…

(b) hold any position for a Competitor or engage in any activities for a Competitor as an employee, agent, consultant, independent contractor, or in any other capacity if such position or activities involve:

(i) responsibilities similar to responsibilities [Mr. Owston] had or performed for any Rubicon Companies in connection with the Business of Rubicon during the Pre-Termination Period;

(ii) supervision of employees or other personnel in the provision of services that are similar to or competitive with those offered or provided by the Rubicon Companies in connection with the Business of Rubicon during the Pre-Termination Period;

(iii) development or implementation of strategies or methodologies related to the provision of services similar to or competitive with the services offered or provided by the Rubicon Companies in connection with the Business of Rubicon during the Pre-Termination Period; or

(iv) responsibilities in which [Mr. Owston] would utilize or disclose Confidential Information.

Agreement at § 15.

159.    Under the Agreement, Mr. Owston also agreed that for twenty-four (24) months following his termination, he would not solicit:

(a) Any Persons with whom or which employee dealt on behalf of the Rubicon Companies during the Pre-Termination Period;

(b) Any Persons whose dealings with the Rubicon Companies were coordinated or supervised by [Mr. Owston] during the Pre-Termination Period;

(c) Any Persons about whom [Mr. Owston] obtained Confidential Information during the Pre-Termination Period; and

29

> (d) Any Persons who received products or services authorized by a Rubicon Companies, the sale or provision of which results or resulted in compensation, commissions, or earnings for [Mr. Owston] during the Pre-Termination Period.

Agreement at § 16.

160. The Agreement also made clear that Mr. Owston could not solicit Rubicon's employees and contractors for a twenty-four (24) month period. Specifically, he could not:

> (i) entice, induce, encourage or solicit or attempt to entice, induce, encourage or solicit any Associate or Contractor then employed or engaged by any Rubicon Companies and with whom the Executive has or had work-related dealings or about which [Mr. Owston] has or had access to Confidential Information, to terminate such [Mr. Owston] or Associate's employment or engagement with a Rubicon Companies; or

> (ii) induce or attempt to induce any such individual to breach his or her agreement(s) with any Rubicon Companies.

Agreement at § 17.

161. Mr. Owston began working for WPC in July 2025, as a division president in a sector which he claimed was unrelated to Rubicon's business.

162. However, upon information and belief, Mr. Owston began working with WPC to create OneWaste, a new business for WPC which directly competed with Rubicon's business, in violation of the Agreement.

163. Upon information and belief, Mr. Owston misappropriated and/or disclosed Confidential Information in furtherance of WPC's ambitions of competing with Rubicon, including but not limited to his intimate knowledge of Rubicon's customer base and client contacts, along with the pricing models and service offerings needed to solicit them.

164. Upon information and belief, Mr. Owston solicited Mr. Malhotra because of his access to Confidential Information and for the purpose of designing and developing OneWaste, in direct violation of the Agreement.

165. Upon information and belief, Mr. Owston solicited Mr. Wall and Mr. Brown to terminate their employment with Rubicon and instead join WPC, in direct violation of the Agreement.

166. Upon information and belief, Mr. Wall and Mr. Brown now oversee certain waste audit programs at WPC, including new programs for Rubicon's former clients, such as Client 1.

167. Upon information and belief, Mr. Owston solicited business from Rubicon's former clients, such as Client 1, in direct violation of the Agreement.

168. Rubicon fulfilled all of its contractual obligations under the Agreement.

169. As part of the Agreement, Mr. Owston "agrees that any breach of this Agreement by Executive will cause Rubicon to suffer immediate and irreparable injury, for which there is no adequate remedy at law." Agreement at § 22.

170. The Agreement specifically states that the applicable restriction time periods are tolled during the continuation of Mr. Owston's breaches, and begin only when Mr. Owston is in compliance with the restrictions in the Agreement. Agreement at § 22.

171. Upon information and belief, Mr. Owston has and continues to violate the Agreement by providing WPC with the Confidential Information that he misappropriated from Rubicon.

172. Mr. Owston has and continues to violate the Agreement by working for WPC, a direct competitor to Rubicon, in a role that has similar responsibilities to his former role with Rubicon, by supervising WPC's employees in the production of services that are similar or

competitive to Rubicon's business, by developing and/or implementing strategies or methodologies related to services similar to or competitive with Rubicon's business, and by having responsibilities at WPC where Mr. Owston is likely to utilize or disclose Confidential Information.

173. Upon information and belief, Mr. Owston has and continues to violate the Agreement by soliciting or assisting WPC in soliciting Rubicon's current or former clients.

174. Upon information and belief, Mr. Owston has and continues to violate the Agreement by soliciting or assisting WPC in soliciting certain Rubicon employees.

175. Pursuant to the Agreement, Mr. Owston agreed that "any breach of this Agreement by [Mr. Owston] will cause Rubicon to suffer immediate and irreparable injury. . . ." *See* Agreement at §22.

176. Rubicon, therefore, is entitled to a temporary restraining order, preliminary injunction, and permanent injunction against Mr. Owston.

177. As a direct and proximate result of Mr. Owston's breaches, Rubicon has been damaged in the form of lost profits, lost business opportunities, lost employees, and other consequential and incidental damages in an amount to be proven at trial.

178. In addition to monetary damage, Rubicon also suffered and continues to suffer irreparable harm, including harm to its competitive position and reputation with prospective clients, for which there is no adequate remedy at law.

<u>**COUNT II**</u>

**VIOLATION OF THE FEDERAL DEFEND TRADE SECRET ACT**
**(18 U.S.C. § 1836 *et. seq*) (against Mr. Owston and WPC)**

179. Rubicon incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

180.    During his employment at Rubicon, Mr. Owston possessed and had access to Rubicon's Confidential Information and trade secrets, which he had an obligation to keep confidential and secret.

181.    Upon termination of his employment with Rubicon, Mr. Owston possessed and/or had access to extensive Confidential Information.

182.    Upon information and belief, Mr. Owston and WPC solicited Mr. Malhotra, Mr. Brown, and Mr. Wall to terminate their employment with Rubicon and join WPC, in part because they had access to extensive Confidential Information, including but not limited to detailed information on Rubicon's customers and its customer onboarding methodologies.

183.    Upon information and belief, Mr. Owston and WPC have misused and misappropriated the Confidential Information known to Mr. Owston, Mr. Malhotra, Mr. Brown, and Mr. Wall.

184.    Upon information and belief, Mr. Owston and WPC have and will continue to use Rubicon's Confidential Information for unlawful purposes, including but not limited to unfairly competing with Rubicon and the solicitation of its customers.

185.    Rubicon's Confidential Information qualifies as trade secrets under the Defend Trade Secrets Act ("DTSA").

186.    Rubicon's Confidential Information is not made available to the public and is carefully guarded by Rubicon for the purpose of maintaining a competitive advantage over Rubicon's competitors, such as WPC.

187.    WPC knows or should have known that Mr. Owston (and Mr. Malhotra, Mr. Brown, and Mr. Wall) had or has access to Confidential Information that he is obligated to refrain from disclosing or misappropriating.

188.   WPC and Mr. Owston have acquired and used Confidential Information through inappropriate and improper means, then used them to launch a business line to compete with Rubicon.

189.   WPC and Mr. Owston's misappropriation of the Confidential Information has a direct impact on interstate and/or foreign commerce, as the Confidential Information is related to services and products provided by Rubicon that are used in and intended for use in interstate commerce.

190.   The Confidential Information holds significant value to Rubicon and its competitors and is the result of substantial time, money, and effort. The Confidential Information is not easily acquired or duplicated by others but continues to be used and misappropriated by WPC and Mr. Owston.

191.   Rubicon's Confidential Information and trade secrets include, but are not limited to, its business plans, customer lists and contact information, proprietary customer onboarding methodologies, marketing strategies, pricing information, and other key information overseen by Owston in his role as CCO.

192.   Rubicon undertook reasonable measures to maintain the secrecy of its Confidential Information through confidentiality clauses in the Agreement, and through the use of non-disclosure agreements, passwords, and cybersecurity software.

193.   Unless enjoined, Mr. Owston and WPC will continue to use, divulge, acquire, and/or otherwise misappropriate Rubicon's Confidential Information.

194.   Mr. Owston's use, disclosure, or misappropriation of Confidential Information is inevitable in his present employment with WPC.

195.    WPC is already taking advantage of the Confidential Information known by Mr. Owston and the employees he oversaw at Rubicon, including using that information to solicit customers of Rubicon, such as Client 1.

196.    Pursuant to 18 U.S.C. § 1836, Rubicon is entitled to injunctive relief to prevent Mr. Owston and WPC from the continuing use and misappropriation of Rubicon's Confidential Information.

197.    Pursuant to the Agreement, Mr. Owston agreed that "any breach of this Agreement by [Mr. Owston] will cause Rubicon to suffer immediate and irreparable injury. . . ." *See* Agreement at §22.

198.    Mr. Owston agreed that Rubicon may seek injunctive relief against him to maintain or restore the status quo notwithstanding any arbitration provision. *See* Agreement at §38.8.

199.    Rubicon, therefore, is entitled to a temporary restraining order, preliminary injunction, and permanent injunction against Mr. Owston and WPC.

200.    Rubicon is also entitled to damages for the losses caused by the prior and continuing misappropriation of the Confidential Information pursuant to 18 U.S.C. § 1836.

201.    This includes, but is not limited to, the lost revenues that would have been obtained from Client 1 and other clients that were solicited using Confidential Information.

202.    Mr. Owston and WPC's actions are intentional, willful, outrageous, and malicious, justifying Rubicon's request for injunctive relief and actual and exemplary damages, including, but not limited to, attorneys' fees and costs.

## COUNT III

**VIOLATION OF THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT**
**(against Mr. Owston and WPC)**

203.    Rubicon incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

204.    Mr. Owston had access to Confidential Information and other trade secrets throughout his employment with Rubicon.

205.    Mr. Owston had a duty to maintain the confidentiality of the Confidential Information.

206.    Mr. Owston has acquired Confidential Information through inappropriate and improper means, including but not limited to the solicitation of Mr. Malhotra, Mr. Wall, and Mr. Brown, who also had access to Confidential Information.

207.    Upon information and belief, Mr. Owston received and continues to receive Confidential Information, which he uses to the detriment of Rubicon.

208.    Upon information and belief, when WPC hired Mr. Owston, it knew or should have known that Mr. Owston was in possession of Confidential Information and other trade secrets, which Mr. Owston had an obligation to refrain from disclosing.

209.    Upon information and belief, when WPC hired Mr. Malhotra, Mr. Brown, and Mr. Wall, it knew or should have known that they possessed Confidential Information and other trade secrets, which they had an obligation to refrain from disclosing.

210.    WPC has obtained Confidential Information and other trade secrets through inappropriate and improper means.

211.    Mr. Owston's use, disclosure, or misappropriation of Confidential Information is inevitable as a result of his current employment with WPC.

212.    WPC received and continues to receive Confidential Information and has used it to the detriment of Rubicon.

213.    Rubicon took reasonable measures to protect its Confidential Information from the public and competitors through the use of non-competition agreements and protective digital software.

214.    The Confidential Information derives its economic value specifically from its secrecy, and allows Rubicon to maintain a competitive edge over other companies in the industry.

215.    The Confidential Information is a trade secret under the Pennsylvania Uniform Trade Secrets Act, as defined at 12 Pa.C.S.A. § 5302, because it includes, *inter alia*, customer information and proprietary customer onboarding processes and methods, that derive its economic value from not being readily known to the others, and is not readily ascertainable by proper means by the others or by Rubicon's competitors, and Rubicon takes reasonable precautions and efforts to maintain the Confidential Information's secrecy.

216.    Misappropriation of Confidential Information causes Rubicon irreparable harm.

217.    Mr. Owston agreed that Confidential Information causes Rubicon irreparable harm. *See* Agreement at § 22.

218.    Rubicon reasonably assumed that Mr. Owston would honor his lawful and contractual obligations not to disclose the Confidential Information or otherwise breach the Agreement.

219.    As CCO, Mr. Owston obtained the Confidential Information while he was in a unique position of trust and confidence.

220.    Unless enjoined, Mr. Owston will continue to use, divulge, acquire, and/or otherwise misappropriate Rubicon's Confidential Information.

221.    Mr. Owston's use, disclosure, or misappropriation of Confidential Information is inevitable in his current employment with WPC.

222.    Rubicon is entitled to injunctive relief and monetary damages in an amount to be determined at trial. Rubicon seeks injunctive relief and monetary and economic damages provided by 12 Pa.C.S.A. § 5304.

223.    Mr. Owston and WPC's actions were and continue to be intentional, willful, outrageous, and malicious, justifying the imposition of injunctive relief and actual and exemplary damages, including attorneys' fees and costs, and punitive damages.

## COUNT IV

### VIOLATION OF THE GEORGIA TRADE SECRETS ACT
### (against Mr. Owston and WPC)

224.    Rubicon incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

225.    Mr. Owston had access to Confidential Information and other trade secrets throughout his employment with Rubicon.

226.    Mr. Owston had a duty to maintain the confidentiality of the Confidential Information.

227.    Mr. Owston has acquired Confidential Information through inappropriate and improper means, including but not limited to the solicitation of Mr. Malhotra, Mr. Wall and Mr. Brown, who also had access to Confidential Information.

228.    Upon information and belief, Mr. Owston received and continues to receive Confidential Information which he uses to the detriment of Rubicon.

229.    Upon information and belief, when WPC hired Mr. Owston, it knew or should have known that Mr. Owston was in possession of Confidential Information and other trade secrets, which Mr. Owston had an obligation to refrain from disclosing.

230.    Upon information and belief, when WPC hired Mr. Malhotra, Mr. Brown, and Mr. Wall, it knew or should have known that they possessed Confidential Information and other trade secrets, which they had an obligation to refrain from disclosing.

231.    WPC has obtained Confidential Information and other trade secrets through inappropriate and improper means.

232.    Mr. Owston's use, disclosure, or misappropriation of Confidential Information is inevitable as a result of his current employment with WPC.

233.    WPC received and continues to receive Confidential Information and has used it to the detriment of Rubicon.

234.    Rubicon took reasonable measures to protect its Confidential Information from the public and competitors through the use of non-competition agreements and protective digital software.

235.    The Confidential Information derives its economic value specifically from its secrecy, and allows Rubicon to maintain a competitive edge over other companies in the industry.

236.    The Confidential Information is a trade secret under the Georgia Trade Secrets Act, as defined at 12 Ga. Code Ann. § 10-1-761, because it includes, *inter alia*, customer information and proprietary customer onboarding procedures, that derive its economic value from not being readily known to the others, and is not readily ascertainable by proper means by the others or by Rubicon's competitors, and Rubicon takes reasonable precautions and efforts to keep the Confidential Information secretive.

237.    Misappropriation of Confidential Information causes Rubicon irreparable harm.

238.    Mr. Owston agreed that Confidential Information causes Rubicon irreparable harm. *See* Agreement at § 22.

239.    Rubicon reasonably assumed that Mr. Owston would honor his lawful and contractual obligations not to disclose the Confidential Information or otherwise breach the Agreement.

240.    As CCO, Mr. Owston obtained the Confidential Information while he was in a unique position of trust and confidence.

241.    Unless enjoined, Mr. Owston will continue to use, divulge, acquire, and/or otherwise misappropriate Rubicon's Confidential Information.

242.    Rubicon is entitled to injunctive relief and monetary damages in an amount to be determined at trial. Rubicon seeks injunctive relief and monetary and economic damages provided by Ga. Code Ann. §§ 10-1-762, 10-1-763.

243.    Mr. Owston and WPC's actions were and continue to be intentional, willful, outrageous, and malicious, justifying the imposition of injunctive relief and actual and exemplary damages, including attorneys' fees and costs, and punitive damages.

## COUNT V

### VIOLATION OF THE NEW JERSEY TRADE SECRETS ACT
### (against Mr. Owston and WPC)

244.    Rubicon incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

245.    Mr. Owston had access to Confidential Information and other trade secrets throughout his employment with Rubicon.

246.    Mr. Owston had a duty to maintain the confidentiality of the Confidential Information.

247. Mr. Owston has acquired Confidential Information through inappropriate and improper means, including but not limited to the solicitation of Mr. Malhotra, Mr. Wall and Mr. Brown, who also had access to Confidential Information.

248. Upon information and belief, Mr. Owston received and continues to receive Confidential Information which he uses to the detriment of Rubicon.

249. Upon information and belief, when WPC hired Mr. Owston, it knew or should have known that Mr. Owston was in possession of Confidential Information and other trade secrets, which Mr. Owston had an obligation to refrain from disclosing.

250. Upon information and belief, when WPC hired Mr. Malhotra, Mr. Brown and Mr. Wall, it knew or should have known that they possessed Confidential Information and other trade secrets, which they had an obligation to refrain from disclosing.

251. WPC has obtained Confidential Information and other trade secrets through inappropriate and improper means.

252. Mr. Owston's use, disclosure, or misappropriation of Confidential Information is inevitable as a result of his current employment with WPC.

253. WPC received and continues to receive Confidential Information and has used it to the detriment of Rubicon.

254. The Confidential Information derives its economic value specifically from its secrecy, which allows Rubicon to maintain a competitive edge over its competitors, such as WPC.

255. The Confidential Information is a trade secret under the New Jersey Trade Secrets Act ("NJTSA"), N.J.S.A. 56:15-1, et seq., because it is the product of substantial time, money, and effort. It is of value to Rubicon only when it is kept secret from the public and/or competitors, and Rubicon takes reasonable precautions and efforts to keep the Confidential Information secretive.

256. Misappropriation of Confidential Information causes Rubicon irreparable harm.

257. Rubicon is entitled to injunctive relief and monetary damages in an amount to be determined at trial, including those provided by N.J.S.A. 56:15-1 *et seq.*

258. Mr. Owston and WPC's actions were and continue to be intentional, willful, outrageous, and malicious, justifying the imposition of injunctive relief and actual and exemplary damages, including attorneys' fees and costs, and punitive damages.

## COUNT VI

### TORTIOUS INTERFERENCE WITH CONTRACT
### (against WPC)

259. Rubicon incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

260. The Agreement is a binding and enforceable contract between Mr. Owston and Rubicon.

261. The Agreement, among other things, required Mr. Owston not to disclose or otherwise misuse the Confidential Information, to not solicit certain Rubicon clients, to not solicit certain Rubicon employees, and to refrain from certain activities which are competitive to Rubicon's business.

262. As a c-suite executive at Rubicon, WPC knew or should have known that Mr. Owston had a contractual obligation to refrain from certain activities that could harm Rubicon.

263. WPC maliciously interfered with the contractual relationships between Mr. Owston and Rubicon, not only for its own profit, but to intentionally cause harm to its competitor, without justification.

264.    WPC's interference was without justification and improper under the circumstances, given its motives and the nature of its conduct.

265.    Upon information and belief, WPC encouraged, or caused Mr. Owston to violate the Agreement through engaging in prohibited competition, the solicitation of Rubicon's clients and employees, and through the disclosure or misappropriation of the Confidential Information.

266.    As a direct and proximate result of WPC's intentional and improper interference, WPC misappropriated the Confidential Information, stole Rubicon clients and customers, and also caused damages to Rubicon in the form of lost profits, lost business opportunities, and other consequential and incidental damages in an amount to be proven at trial.

267.    In addition to monetary damage, Rubicon is entitled to injunctive relief because it also suffered and continues to suffer irreparable harm, including harm to its competitive position and relationship with current or former clients, for which there is no adequate remedy at law absent equitable relief.

268.    WPC's actions were and continue to be intentional, willful, outrageous, and malicious, justifying the imposition of injunctive relief and punitive damages.

## COUNT VII
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (against WPC and Mr. Owston)

269.    Rubicon incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

270.    Rubicon had and has business relations with various clients, where Rubicon provides waste auditing services in exchange for payment.

271.    This business relationship is exemplified by Rubicon's long-standing service agreement with Client 1.

43

272.    Upon information and belief, WPC and Mr. Owston acted improperly and without privilege, to tortiously interfere with Rubicon's business relationships by inducing Rubicon's customers such as Client 1 to end their business relationship with Rubicon.

273.    As is the case with Client 1, WPC and Mr. Owston then enticed Rubicon's clients to work with WPC instead of Rubicon.

274.    The actions of WPC and Mr. Owston were intentional and malicious, and generated profits for WPC while also accomplishing the goal of harming its competitors.

275.    WPC is not a party to the Rubicon's business relationships or contracts with its clients, nor does WPC have any legitimate financial interest in such business relationships or contracts.

276.    As a direct and proximate result of WPC and Mr. Owston's intentional, malicious, and improper interference, the business relationships between Rubicon and its customers were terminated, damaging Rubicon in the form of lost profits, lost business opportunities, and other consequential and incidental damages in an amount to be proven at trial.

277.     In addition to monetary damages, Rubicon is entitled to injunctive relief because it also suffered and continues to suffer irreparable harm, including harm to its competitive position and reputation with clients, for which there is no adequate remedy at law absent equitable relief.

278.    Both WPC and Mr. Owston's actions were and continue to be intentional, willful, outrageous, and malicious, justifying the imposition of injunctive relief and actual and exemplary damages, including attorneys' fees and costs, and punitive damages.

**WHEREFORE**, Plaintiff Rubicon respectfully requests that this Court issue the following relief:

1.  Enter an order enjoining Mr. Owston from continued employment at WPC;

44

2. Enter an order enjoining WPC and Mr. Owston from:

   a. Using, possessing, or accessing any of Rubicon's Confidential Information; and

   b. Disclosing or transferring any of Rubicon's Confidential Information to anyone not authorized to receive such information.

3. Enter an order enjoining Mr. Owston from soliciting Rubicon's clients and employees in violation of the Agreement;

4. Enter an order enjoining WPC from causing Mr. Owston or other WPC employees to solicit Rubicon's clients and employees in violation of the Agreement;

5. Enter an order requiring WPC and Mr. Owston to return any and all Confidential Information that they possess or is within their custody or control to Rubicon;

6. Enter judgment against WPC and Mr. Owston in favor of Rubicon for compensatory damages in an amount to be determined at trial;

7. Enter judgment against WPC and Mr. Owston for punitive damages for their willful and malicious conduct in an amount to be determined at trial;

8. Award Rubicon its reasonable attorney fees, costs, and expenses incurred as a result of the breaches of the Agreement and violations of the Pennsylvania Uniform Trade Secret Act, Georgia Trade Secrets Act, New Jersey Trade Secrets Act, and the Defend Trade Secrets Act;

9. Rubicon seeks all of its pre- and post-judgment interest; and

10. Award Rubicon any such other relief as this Court deems just and proper under the circumstances.

*[signature page to follow]*

45

Respectfully submitted,

Mahendru, PC

By: /s/_____
    Ashish Mahendru (*pro hac vice* pending)
    Darren Braun (*pro hac vice* pending)
    639 Heights Blvd.
    Houston, Texas 77008
    P: (713) 571-1519

Dated: August 6, 2026    amahendru@thelitigationgroup.com
    dbraun@thelitigationgroup.com
    *Counsel for Plaintiff*
    *Pro hac vice forthcoming*


KANG HAGGERTY LLC

By: */s/ Kyle Garabedian*_____
    Kyle Garabedian
    Walter Bourdaghs
    123 S. Broad St., Suite 1950
    Philadelphia, PA 19109
    P: (215) 525-5850
    F: (215) 525-5860
    kgarabedian@kanghaggerty.com
    wbourdaghs@kanghaggerty.com
    *Counsel for Plaintiff*

## VERIFICATION

I, Michael Dulin, hereby certify that I am the CEO of Plaintiff named herein, and that I am authorized to make this verification on behalf of Rubicon Technologies, LLC. I verify that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief. I understand that this verification is made subject to the penalties of 18 Pa.C.S.A. §4909 relating to unsworn falsification to authorities.

Dated: 8/6/2026

5135227.1