# EXHIBIT A

# EMPLOYMENT AGREEMENT

This Employment Agreement (hereinafter the "***Agreement***") is made and entered into by and between Rubicon Technologies, LLC, a Delaware limited liability company (the "***Company***" or "***Rubicon***"), and Tom Owston ("***Executive***"), as March 26th, 2023 (the "***Effective Date***").

WITNESSETH:

WHEREAS, the Company and Executive each desire to execute an agreement setting forth the terms and conditions of Executive's employment by the Company;

WHEREAS, with respect to Executive's employment on or after the Effective Date, this Agreement shall supersede and extinguish that certain Employment Agreement, dated on or about August 12, 2020, between Company and Executive, including all subsequent amendments thereto (the "***Prior Employment Agreement***");

NOW, THEREFORE, for and in consideration of the premises, the mutual promises, covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Employment and Duties. The Company hereby employs Executive to serve as the Chief Commercial Officer to perform such duties and responsibilities as are customarily performed by persons acting in such capacity, and/or to serve in such other positions and to have such other duties and responsibilities as may be assigned to Executive from time to time by the Chief Executive Officer or a designee of the Chief Executive Officer.

2. Conflicting Employment. Executive shall devote substantially all his professional time and effort to the duties hereunder during the term of this Agreement. Executive agrees that, during his employment with Rubicon, Executive will not engage in any other employment, occupation, consulting, or other business activity directly related to the Business of Rubicon, nor will Executive engage in any activities that conflict with Executive's obligations to Rubicon.

Upon termination of Executive's employment for any reason, Executive will cease holding any office(s), position(s) or title(s) that he then holds with the Company or its subsidiaries, parent(s), or other affiliated entities that he then holds with the Company or its subsidiaries, parent(s), or other affiliated entities.

3. Term. The term of Executive's employment under this Agreement (the "***Term***") shall be deemed to have commenced as of the Effective Date and shall continue unless terminated in accordance with Paragraph 11 of this Agreement.

4. Compensation. For all services to be rendered by Executive for Rubicon during the Term, the Company shall pay Executive a base salary of Two Hundred Seventy-Five Thousand Dollars and Zero Cents ($275,000.00) per year (the "***Base Salary***"**),** less applicable deductions and withholdings, payable in substantially equal monthly or more frequent installments as is customary under the Company's normal payroll practices from time to time for its senior management employees. The Company shall review Executive's Base Salary no less frequently than annually and

may adjust Executive's Base Salary from time to time during the Term, at the Company's sole discretion, after taking into account such factors as the Company deems relevant including, without limitation, changes in the cost of living, Executive's performance, and the performance of the Company.

5. Annual Bonus; Restricted Stock Unit Awards. Executive shall be eligible for an annual cash bonus pursuant to the terms of the Incentive Program, or any successors thereto, based on achievement of the performance standards set forth under such plan(s), as determined by the Company in its sole discretion; provided that Executive's annual target bonus amount for 2023 and subsequent years will be fifty percent (50%) of Executive's Base Salary (the "***Bonus Percentage***"). Executive shall also be eligible for awards under Rubicon Global Holdings, LLC's incentive plans, or any successors thereto, based on the conditions set forth under such plans. In addition, each year of the Term, Executive will receive a grant of Restricted Stock Units ("***RSUs***") worth One Hundred Thirty-Seven Thousand Five Hundred Dollars and Zero Cents ($137,500.00) under the Rubicon Technologies, Inc. 2022 Equity Incentive Plan (the "***Plan***") subject to approval by the Compensation Committee of the Company's Board of Directors. During the first year of the Term, the grant of RSUs to Executive shall be calculated based on a dollar value of $1.75 per share and in subsequent years, the Company will have the sole discretion to determine the value of the RSUs granted to Executive. All grants of RSUs will be subject to the terms and conditions of the Plan's Grant Notice for Restricted Stock Unit Award (the "***Grant Notice***"), which Executive must execute at the time of each award in order to receive the RSUs. Each Grant Notice will be subject to the terms of the Plan in effect at the time of each granting. Notwithstanding the foregoing, upon a Sale Event or a Change in Control (each as defined below), all granted and then unvested RSUs shall automatically vest in full.

6. Retention Bonus. The Company has determined that certain key employees will be necessary to support a potential Change in Control or Sale Event. Accordingly, and subject to the terms and conditions below, Executive will be eligible to receive a "Retention Bonus" equal to two hundred percent (200%) of the Base Salary, which shall be payable two (2) years after the closing of any Sale Event or Change in Control, as applicable (the "***Retention Bonus***") provided that Executive remains employed on the two-year anniversary of the Change in Control or Sale Event. If the Company terminates Executive's employment without Cause or if Executive terminates his employment for Good Reason, before the Retention Bonus becomes due, Executive shall be entitled to a prorated Retention Bonus calculated by multiplying two hundred percent (200%) of Executive's Base Salary by a fraction, which numerator shall be the number of full months that Executive has worked since the close of the Sale Event or Change in Control, as applicable, and denominator shall be twenty-four (24), which shall be paid within thirty (30) days of Executive's termination. For the avoidance of doubt, Executive shall not be entitled to any portion of the Retention Bonus if the Company terminates Executive's employment for Cause or Executive terminates his employment without Good Reason before the two-year anniversary of a Change in Control or Sale Event. Executive shall only be eligible for one (1) Retention Bonus, no matter how many Sale Events or Changes in Control take place during the Term of this Agreement.

7. Expenses. So long as Executive is employed hereunder, Executive shall be entitled to receive reimbursement for, or seek payment directly by the Company of, all reasonable business expenses incurred by Executive in accordance with applicable policies, practices, and procedures of the Company.

8. Employee Benefits. So long as Executive is employed hereunder, Executive will be entitled to participate in the Company's employee benefit, bonus, and other such plans and programs (including but not limited to medical, disability, life insurance, and 401(k) plans) covering members of senior management of the Company and perquisites as may be offered by the Company from time to time, subject to the generally applicable eligibility and other provisions of such plans, programs, and arrangements as in effect from time to time.

9. Vacation. Executive shall be entitled to vacation annually in accordance with the Company's vacation policies applicable to members of senior management of the Company in effect at the time the vacation is to be taken.

10. Office. Executive's office shall be located in New York, New York, or such other location as may be agreed-to by the parties in writing.

11. Termination and Severance. Executive's employment with the Company may be terminated at any time by Company or Executive as follows:

(a) *Termination by the Company for Cause or by Executive other than for Good Reason*. If Executive's employment with the Company is terminated by the Company for Cause, Executive shall receive no further compensation other than Executive's Base Salary through the date of termination of Executive's employment and other compensation as accrued and payable through the date of such termination ("***Accrued Compensation***"). For clarification, Executive shall not be entitled to receive any annual cash bonus or other annual incentive award bonus for the applicable performance period if terminated for Cause, and any such bonus payments shall not be considered Accrued Compensation under these circumstances. If Executive terminates his employment other than for Good Reason, Executive shall provide the Company as much written notice as possible but in no event less than 30 days' notice, and Executive shall receive no further compensation other than any Accrued Compensation. Any Accrued Compensation that is payable shall be paid to Executive pursuant to the Company's normal payroll practices for its senior management employees unless otherwise required by applicable law. Any awards or benefits earned and payable to Executive shall be paid pursuant to the Company's normal practices, or as otherwise provided by applicable law and/or the terms of the plan or policy pursuant to which such award and benefits are paid.

(b) *Termination by the Company other than for Cause or by Executive for Good Reason.* In the event that Executive's employment with the Company is terminated by the Company other than for Cause or by Executive for Good Reason, Executive shall receive: (1) all Accrued Compensation as of Executive's termination date and any other awards or benefits payable to Executive pursuant to the terms of any then-existing plan or policy of the Company; and (2) provided that Executive executes and does not revoke, within any legally required period beginning on the date of Executive's execution, a confidential general release and separation agreement in a form satisfactory to the Company, the following:

i. A prorated bonus amount for the annual performance period up to and including the Executive's termination date. For purposes of this prorated bonus, the Executive shall be presumed to have achieved his individual goals for the year and any payouts for this metric shall be at 100%. The prorated bonus shall be subject to a final determination of the Company's performance and the final payout percentage for this metric. Any such pro rata bonus amount shall be paid in equal

installments pursuant to the Company's regular payroll schedule beginning after the Company makes a final determination of the Company's performance and the final payout percentage for this metric and concluding twelve (12) months after the first payment is made and shall not be subject to any mitigation requirement *(i.e.,* such amounts shall be payable irrespective of whether or not Executive obtains subsequent employment);

ii. A severance payment equal to twelve (12) months of the Executive's Base Salary then in effect, subject to standard deductions and withholdings, to be paid out over a period of twelve (12) months in equal installments pursuant to the Company's regular payroll schedule beginning twenty-one (21) days after Executive signs (and does not revoke) the confidential general release and separation agreement and shall not be subject to any mitigation requirement *(i.e.*, such amounts shall be payable irrespective of whether or not Executive obtains subsequent employment);

iii. Reimbursement by the Company of Executive's COBRA premiums, if any, at the coverage levels in effect immediately prior to the date Executive terminates employment until the end of the twelfth (12th) month following the termination of employment date (the "***COBRA Premium Payments***"); provided, however, that Executive expressly agrees to notify the CEO of the Company within five (5) calendar days of obtaining new employment, which will terminate the Company's obligation to make any remaining COBRA Premium Payments; and

iv. The cost of outplacement services through one or more outside firms of the Executive's choosing up to an aggregate of $7,500, with such services to extend until the first to occur of (1) six (6) months following the termination of Executive's employment, or (2) the date the Executive secures full time employment.

(c) *Disability*. In the event of (1) termination of Executive's employment following Disability, and (2) with respect to the benefits under clause (ii) following, Executive executes and does not revoke, within any legally required period beginning on the date of Executive's execution, a confidential general release and separation agreement in a form satisfactory to the Company, Executive shall be entitled to the following:

i. All Accrued Compensation as of Executive's termination date and any other awards or benefits payable to Executive pursuant to the terms of any then-existing plan or policy of the Company; and

ii. Continuation of his Base Salary then in effect for a period of six (6) months following Executive's termination date, which amount shall be paid in equal monthly or more frequent installments as is customary under the Company's normal payroll practices for its senior management employees.

(d) *Death*. In the event of termination of Executive's employment upon Executive's death during the Term, the following shall be paid to Executive's estate: all Accrued Compensation as of Executive's date of death, and any other awards or benefits earned and payable pursuant to the terms of any then-existing plan or policy of the Company.

12. Representations and Acknowledgments.

(a) *Protection of Legitimate Interests*. Executive acknowledges and agrees that, in Executive's position with Rubicon, Executive will be responsible for: (i) actively conducting Rubicon's business, (ii) overseeing Rubicon's activities, (iii) developing and implementing strategies on behalf of Rubicon, and (iv) affecting customers everywhere that Rubicon conducts the lines of business within Executive's areas of responsibilities. Accordingly, Executive acknowledges and agrees that the promises set forth in this Agreement are intended to protect Rubicon's legitimate interests, including its Confidential Information, business relationships, goodwill, and workforce, and that the terms of this Agreement (i) are reasonable and necessary to protect Rubicon's legitimate interests; (ii) will not prevent Executive from earning or seeking a livelihood; and (iii) shall apply wherever permitted by law. Executive further recognizes that, given Rubicon's providing Executive with access to its Confidential Information and its longstanding customer relationships, Executive possesses information allowing him to unfairly convert Rubicon's business, customer accounts, vendor relationships and goodwill of customers, vendors and employees for use by Executive and other persons or entities in competition with Rubicon, and that this would cause Rubicon to suffer immediate and irreparable injury, for which monetary damages will not be sufficient to make Rubicon whole.

(b) *No Other Agreement or Understanding*. Executive represents and warrants that Executive is not a party to any agreement or understanding that would impair Executive's ability to enter into this Agreement or otherwise preclude or restrict Executive's employment with Rubicon, and that Executive's execution of this Agreement and employment with Rubicon will not violate any other agreement or understanding to which Executive is bound.

(c) *Survival*. If, after executing this Agreement, Executive: (i) is promoted to, assigned to, or otherwise assumes one or more positions or functions other than or in addition to Executive's position or functions at the time Executive signed this Agreement, regardless of title, or (ii) is transferred or assigned to or otherwise works for any affiliate, subsidiary or other division or business unit of Rubicon, the terms of this Agreement shall continue to apply with full force and effect. Executive acknowledges and understands that unless and until a subsequent written Agreement is signed by all parties to this Agreement that expressly supersedes this Agreement, this Agreement will continue in full force and effect. Executive understands and agrees that the obligations and restrictions imposed under this Agreement shall apply after the termination of employment, regardless of whether such termination is voluntary or involuntary, or is with or without cause or notice.

13. Non-Disclosure of Confidential Information. At no time, either during or after the termination of employment, shall Executive directly or indirectly obtain, disclose or use for Executive or any Person, or aid others in obtaining, disclosing or using any Confidential Information of Rubicon, other than as may be required in the performance of duties for and as authorized by Rubicon. All Confidential Information is and shall remain the sole property of Rubicon. Notwithstanding anything to the contrary, this Agreement shall not prevent Executive from revealing evidence of criminal wrongdoing to law enforcement or prohibit Executive from divulging Confidential Information by order of court or agency of competent jurisdiction, or from making other disclosures that are protected under the provisions of law or regulation and/or as provided in Paragraph 34. Nothing in this Agreement prohibits Executive from reporting possible violations of law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities

and Exchange Commission, the Congress, and any Inspector General, or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation. Executive further acknowledges and agrees that Rubicon has provided Executive with written notice that the Defend Trade Secrets Act, 18 U.S.C. § 1833(b), provides an immunity for the disclosure of a trade secret to report suspected violations of law and/or in an anti-retaliation lawsuit. Pursuant to the Defend Trade Secrets Act, Employee understands that: An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade secrets to the attorney and use the trade secret information in the court proceeding if the individual: (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

14. Return of Rubicon Property and Confidential Information. Executive acknowledges and agrees that Executive has no expectation of privacy with respect to Rubicon's telecommunications, networking, or information processing systems (including, without limitation, stored company files, e-mail messages, and voice messages) and that Executive's activity and any files or messages on or using any of those systems may be monitored at any time without notice. Executive further acknowledges and agrees that all records, files, customer order guides, pricelists, photo/videographic materials, computers, and computer related equipment *(e.g.,* hardware, software, disks, electronic storage devices, etc.), cell phones, smart phones, Blackberries, personal data assistants, keys, equipment, access cards, passwords, access codes, badges, credit cards or other tangible material, and all other documents, including but not limited to Confidential Information, that Executive receives, acquires, produces or has access to as a result of his employment with Rubicon (regardless of the medium in which any information is stored) (collectively "Property"), are the exclusive property of Rubicon. Upon request of the Company, and in any event, upon the termination of Executive's employment with the Company, Executive shall return to Rubicon all Property of Rubicon and all copies thereof in Executive's possession or control, in all formats (whether tangible, electronic, or otherwise), including all Confidential Information, documents, copies, recordings of any kind, papers, computers and computer equipment, mobile devices, external storage devices, smart phones, tablets, USB devices, computer records or programs, electronic files, drawings, manuals, letters, notes, notebooks, reports, formulae, memoranda, client lists, keys, passwords, login credentials, and other material in Executive's possession or under Executive's control that relate to the business of Rubicon and that Executive obtained in connection with employment with any Rubicon Companies. Executive will not copy, delete, or alter any information contained upon Executive's Rubicon computer or Rubicon equipment before Executive returns it to Rubicon. Without limiting the foregoing, Executive agrees to provide Rubicon with access to any of Executive's personal electronic devices, including computers and computer equipment, mobile devices, external storage devices, smart phones, tablets, and USB devices, that contain any Rubicon Property to remove said property and/or investigate suspected misappropriation of said property at time of termination and it is the Executive's express obligation to provide Rubicon access to such personal electronic devices to accomplish the same.

15. Noncompetition. In exchange for salary and benefit increases and because of the Company's legitimate business interest in protecting its trade secrets and Confidential Information and without limiting Executive's obligations under Paragraph 2 of this Agreement, during the Restricted

Period, Executive shall not, within the Restricted Area, on Executive's own behalf or on behalf of any other Person:

(a) own, operate, or control any Competitor other than as a passive owner of not more than five percent (5%) of the outstanding stock of any class of a corporation, provided that Executive has no active participation in the business of such corporation; or

(b) hold any position for a Competitor or engage in any activities for a Competitor as an employee, agent, consultant, independent contractor, or in any other capacity if such position or activities involve: (i) responsibilities similar to responsibilities Executive had or performed for any Rubicon Companies in connection with the Business of Rubicon during the Pre-Termination Period; (ii) supervision of employees or other personnel in the provision of services that are similar to or competitive with those offered or provided by the Rubicon Companies in connection with the Business of Rubicon during the Pre-Termination Period; (iii) development or implementation of strategies or methodologies related to the provision of services similar to or competitive with the services offered or provided by the Rubicon Companies in connection with the Business of Rubicon during the Pre-Termination Period; or (iv) responsibilities in which Executive would utilize or disclose Confidential Information.

16. Non-Solicitation of Restricted Customers. In exchange for salary and benefit increases and because of the Company's legitimate business interest in protecting its substantial relationships with prospective or existing customers, vendors, and/or clients, during the Restricted Period, Executive shall not, within the Restricted Area, directly or indirectly (for Executive or any other Person, whether as an employee, owner, consultant, independent contractor, or in any other capacity) solicit, market, service, contact, sell to or attempt to sell to any of the below Person(s) for the purpose of providing products or services competitive with those conducted, authorized, offered or provided by the Rubicon Companies in connection with the Business of Rubicon:

(a) Any Persons with whom or which employee dealt on behalf of the Rubicon Companies during the Pre-Termination Period;

(b) Any Persons whose dealings with the Rubicon Companies were coordinated or supervised by Executive during the Pre-Termination Period;

(c) Any Persons about whom Executive obtained Confidential Information during the Pre-Termination Period; and

(d) Any Persons who received products or services authorized by a Rubicon Companies, the sale or provision of which results or resulted in compensation, commissions, or earnings for Executive during the Pre-Termination Period.

17. Non-Solicitation of Company Employees and Contractors. In exchange for salary and benefit increases, during the Restricted Period, Executive shall not, directly or indirectly, for Executive or any other Person, whether as an employee, owner, consultant, independent contractor, or in any other capacity: (i) entice, induce, encourage or solicit or attempt to entice, induce, encourage or solicit any Associate or Contractor then employed or engaged by any Rubicon Companies and with whom the Executive has or had work-related dealings or about which Executive has or had access to

Confidential Information, to terminate such Executive or Associate's employment or engagement with a Rubicon Companies; or (ii) induce or attempt to induce any such individual to breach his or her agreement(s) with any Rubicon Companies. Notwithstanding the above, this provision is not intended to restrict communications addressed to the general public, such as advertising to fill open positions.

18. Non-Disparagement and Non-Interference. Executive covenants and agrees, except as inconsistent with Paragraph 34, not to make any negative statements or to take any action which disparages or criticizes the Company, including its officers, directors, management, Executives, suppliers, products and services. Executive understands and agrees that this restriction prohibits Executive from making disparaging or defamatory remarks toward or complaints about the Company, its officers, board, board of advisors, management, Executives, suppliers, or products in their capacities as such (1) to any member of the general public, including, but not limited to, any customer or vendor of the Company; or (2) to any current or former officer, manager or Executive of any of the Company; or (3) to any member of the press or other media. If Executive receives a subpoena or other legal document concerning Executive's employment with the Company, then, to the extent permitted by law and provided it is consistent with Paragraph 34 of this Agreement, Executive agrees to notify the Chief Executive Officer within ten (10) business days of receipt of the legal document requiring Executive to provide this information and to make reasonable efforts to produce documents subject to confidentiality and/or protective order(s).

Nothing in this Agreement is intended to or does in any way: (i) prevent Executive from discussing or disclosing information about sexual harassment and sexual assault; (ii) waive any rights which cannot be waived by agreement; or (iii) prevent Executive from otherwise disclosing information as permitted or required by law.

19. Certification and Exit Interview Requirement. Executive agrees that, upon Rubicon's request, at any time during Executive's employment and thereafter for twelve (12) months following the termination of Executive's employment with Rubicon, Executive shall certify Executive's compliance with the obligations contained in this Agreement by submitting to Rubicon a statement under penalty of perjury stating that Executive has fully complied and continues to comply with the restrictions contained in this Agreement. Executive shall describe in detail any breaches of this Agreement in the statement. Executive also agrees to be available for an exit interview with a designated Rubicon representative to answer questions regarding Executive's departure. Executive also agrees to execute an exit interview certification affirming Executive's compliance with his obligations in this Agreement.

20. Ownership of Inventions.

(a) Executive shall disclose all Inventions promptly and fully to Rubicon.

(b) Except as excluded in Paragraph 20(e) below, Executive hereby assigns to Rubicon all of Executive's right, title, and interest in and to all Inventions and agrees that all such Inventions shall be Rubicon's sole and exclusive property to the maximum extent permitted by law.

(c) Executive shall at the request of Rubicon (but without additional compensation from Rubicon): (i) execute any and all papers and perform all lawful acts that Rubicon deems necessary for the preparation, filing, prosecution, and maintenance of applications for United States

patents or copyrights and foreign patents or copyrights on any Inventions, (ii) execute such instruments as are necessary to assign to Rubicon or to Rubicon's nominee, all of Executive's right, title, and interest in any Inventions so as to establish or perfect in Rubicon or in Rubicon's nominee, the entire right, title, and interest in such Inventions, and (iii) execute any instruments necessary or that Rubicon may deem desirable to confirm, perfect, record, protect, register or enforce Rubicon's rights in any Inventions, including in connection with any continuation, renewal, or reissue of any patents in any Inventions, renewal of any copyright registrations for any Inventions, or in the conduct of any proceedings or litigation relating to any Inventions. All expenses incurred by the Executive by reason of the performance of any of the obligations set forth in this Paragraph 20(c) shall be borne by Rubicon.

(d) Concurrent with Executive's execution of this Agreement, Executive lists and provides a brief description below of all unpatented inventions and discoveries, if any, made or conceived by Executive prior to the Effective Date that are to be excluded from this Agreement. If no such list is provided below at the time of execution of this Agreement, it shall be conclusively presumed that Executive has waived any right Executive may have to any such invention or discovery which relates to Rubicon's business.

LIST ANY EXCEPTIONS:

________________________________________________
________________________________________________
________________________________________________

(e) Provisions (a) through (d) of this Paragraph 20 regarding assignment of right, title, and interest do not apply to Inventions for which assignment is prohibited under state law in the state where Executive is employed.

21. <u>Notification</u>. If, within the one (1) year after the termination of Executive's employment, the Executive provides services as an employee, independent contractor or consultant, owner, or in any other capacity, whether or not for compensation, to any Person, then Executive shall promptly provide Rubicon with the following information about such Person: the name, address, and telephone number of the location to which Executive is assigned, and his or her job title. Executive shall promptly provide any such Person with a copy of this Agreement, and Executive consents to Rubicon's right, at any time, to notify such Person of this Agreement, as well as the details of any alleged violations thereof. Executive further consents to notification by Rubicon to Executive's subsequent employer or other third party of Executive's obligations under this Agreement.

22. <u>Remedies for Breach</u>. Executive agrees that any breach of this Agreement by Executive will cause Rubicon to suffer immediate and irreparable injury, for which there is no adequate remedy at law. In the event of a breach or threatened breach of any of the terms of this Agreement, Rubicon's remedies for breach of the Agreement shall be cumulative, the pursuit of one remedy shall not be deemed to exclude any other remedies, and the running of the period of the restrictions set forth in this Agreement shall be tolled during the continuation of any such breach by Executive and the running of the period of such restrictions shall commence only upon compliance by Executive with the restrictions in this Agreement. Executive further agrees that, in the event of a breach or threatened breach of any of the terms of this Agreement, Rubicon shall be entitled to seek and obtain enforcement

of this Agreement by means of a decree of specific performance, a temporary restraining order, a preliminary or permanent injunction, and any other remedies at law or equity which may be available. Executive shall reimburse Rubicon for all reasonable attorneys' fees and costs incurred by Rubicon in enforcing this Agreement.

23. Other Agreements. In the event Executive executed other written agreements relating to this subject matter with Rubicon, and/or in the event Executive enters into other written agreements that contain provisions similar to the provisions contained herein, all such provisions shall be interpreted to provide Rubicon with cumulative rights and remedies and the benefits and protections provided to Rubicon under each such agreement shall be given full force and effect. Without limitation of the foregoing, Executive expressly acknowledges and agrees that any previous arbitration, non-disclosure, or non-disparagement agreements between Executive and Rubicon, including, without limitation, Executive's obligations under that certain Confidential Release Agreement (including all exhibits thereto), dated on or about February 17, 2023, between Company and Executive (including any subsequent amendments thereto) (the "***Release***") and the Rubicon Global Holdings, LLC Profit Participation Plan and any Incentive Unit Award Agreement, shall remain in full force and effect notwithstanding this Agreement (the "***Other Agreements***").

24. Successors and Assigns. Executive expressly agrees that this Agreement, including the rights and obligations hereunder, may be transferred and/or assigned by Rubicon without the further consent of Executive, and that this Agreement is for the benefit of and may be enforced by Rubicon, its present and future successors, assigns, subsidiaries, affiliates, and purchasers, but is not assignable by Executive.

25. Third Party Beneficiaries. This Agreement is intended to benefit each and every entity in the Rubicon Companies and any successors or assigns of Rubicon for which Executive performs services, for which Executive has customer contact, or about which Executive receives Confidential Information and may be enforced by any such entity. Executive agrees and intends to create a direct, consequential benefit to the Rubicon Companies regardless of the Rubicon Companies Company with which Executive is affiliated.

26. Construction of Covenants. The covenants contained herein shall be presumed to be enforceable, and any reading causing unenforceability shall yield to a construction permitting enforcement. If a court finds that any provision in this Agreement is overly broad such that it is unenforceable under applicable state law, the court may modify that provision to narrow its scope to the extent necessary to render it enforceable.

27. Code Section 409A. Certain compensation and benefits payable under this Agreement are intended to be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and regulations and other official guidance thereunder ("Code Section 409A" including without limitation applicable exclusions first for short-term deferrals and then for separation pay arrangements), and any other compensation and payments are intended to comply with Code Section 409A. The provisions of this Agreement shall be construed and interpreted in a manner that compensation and benefits are either exempt from or compliant with the application of Code Section 409A, and which does not result in additional tax or interest to Executive under Code Section 409A; provided, however, the Company shall not have any liability to reimburse Executive for any liabilities under Code Section 409A.

Notwithstanding any other provision of this Agreement to the contrary, if upon Executive's termination of employment Executive is a specified employee, as defined in Code Section 409A(a)(2)(B), and if any portion of the payments or benefits to be received by Executive upon separation from service would be considered deferred compensation under Code Section 409A, then such payments shall be delayed until the earliest of (a) the date that is at least six months after Executive terminates employment for reasons other than Executive's death, (b) the date of Executive's death, or (c) any earlier specified date that does not result in additional tax or interest to Executive under Code Section 409A. As soon as practicable after the expiration of such period, the entire amount of the delayed payments shall be paid to Executive in a single lump sum.

For purposes of this Agreement, references to a termination of employment shall be construed consistently with the definition of a "separation from service" under Code Section 409A and each payment under this Agreement shall be treated as a separate payment. With respect to any taxable reimbursements or in-kind benefits provided for under this Agreement or otherwise payable to Executive, the Company (a) shall make all such reimbursements no later than Executive's taxable year following the taxable year in which the expense was incurred, (b) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during any calendar year shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year, and (c) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for other benefits. Each payment and benefit payable under this Agreement is intended to constitute separate payments for purposes of Section l.409A-2(b)(2) of the Treasury Regulations.

28. Code Section 280G. In the event amounts payable hereunder are contingent on a change in control for purposes of Code Section 280G and it is determined by a tax practitioner retained by the Company that any payments made or provided to the Executive in connection with this Agreement or otherwise ("***Total Payments***") would be subject to the excise tax under Code Section 4999 (the "***Parachute Tax***"), such payments otherwise to be paid under this Plan will be payable in full or, if applicable, in such lesser amount which would result in no portion of the Total Payments being subject to the Parachute Tax, whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the Parachute Tax, results in the receipt by the Executive, on an after-tax basis, of the greatest amount of Total Payments. The reporting and payment of any Parachute Tax will be the responsibility of the Executive and neither the Company nor any other member of Rubicon will provide a gross-up or any other payment to compensate the Executive for the payment of the Parachute Tax. The Company will withhold from such payments any amounts it reasonably determines is required under Code Section 4999(c).

29. Confidentiality of Agreement. Other than with respect to information required to be disclosed by applicable law and/or as required under Paragraphs 18 and 34, Executive agrees not to disclose the terms of this Agreement to any individual or entity unless prohibited by applicable law; provided Executive may disclose this Agreement and/or any of its terms to Executive's spouse, financial advisors and attorneys, so long as each individual to whom Executive makes such disclosure agrees not to disclose the terms of this Agreement further. Notwithstanding any provision to the contrary, nothing in this Agreement is intended to or does in any way: (i) prevent Executive from discussing or disclosing information about sexual harassment or sexual assault; (ii) waive any rights which cannot be waived by agreement; or (iii) prevent Executive from otherwise disclosing information as permitted or required by law.

30. Notices. All notices, requests, demands and other communications required or permitted hereunder shall be in writing and be deemed to have been duly given if delivered or three days after mailing if mailed, first class, certified mail, postage prepaid:

To the Company:

Rubicon Technologies, LLC
950 East Paces Ferry Road NE
Atlanta, Georgia 30326
Attn: Chief Executive Officer

To the Executive:

Tom Owston
409 McClenaghan
Wynnewood, Pennsylvania 19096

Any party may change the address to which notices, requests, demands and other communications shall be delivered or mailed by giving notice thereof to the other party in the same manner provided herein.

31. Non-Impairment of Statutory and Common Law. Nothing in this Agreement shall relieve Executive of any duties or obligations Executive has to Rubicon under statutory or common law, which include but are not limited to: fiduciary duties, the duty of loyalty, the duty not to tortiously interfere with business relationships, the duty not to engage in unfair competition, and the duty not to misappropriate any Company trade secrets.

32. Entire Agreement; Reasonable and Necessary; Severability; Enforceability; Non-Waiver. This Agreement, the Release, and the Other Agreements as defined in Paragraph 23 above constitute the entire agreement between Executive and the Company regarding the terms of Executive's employment with the Company and the termination thereof and supersedes any other prior written or oral understandings. The terms and provisions of this Agreement are severable and if any term or provision is held to be unenforceable, it shall be enforced to the maximum extent allowable under the law and reformed or severed to the minimum extent necessary to render it or the Agreement enforceable. Any such alteration shall not affect the validity and enforceability of any other term or provision. Executive acknowledges that the obligations contained in this Agreement are not indivisible to any extent but are fully divisible and reformable or severable as legally necessary whether through alteration of a word, clause, or sentence. Rubicon's failure to act upon any breach of this Agreement or waiver of any such breach shall not constitute a waiver of any preceding or succeeding breach, or of any other right. Notwithstanding any other clauses to the contrary in this Agreement, both parties agree as of the Effective Date, the Executive does not have Good Reason to terminate this Agreement. Nothing in this clause is intended to waive Executive's right to recover, or for Company to pay Executive, compensation due as of the Effective Date (i.e., annual compensation, annual bonus, equity awards, etc.) or reimbursement of reasonable business expenses incurred prior to the Effective Date. For the avoidance of doubt, the Prior Employment Agreement shall be superseded and extinguished by this Agreement, including but not limited to all terms in the Prior Employment Agreement relating to any Special Bonus.

33. Cooperation. During the Term of this Agreement and while employed by the Company and after his termination for any reason, Executive agrees to be reasonably available to the Company to respond to reasonable requests by the Company for information pertaining to or relating to the Company and/or any of the Rubicon Companies or any of their agents, officers, directors, managers, executives, or employees which may be within the knowledge of Executive. Executive will cooperate fully with the Company in connection with any and all existing or future depositions, litigations and/or investigations (including internal investigations) brought by or against the Company or any of the Rubicon Companies or any of their agents, officers, directors, managers, executives or employees, whether administrative, civil or criminal in nature, in which and to the extent the Company, in its sole discretion, deems Executive's cooperation necessary. This cooperation may include without limitation making himself available to participate in any proceeding, inquiry, and/or investigation involving the Company and/or any of the Rubicon Companies, allowing himself to be interviewed by representatives of the Company and/or any of the Rubicon Companies, participating as requested in interviews and/or preparation by the Company and/or any of the Rubicon Companies of other witnesses, appearing for depositions and testimony without requiring a subpoena, and producing and/or providing any documents and/or information. Executive also understands and agrees to provide only honest, accurate, and complete information in connection with any and all existing or future depositions, litigations and/or investigations (including internal investigations) brought by or against the Company or any of the Rubicon Companies in which and to the extent the Company deems Executive's cooperation necessary. Executive also represents and agrees that he has not and will not withhold, tamper with or fail to communicate relevant information and will provide and maintain all relevant information as directed by the Company and/or any of the Rubicon Companies. Executive hereby further agrees to execute all documents and take such other actions as the Company may reasonably request in order to accomplish the purposes of this Agreement. The Company will reimburse Executive for reasonable out-of-pocket expenses incurred as a result of such cooperation (this does not include an hourly fee), provided that Executive comply with all Company policies and/or directions for submission of expense reimbursement requests. The prior sentence is not intended to affect the substance of any testimony or cooperation that Executive provides.

34. Cooperation with Government Agencies and Regulatory Organizations. Nothing in this Agreement (or any other policy, plan, or program of the Company) is intended to, or shall be deemed to, prohibit or restrict Executive in any way from communicating directly with, reporting to, cooperating with, responding to any inquiry from, or providing testimony before, the Securities and Exchange Commission, FINRA, or any other self-regulatory organization, or any other federal or state regulatory authority, or governmental agency or entity, regarding any possible securities violation or other possible violation of law or this Agreement or its underlying facts and circumstances. In addition, nothing in this Agreement is intended, or shall be deemed, to interfere with Executive's ability to file a charge or complaint with the Equal Employment Opportunity Commission or any other federal, state, or local government agency or commission, including those agencies responsible for enforcing equal opportunity laws or limit Executive's ability to participate in any investigation or proceeding conducted by any such agency or commission. Moreover, Executive is not required to provide advance notice to, or have prior authorization from, the Company in order to engage in any of the foregoing activity referenced in this Paragraph. Without prior authorization of the Chief Executive Officer of the Company, however, the Company does not authorize Executive to disclose to any third party (including any government official or any attorney Executive may retain) any communication that is covered by the Company's attorney-client or other privilege.

35. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same agreement. The exchange of a fully-executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement. A facsimile or scanned (e.g., .PDF, etc.) signature shall be deemed to be an original.

36. Headings. The paragraph headings in this Agreement are inserted for convenience of reference only and shall not constitute a part hereof or affect the interpretation hereof.

37. Governing Law. This Agreement shall be governed, construed, and interpreted under and in accordance with the laws of the State of Georgia, without regard to any conflict of laws principles that would direct the application of another jurisdiction's laws.

38. Mandatory Binding Arbitration.

38.1 Mandatory Arbitration of All Disputes. This Paragraph 38 shall be governed by and interpreted in accordance with the Federal Arbitration Act (the "***FAA***"). Executive and the Company agree that any controversy, claim, or dispute between or among them that cannot be resolved shall be adjudicated exclusively by final and binding individual arbitration in Atlanta, Georgia or another agreed-upon location. The parties agree that the American Arbitration Association (the "***AAA***") shall be the exclusive provider for all arbitrations, and Executive and the Company agree not to file, institute, or maintain any arbitration other than with the AAA. The arbitration will be governed by the AAA Employment Arbitration Rules and Mediation Procedures (available at www.adr.org/employment) and subject to the AAA Employment Due Process Protocol, if applicable, except as they are modified by the parties. Unless otherwise agreed by the parties, the arbitration will be submitted to a single arbitrator selected in accordance with AAA rules. The arbitrator must follow applicable law and may award only those remedies (including, without limitation, attorney's fees and costs) that would have been available had the claim(s) been heard in court. In addition, the arbitrator is required to issue a written arbitration award setting forth the essential findings and conclusions on which any award is based. The Company will pay all arbitration administrative fees (including filing fees), the arbitrator's fees and costs, and any other fees or costs unique to arbitration. Each party shall be responsible for paying his/its own litigation costs for the arbitration, including, but not limited to, attorneys' fees, witness fees, transcript fees, or other litigation expenses that each party would otherwise be required to bear in a court action, subject to any relief awarded by the arbitrator in accordance with applicable law.

38.2 Covered Disputes. Except as expressly set forth below, the foregoing shall apply to the following "***Covered Disputes***": (i) the Release and all other disputes and claims of any nature that Executive may have against the Releasees, including any and all statutory, contractual, and common law claims unless prohibited by applicable law; (ii) all disputes and claims of any nature that the Company may have against Executive and that Executive may have against the Company; (iii) all disputes and claims related to any breach of this Agreement; (iv) all disputes and claims concerning the validity and/or enforceability of the Agreement; and (v) all disputes concerning the validity, enforceability, or the applicability of this Paragraph 38 to any dispute or claim. The term "Covered Disputes" does not include, and this Paragraph 38 does not apply to: (a) claims seeking unemployment insurance benefits, state disability insurance benefits, or workers' compensation benefits, except that

claims for retaliation pursuant to these laws shall be subject to arbitration under this Paragraph 38; (b) claims for benefits under ERISA, which must be resolved in accordance with the terms and procedures set forth in the applicable plan documents; (c) Sarbanes-Oxley Act, Consumer Financial Protection Bureau, and Commodity Futures Trading Commission whistleblower claims; or (d) any other claims that are not permitted to be subject to a pre-dispute arbitration agreement under applicable federal law and/or federal regulation.

38.3 Delegation. The arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of this Paragraph 38 and/or to the arbitrability of any claim or counterclaim.

38.4 Charges/Complaints with Government Agencies. Nothing in this Paragraph 38 affects Executive's right to file a charge with, make a complaint to, or participate in an investigation or other proceeding of the EEOC (or any similar state or local bodies), the National Labor Relations Board, or any other administrative, law enforcement, or regulatory body. Notwithstanding the foregoing, Executive may seek monetary relief with respect to a dispute or claim covered by this Paragraph 38 only through an arbitration conducted pursuant to this Agreement.

38.5 Enforcement of Arbitration Award. Either party may bring an action in any court of competent jurisdiction to compel arbitration under this Paragraph 38 and to enforce an arbitration award.

38.6 Waiver of Class, Collective, and Representative Actions. To the extent permitted by law, Executive and the Releasees waive any right or authority to have any Covered Disputes heard as a class, collective, or representative action. Executive and the Releasees must bring any Covered Dispute in an individual capacity, and not as a plaintiff, "opt-in", or class member in any purported class, collective, or representative proceeding. The arbitrator may not join or adjudicate the claims or interests of any other person or employee in the arbitration proceeding, nor may the arbitrator otherwise order any consolidation of actions or arbitrations or any class, collective, or representative arbitration.

38.7 Confidentiality of Proceedings. Executive and the Company agree that the resolution of Covered Disputes likely would involve information that each considers to be sensitive, personal, confidential, and/or proprietary and that Executive and the Releasees intend to resolve the Covered Disputes in a non-public forum. Accordingly, except as provided by Paragraph 34, Executive and the Company agree that all information regarding the Covered Dispute or arbitration proceedings, including the arbitration award, will not be disclosed by Executive, the Company, any arbitrator, or the AAA to any third party without the written consent of both Executive and the Company, except as necessary to comply with a subpoena, court order or other legal requirement, to prosecute or to defend a claim, to enforce an arbitration award, or to meet a reasonable business need of the Company. To the extent that either party files any suit, complaint, or proceeding with any court or other public forum with respect to a Covered Dispute (including, but not limited to, proceedings to challenge the arbitrability of a matter, to compel arbitration or to enforce an arbitration award or for injunctive relief pending arbitration), such party shall take all measures and use best efforts to file such complaint or proceeding under seal or in other manner designed to protect the confidentiality of the Covered Dispute to the maximum extent possible.

38.8 Injunctive Relief Pending Arbitration. Notwithstanding the foregoing, Executive and/or the Company may seek any injunctive relief (including without limitation temporary and preliminary injunctive relief) necessary in order to maintain (or restore) the status quo and/or to prevent the possibility of irreversible or irreparable harm during the pendency of any arbitration.

38.9 Governing Terms. In the event there is any conflict between this Paragraph 38 and any provisions in the Prior Employment Agreement or the Release providing for arbitration, the provisions of this Paragraph shall supersede and govern.

39. Waiver of Breach. The failure of the Company at any time to require performance of any provision of this Agreement shall in no way affect its right thereafter to enforce the same, nor shall the waiver by the Company of any breach of any provision of this Agreement be taken or held to be a waiver of any succeeding breach of any provision, or as a waiver of the provision itself.

40. Binding Agreement. This Agreement is a contract between Executive and the Company and not merely a recital. Should Executive breach any term of this Agreement, Executive will be liable to the Company for reasonable attorney's fees and costs incurred in attempting to enforce the terms of the Agreement. Executive further acknowledges that any breach by the Company of any contractual, statutory, or other legal obligation to Executive shall not excuse or terminate Executive's obligations hereunder or otherwise preclude the Company from seeking relief pursuant to any provision of this Agreement.

41. Modification. No change or modification to this Agreement shall be valid or binding unless the same is in writing and signed by the parties hereto.

**THE UNDERSIGNED HAVE CAREFULLY READ THIS AGREEMENT; THEY KNOW AND UNDERSTAND ITS CONTENTS; THEY FREELY AND VOLUNTARILY AGREE TO ABIDE BY ITS TERMS; AND THEY HAVE NOT BEEN COERCED INTO SIGNING THIS AGREEMENT.**

**TOM OWSTON**

DocuSigned by:
Tom Owston
CE856834783B418...

Date: 9/13/2023 | 6:27 PM EDT

**RUBICON TECHNOLOGIES, LLC**

By: DocuSigned by:
Phil Rodoni
489FB87957F1484...

Phil Rodoni

Title: Chief Executive Officer

Date: 9/13/2023 | 7:25 PM EDT

# APPENDIX A

## Definitions

For the purposes of this Agreement, the following terms shall have the following meanings:

(a) "Affiliate" means any organization, firm, or entity (i) in respect of which Company has or shall have during the Term of this Agreement, an ownership interest of fifty percent (50%) or more; or (ii) which directly or indirectly through one or more intermediates, controls, is controlled by, or is in common control with Company.

(b) "Associate" means an employee of Rubicon or the Rubicon Companies.

(c) "Business of Rubicon" means activities, products, or services of the type conducted, authorized, offered, or provided by the Company or its Affiliates in the waste and recycling industry.

(d) "Cause" when applied to the Executive's termination of employment, means, as reasonably determined by the Company in its sole discretion:

(i) Executive's conviction of or plea of guilty or nolo contendere to (A) a felony or (B) a misdemeanor involving dishonesty or having a material adverse effect on the Company or its Affiliates;

(ii) Executive's willful misconduct or gross negligence in the conduct of his duties that is or could be injurious to the Company or its Affiliates (monetarily or otherwise), or the willful failure to abide by reasonable instructions of management of the Company or its Affiliates or the Board, as applicable;

(iii) fraud or embezzlement by Executive against the Company or its Affiliates;

(iv) Executive's having engaged in conduct which is or could be injurious in a meaningful way (monetarily or otherwise) to the business or reputation of the Company or its Affiliates;

(v) Executive's violation or threatened violation of any Company rule, policy, or procedure; or

(vi) Executive's material violation of the confidentiality restrictions or any violation of the Company's non-solicit or non-compete restrictions applicable to such Executive.

For purposes of this definition, no act or failure to act on the part of Executive shall be considered "willful" unless it is done, or omitted to be done, by Executive in bad faith or without reasonable belief (based upon an objective reasonable person standard) that Executive's action or omission was in the best interest of the Company. Any act or failure to act based upon authority given pursuant to a resolution duly adopted by the Board or based upon the advice of counsel for the Company shall be conclusively presumed to be done, or omitted to be done, by Executive in good faith and in the best

interests of the Company.

(e) "<u>Change in Control</u>" shall mean the occurrence of any of the following:

(i) any sale, directly or indirectly, of more than 50% of the equity securities of the Company to any Person or group of Persons acting in concert excluding a sale to any Affiliate of the Company;

(ii) any merger or consolidation of the Company with or into any Person where those Persons who, directly or indirectly, own equity securities in the Company immediately prior to the effective date of the merger or consolidation and their Affiliates own, directly or indirectly, less than 50% of the equity securities in the entity surviving the merger or consolidation; or

(iii) a sale of all or substantially all of the assets of the Company to any Person, excluding any Affiliate of the Company.

For the avoidance of doubt, any transfer, directly or indirectly, of equity securities of the Company by gift or bequest shall not constitute a Change of Control. Notwithstanding the foregoing, a transaction shall not be deemed a Change of Control unless the transaction qualifies as a Change of Control event within the meaning of Code Section 409A, as it has been and may be amended from time to time, and any proposed or final Treasury Regulations and Internal Revenue Service guidance that has been promulgated or may be promulgated thereunder from time to time.

(f) "<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

(g) "<u>Company</u>" means Rubicon, its affiliated companies and entities (and successor entities and assigns), officers, directors, employees and investors.

(h) "<u>Contractor</u>" means any Person other than an Associate whom Rubicon or any of the Rubicon Companies hires, retains, or engages to perform services.

(i) "<u>Competitor</u>" means any Person that competes with Rubicon in the Business of Rubicon, including, without limitation, Rock Tenn Corporation, SLM Waste and Recycling, Discovery Refuse Management, Inc. (d/b/a DRM Waste Management), Quest Recycling Services LLC, Resource Management Group, Inc., International Environmental Alliance (IEA), Environmental Waste Solutions, LLC (EWS), Ecova, Inc., New Market Waste Solutions, Waste Harmonics, LLC, Waste Management, Inc., Republic Services, Inc., Advanced Disposal, LLC, Clean HarborsStericycle, Inc., Progressive Waste Solutions Ltd., Waste Connections, Inc., Recology, Inc., Rumpke Consolidated Companies, Inc., Casella Waste Systems, Inc., Waste Industries USA, Inc., Waste Pro USA, Inc., and any affiliate of or successor to any such entity.

(j) "<u>Confidential Information</u>" means any information (in whatever form and whether or not recorded in any media) relating to Rubicon (whether constituting a trade secret or not) and including, but not limited to, information regarding research, development, inventions, manufacturing, purchasing, accounting, engineering, marketing, merchandising, selling, source codes, software programs, computer systems, logos, designs, graphics, writings or other materials, algorithms, formulae, works of authorship, techniques, documentation, models and systems, products, sales and

pricing techniques, procedures, inventions, products, improvements, modifications, methodology, processes, concepts, records, files, memoranda, reports, plans, proposals, price lists, services, client, customer and supplier lists, and client, customer and supplier information, which (i) is or has been disclosed to Executive (or of which Executive became aware) as a consequence of or through his employment with a Rubicon Companies, (ii) has value to Rubicon or would be of value (actual or potential) to a Competitor, and (iii) is not generally known, or readily available by lawful means, to the public (including compiled information that is not publicly available in such a consolidated form). Confidential Information shall not include any specific information that has been voluntarily disclosed to the public by Rubicon (except where such public disclosure has been made by Executive or another Associate or Contractor without authorization) or that has been independently developed and disclosed by others, or that otherwise has entered the public domain through lawful means. Nothing in this Agreement should be construed as restricting the Executive's right to engage in legally protected activities under applicable law.

(k) "Disability" shall mean Executive:

(i) Is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, or

(ii) By reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, is receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan covering employees of the Company.

(l) "Good Reason" shall mean, without the written consent of Executive, any one or more of the following events:

(i) a material reduction in Executive's current base salary or other component of compensation or benefits Executive currently receives;

(ii) the Company's breach of any material provision of this Agreement;

(iii) the Company requires Executive to move greater than fifty (50) miles from Executive's current residence in Wynnewood, Pennsylvania; and/or

(iv) there is a material diminution of your current title or duties for which you currently are responsible.

However, none of the foregoing events or conditions will constitute Good Reason unless (A) Executive provides the Company with a written objection of the event or condition within ninety (90) days following the earliest date on which Executive has (or reasonably would be expected to have had) knowledge of the existence of the condition; (B) the Company does not reverse or otherwise cure the event or condition to the extent curable within thirty (30) days of receiving that written objection; and (C) Executive resigns from his position with the Company within thirty (30) days following the expiration of that cure period.

(m) "Invention" means all software programs, in source or object code form, algorithms, databases, data collections, formulas, ideas, developments, improvements, discoveries and inventions (whether or not patentable), processes, techniques, trade secrets, know-how, technical and non-technical data, designs, drawings, methods, devices, works of authorship, copyrights, copyright registrations and applications for copyright registration, trademarks, service marks, trade dress, trademark registrations, applications for trademark registration, patents and patent applications, either authored, developed, conceived or reduced to practice by Executive while in Rubicon's employ, either solely or jointly with others, and whether or not during regular working hours, or authored, developed, conceived or reduced to practice by Executive within one (1) year of the termination of Executive's employment with Rubicon using Confidential Information and which relate in any way to the actual or anticipated business or research or development of a Rubicon Companies, or which are suggested by or result from any task assigned to the Executive or work performed by the Executive for or on behalf of a Rubicon Companies.

(n) "Person(s)" mean all individuals, partnerships, corporations, limited liability companies, firms, businesses, and other entities, other than Rubicon Companies.

(o) "Pre-Termination Period" means the eighteen (18) month period immediately prior to the termination of Executive's employment with Rubicon Companies.

(p) "Restricted Area" means the United States of America and any other geographic territory (a) that Executive managed for a Rubicon Companies during the Pre-Termination Period, or (b) in which Executive provided services for a Rubicon Companies during the Pre-Termination Period, or (c) in which Executive directly or indirectly supervised or managed Associates or Contractors during the Pre-Termination Period.

(q) "Restricted Period" means the period of time that Executive is employed by Rubicon and the 24-month period immediately following termination of Executive's employment, for any reason.

(r) "Rubicon Companies" means Rubicon Technologies, LLC and its parent(s), subsidiaries, related and affiliated companies and all divisions of them, any other businesses that the foregoing entities may acquire or establish after the execution of this Agreement, and any successors and assigns of the foregoing entities.

(s) "Sale Event" includes: (a) a sale(s) of the Company's assets or shares with aggregate proceeds in any form greater than Three Hundred Million and 00/100 Dollars ($300,000,000); (b) the meaning ascribed in the Company's Operating Agreement, as amended and includes a transaction pursuant to which a special purpose acquisition company or other similar vehicle (or, in either case, a subsidiary thereof) acquires ownership of the Company or its operating subsidiaries, whether by merger, purchase or otherwise; and (c) a minority recapitalization of the business with an investor investing new capital into the Company and, upon such investment, then owning more than forty percent (40%) of the Company's common stock.

# EXHIBIT B

# RUBICON GLOBAL HOLDINGS, LLC
# CODE OF ETHICAL CONDUCT FOR OFFICERS AND EMPLOYEES

## INTRODUCTION

**Purpose and Applicability:**
This Code of Ethical Conduct for Officers and Employees (this "**Code**") contains general guidelines for conducting the business of Rubicon Global Holdings, LLC and its subsidiaries (collectively, the "**Company**") consistent with the highest standards of business ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, the Company adheres to the higher standards described herein.

This Code applies to all Company officers and employees (collectively referred to herein as "**Rubicon Associates**").

**Additional Information:**
This Code is not intended to be a comprehensive rulebook and cannot address every situation Rubicon Associates may face. Rubicon Associates aree encouraged to contact the Company's General Counsel or the Company's human resources department if they are uncomfortable about a situation or have any doubts about whether it is consistent with the Company's ethical standards.

**Reporting Violations of this Code:**
All Rubicon Associates have a duty to report any known or suspected violation of this Code, including any violation of the laws, rules, regulations, or policies that apply to the Company. Rubicon Associates who know of or suspect a violation of this Code, should immediately report the conduct to the Company's General Counsel or the Company's human resources department. All reports of known or suspected violations of the law or this Code will be handled sensitively and with discretion.

It is Company policy that any Rubicon Associate who violates this Code will be subject to appropriate discipline. This determination will be based upon the facts and circumstances of each particular situation. A Rubicon Associate accused of violating this Code will be given an opportunity to present his or her version of the events at issue prior to any determination of appropriate discipline. Rubicon Associates who violate the law or this Code may expose themselves to substantial civil damages, criminal fines, and prison terms. The Company may also face substantial fines and penalties and may incur damage to its reputation and standing in the community. A Rubicon Associate's conduct as a representative of the Company, if it does not comply with the law or with this Code, can result in serious consequences for both the Rubicon Associate and the Company.

**Policy Against Retaliation:**
The Company prohibits retaliation against a Rubicon Associate who, in good faith, seeks help or reports known or suspected violations. Any reprisal or retaliation against a Rubicon Associate because he or she, in good faith, sought help or filed a report will be subject to disciplinary action.

## CONFLICTS OF INTEREST

**Identifying Potential Conflicts of Interest:**
A conflict of interest arises when a Rubicon Associate's private interests interfere, or appear to interfere, with the interest of the Company, or impair, or could be perceived to impair, the Rubicon Associate's business judgment. Rubicon Associates should identify and avoid situations of actual or apparent conflict of interest.

**Disclosure of Conflicts of Interest:**
The Company requires that Rubicon Associates disclose any situations that reasonably would be expected to give rise to a conflict of interest. Rubicon Associates who have a conflict of interest, or something others could reasonably perceive as a conflict of interest, must report it to the Company's General Counsel or the Company's human resources department. The Company will work to determine whether a conflict of interest exists and, if so, how best to address it.

**Confidential Information:**
Rubicon Associates have access to a variety of confidential information while employed at the Company. Confidential information includes all non-public information that might be of use to competitors, or, if disclosed, harmful to the Company, its customers or vendors. Rubicon Associates have a duty to safeguard all confidential information of the Company or third parties with which the Company conducts business, except when disclosure is authorized or legally mandated. A Rubicon Associate's obligation to protect confidential information continues after he or she leaves the Company. Unauthorized disclosure of confidential information could cause competitive harm to the Company or its customers and could result in legal liability to the Rubicon Associate.

Any questions or concerns regarding whether disclosure of Company information is legally mandated should be promptly referred to the Company's General Counsel.

## COMPANY RECORDS

Accurate and reliable records are crucial to the Company's business. The Company's records are the basis of financial reports and guide the Company's business decision-making and strategic planning.

Company records include booking information, payroll, timecards, travel and expense reports, emails, accounting and financial data, measurement and performance records, electronic data files, and all other records maintained in the ordinary course of Company business.

All Company records must be complete, accurate and reliable in all material respects. Undisclosed or unrecorded funds, payments or receipts are inconsistent with Company business practices and are prohibited. Rubicon Associates are responsible for understanding and complying with Company record keeping policy. Rubicon Associates should contact the Company's General Counsel if they have any questions regarding the Company's record keeping policies or practices.

## PROTECTION AND USE OF COMPANY ASSETS

Rubicon Associates should protect the Company's assets and ensure their efficient use for legitimate business purposes only. Theft, carelessness and waste have a direct impact on the Company's profitability. The use of Company funds or assets, whether or not for personal gain, for any unlawful or improper purpose is prohibited.

Rubicon Associates should be aware that Company property includes all data and communications transmitted or received to or by, or contained in, the Company's electronic or telephonic systems. Company property also includes all written communications. Rubicon Associates and other users of this property should have no expectation of privacy with respect to these communications and data. To the extent permitted by law, the Company has the ability, and reserves the right, to monitor all electronic and telephonic communication regardless of whether the device is owned by the Company. These communications may also be subject to disclosure to law enforcement or government officials.

## ACCURACY OF FINANCIAL REPORTS AND OTHER COMMUNICATIONS

Rubicon Associates working in the Company's accounting department have a special responsibility to ensure all Company financial disclosures are full, fair, accurate, timely, and understandable. These Rubicon Associates must



GLOBAL OFFICE

950 East Paces Ferry Road
Suite 1900
Atlanta, Georgia 30326

understand and strictly comply with generally accepted accounting principles and all standards, laws, and regulations for accounting and financial reporting of transactions, estimates, and forecasts. In that regard, without limiting the generality of the foregoing, this Code explicitly prohibits inappropriate overrides of established disclosure controls and procedures and internal control over financial reporting.

**COMPLIANCE WITH LAWS AND REGULATIONS**

Rubicon Associates have an obligation to comply with all laws, rules, and regulations applicable to Company operations. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices (as more fully discussed in the Company's Foreign Corrupt Practices Act Anti-Corruption Policy), offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information, or misuse of corporate assets. Rubicon Associates are expected to understand and comply with all laws, rules and regulations applicable to their position with the Company. If any doubt exists about whether a course of action is lawful, Rubicon Associates must seek advice from the Company's General Counsel.

**EMPLOYMENT PRACTICES**

The Company pursues fair employment practices in every aspect of its business. The following is intended to be a summary of the Company's employment policies and procedures. Copies of the Company's detailed policies are available from the Company's human resources department. Rubicon Associates must comply with all applicable labor and employment laws, including antidiscrimination laws and laws related to freedom of association, privacy, and collective bargaining. It is the Rubicon Associate's responsibility to understand and comply with the laws, regulations, and policies that are relevant to such Rubicon Associate's job. Failure to comply with labor and employment laws can result in civil and criminal liability, as well as disciplinary action by the Company.

**Harassment and Discrimination:**
The Company is committed to providing equal opportunity and fair treatment to all individuals on the basis of merit, without discrimination because of race, color, religion, national origin, sex, sexual orientation, age, disability, veteran status, or other characteristic protected by law. The Company prohibits harassment in any form, whether physical or verbal and whether committed by supervisors or non-supervisory personnel.

Any complaints about discrimination or harassment, should be reported to the Company's General Counsel or the Company's human resources department. All complaints will be treated with sensitivity and discretion. Where the Company's investigation uncovers harassment or discrimination, the Company will take prompt corrective action, which may include disciplinary action. The Company strictly prohibits retaliation against a Rubicon Associate who, in good faith, files a complaint.

Any supervisor or other member of management who has reason to believe a Rubicon Associate has been the victim of harassment or discrimination or who receives a report of alleged harassment or discrimination is required to report it to the Company's human resources department.

**Alcohol and Drugs:**
The Company is committed to maintaining an alcohol and drug-free work place. The use, possession, manufacture, dispensation or distribution of alcohol or controlled substances in any Company work locations is prohibited.

**Violence Prevention and Weapons:**
The safety and security of Rubicon Associates is vitally important. The Company will not tolerate violence or threats of violence in, or related to, the workplace. Rubicon Associates who experience, witness or otherwise become aware of a violent or potentially violent situation that occurs at Company work locations or affects the Company's business


GLOBAL OFFICE
950 East Paces Ferry Road
Suite 1900
Atlanta, Georgia 30326

must immediately report the situation to the Company's General Counsel or the Company's human resources department.

The Company does not permit any individual to have weapons of any kind on Company property or in Company vehicles, while on the job or off-site while on Company business. This is true even if legal permits to carry weapons have been obtained. The only exception to this policy applies to security personnel who are specifically authorized by Company management to carry weapons.

**CONCLUSION**

This Code contains general guidelines for conducting the business of the Company consistent with the highest standards of business ethics. Rubicon Associates with questions regarding this Code should contact the Company's General Counsel or the Company's human resources department. The Company expects all Rubicon Associates to adhere to these standards.

*This Code and the matters contained herein are neither a contract of employment nor a guarantee of continuing Company policy. The Company reserves the right to amend, supplement, or discontinue this Code and the matters addressed herein, without prior notice, at any time.*

**EFFECTIVE DATE: November 13, 2019**

____________________________________
William D. Meyer
General Counsel & Corporate Secretary

Thomas Owston
____________________________________
Employee Name

Electronically Signed By
Thomas Owston
____________________________________
Employee Signature

9/4/2020
__________________
Date Signed



GLOBAL OFFICE

950 East Paces Ferry Road
Suite 1900
Atlanta, Georgia 30326

# EXHIBIT C



**Tom Owston** in • 3rd+

Division President

Visit my website

1yr •

+ Follow

Today marks my last day at Rubicon where I've spent the better part of the last decade.

With the transition to new leadership earlier this year, the company is in great hands and it made sense to begin my new chapter. I'm incredibly grateful to the customers, partners, and teammates who have made this time of my life so meaningful.

I'll be staying in the waste and recycling industry, but focusing on a different approach. I'll share more about my new role and company soon.

Thank you to everyone I've had the chance to work with over the years.

471 79 comments

Like Comment Repost Send

Add a comment... GIF

Most relevant

**Taylor Wall** • 3rd+ 1yr Follow
Account Executive at OneWaste

Tom, your leadership has left a lasting impact on all of us at Rubicon. You've been a true role model, and I have the utmost respect and admiration for you. I'm incredibly grateful for your friendship, and I look forward to staying connected in the future. Wishing you nothing but continued success in all that's ahead brother.

3

**Perry Moss** in • 3rd+ 1yr Follow
President and CEO

Congrats, Tom!! You will certainly be missed at Rubicon. I can tell you there is definitely opportunities ahead for you. And you deserve them!! Now go out and crush it!!!

2

**Donovan Bennett** • 3rd+ 1yr Follow
Sustainable Operations | Project Management | Process Improvement | Operations - PMP, LEED Green ...

Congrats and good luck in the new role!

**Scott Rizzo** in • 3rd+ 1yr Follow
SVP Business Development - Vixxo Facility Solutions / President - The MOB / USMC

Thanks for your great partnership, To! All the best in your next endeavor!

1

**Chris Witherspoon** • 3rd+ 1yr Follow
Executive Vice President North America | Strategic Partnerships | Account Management | Waste and ...

Congrats Tom. You will succeed in anything you do.

1

**Dan Miller** • 3rd+ 1yr Follow
Innovative Engineering & Operations Executive | Global R&D Leader | Cross-Industry Expertise (Medical ...

Go Tom!

1

**Brian Dolan** in • 3rd+ 1yr Follow
Software & Services for the waste & recycling industry

Well done. With class

1

**Ben Woodman** • 3rd+ 1yr Follow
Head of Strategy & Operations @ Caramel (an eBay company)

Congrats, Tom! You're an amazing leader and I'm glad our paths crossed.

2

**Evans Liolin** • 3rd+ 1yr **Follow**
High Performance Coach | Team Builder | Mentor

You are an admirable man and skillful professional, I can't wait to see what you do next, Tom.

1

**Damla Meral** • 3rd+ 1yr **Follow**
Vice President Account Operations at Rubicon | MBA

I don't think I've ever met someone who lifts up everyone around them the way you do. Your leadership inspires, your presence motivates, and your belief in people brings out the best in all of us. I've grown more under your guidance than I ever imagined possible, both professionally and personally. Rubicon wouldn't be what it is today without your vision and heart and I wouldn't be who I am without your guidance. They are ... more

2

**Dave Aardsma** • 3rd+ 1yr **Follow**
Founder - Aardsma Environmental Solutions Inc.

Hey Tom — looking forward to hearing more!!!

**Larry Connor** • 3rd+ 1yr **Follow**
QA/QC Director at All Trades Distribution

Congrats, Tom

**Alex DiPietro** • 3rd+ 1yr **Follow**
National Sales Manager at Herc Rentals

Wishing you all the best and continued success in your new role, Tom!

**Joseph A. Zarabba** • 3rd+ 1yr **Follow**
National Account Manager at Eldredge, Inc. | My Aim Is To Assist Our Clients In Achieving Circularity By ...

Best of luck in your new role!!

Load more

# EXHIBIT D



**Tom Owston** in • 3rd+

Division President

Visit my website

1yr •

+ Follow •••

Excited to share that I've joined the Executive Team at The Wilmington Group as Division President of Wilmington Paper - The Program™

Big thanks to Brett Lurie and The Wilmington Group team for the opportunity. It's great to be part of a people-first organization doing transformational work in the waste and recycling space.

If we haven't connected in a while—or if you're working on tough recycling challenges—don't hesitate to reach out.






235 40 comments • 4 reposts

Like Comment Repost Send

Add a comment... GIF

Most relevant

**Taylor Wall** • 3rd+ 1yr Follow
Account Executive at OneWaste

Congrats, Tom! They are lucky to have you!

1

**Carol Colgan, OLY** • 3rd+ 1yr Follow
Owner, North Bay, Inc

Congrats Tom!

**Venis T Wilder-Henry MD, MBA** • 3rd+ 1yr Follow
Physician Executive | Value-Based Care Expert | Lean Six Sigma Black Belt | Healthcare Innovator

Congratulations Tom!! 💙

**John Lund** • 3rd+ 1yr Follow
Ports & Terminals Commercial Leader | Strategic Partnerships, Business Development & Revenue Growth |...

Congratulations, Tom! 👏

Load more

# EXHIBIT E



**Tom Owston** in • 3rd+

Division President

Visit my website

3mo •

\+ Follow •••

Partnering with Wilmington Paper - The Program™ for multi-site waste and recycling services offers a significant advantage.

Unlike traditional brokers, we operate our own network of waste and recycling plants through Recycling Management Resources. This allows us to conduct in-depth material audits, ensuring a more effective and tailored approach to waste management and recycling.





231 · 7 comments • 6 reposts

Like Comment Repost Send

Add a comment... GIF

Most relevant

**Ron H.** • 3rd+ (edited) 3mo
Advanced Environmental & Safety Compliance Specialist CHMM, BCSP Certified CHST, OSHA 501 trainer. ...

Tom, working in these environments causes a lot of loose particulates-A P-100 dust mask is always great for your employees 👍

**Melissa Grant, MSML** • 3rd+ (edited) 3mo Follow
Experienced businesswoman with more than 25 years in customer service, insurance, eligibility, ...

Hey there Tom! Miss you! Looks like you're doing great though.

1

**Ruth Morss** • 3rd+ 3mo Follow
Executive Communications | Internal Communications | Marketing Communications | Enterprise Technology

Tom, looking great. Delightful to see you. I hope you're coaching rowing for some lucky people.

Load more

# EXHIBIT F



Tom Owston in • 3rd+
Division President
Visit my website
4w •

+ Follow •••

Excited to share that today The Wilmington Group officially launched OneWaste, our purpose-built managed waste and recycling solution for organizations operating across multiple locations.

What makes this launch especially meaningful is that it builds on nearly 50 years of experience managing some of the industry's most complex recycling programs. We started with the hard stuff, maximizing commodity value and designing custom material management solutions at complex packaging/industrial sites... and now we have expanded that expertise into a simpler, more accountable approach to managed waste at properties of all kinds.

Proud of the team that made this possible and excited for what's ahead!

https://lnkd.in/gf4QfbE5

OneWaste in
Learn more
4w • Edited •

+ Follow

Today, we're launching OneWaste.

... more






65 9 comments

Like Comment Repost Send

Add a comment... GIF

Most relevant

**Lori Sullivan** • 3rd+ 1mo Follow
Vice President Broker and National Accounts

Congratulations, Tom and team! Looking forward to being your partner of choice in the NJ-NY-CT markets.

2 1

**Tom Owston** Author
Division President
1mo

Lori Sullivan definitely! And please keep bringing us loads to our Barrington NJ Plant :)

1

**Kyle L.** • 3rd+
Sr. Strategic Account Manager
1mo

Congrats, Tom - looking forward to watching the continuation of the remarkable strides you make as a leader within the industry. 👏

3

**Hayden Dunn** • 3rd+
Chief Revenue Officer | Enviracore Services Group
1mo Follow

Congrats Tom

1

**Thomas Simone** • 3rd+
Territory Manager Mid-Atlantic EC3 at Moldex-Metric, Inc.
1mo Follow

Tom Owston this is outstanding!

1

Load more

# EXHIBIT G

The Wilmington Group

***Quelle:*** *The Wilmington Group*

*Juli 07, 2026 08:45 ET*

# The Wilmington Group Launches OneWaste℠, a Fully Managed Waste and Recycling Service for Multi-Site Operations

## Nearly five decades of recycling expertise backs a new kind of waste management partnership

PARSIPPANY, N.J., July 07, 2026 (GLOBE NEWSWIRE) -- The Wilmington Group, a leading recycling, secure destruction, and managed waste services provider, today announced the launch of OneWaste℠, a fully managed waste and recycling service for organizations operating across multiple locations. OneWaste centralizes vendor relationships, contracts, and service issues under one dedicated partner, eliminating the complexity that has long made waste management a drain on multi-site businesses.

OneWaste℠

Powered by The Wilmington Group

Unlike asset-light brokers that manage contracts from behind a desk, OneWaste owns and operates its own recycling plants, providing operational credibility and aligning its incentives with clients' rather than landfill volume. Clients receive one accountable partner across every location, continuous invoice auditing and payment processing, annual rate benchmarking, and a 24-hour resolution target, built for any organization managing waste across multiple locations, where fragmented vendor relationships routinely drive cost overruns and reporting failures.

"Most waste programs aren't broken because of bad providers. They're broken because nobody truly owns the problem," said Tom Owston, Division President. "We put our people front and center,

supported by technology rather than replaced by it. Our roots are in managing highly complex material streams. As we've expanded into broader managed waste services, we've become brilliant at the basics and in this industry, that's exactly what's been missing."

OneWaste operates nationally: nine Wilmington Group recycling plants anchor the network, backed by reciprocal arrangements across the country, giving pricing leverage and capacity resilience.

"OneWaste is the natural next step for everything we've built over the past five decades," said Jeff Snyder, CEO of The Wilmington Group. "Our competitors are racing to replace people with technology, not empower them. We think that's the wrong race to run. Relationships built on trust and accountability outlast any contract."

**About OneWaste℠**

OneWaste℠, powered by The Wilmington Group, is a fully managed waste and recycling service for multi-site operators, centralizing every vendor relationship, contract, and service issue under one accountable partner, combining broker-level flexibility with the credibility of an actual plant operator. Learn more at onewaste.com.

**About The Wilmington Group**

Founded in 1977, The Wilmington Group processes close to two million tons of material annually, delivering fiber, plastics, and metal recycling, secure destruction, and logistics and sustainability services. Learn more at thewilmingtongroup.com.

Media Inquiries:
press@thewilmingtongroup.com

A photo accompanying this announcement is available at https://www.globenewswire.com/NewsRoom/AttachmentNg/5401b237-0d82-4b84-8c4a-d6c2a6ea4d39

**Anhänge**:

- OneWaste Logo

# EXHIBIT H

**OneWaste** in
Learn more
2w • Edited •

+ Follow •••

Some numbers behind OneWaste:

• 1977 - The Wilmington Group was founded
• Nine - Recycling plants we own and operate
• One - Accountable partner for every customer

OneWaste isn't a startup running on a pitch deck. It's a new model built on top of nearly five decades of real relationships, expertise, and commitment to recycling and sustainability.

Learn more: https://lnkd.in/eUUGGBUQ









24

5 reposts

Like Comment Repost Send

Add a comment...

GIF

# EXHIBIT I

# EMPLOYEE AGREEMENT

I make this Employee Agreement ("Agreement") with RUBICON GLOBAL HOLDINGS, each of its subsidiaries or affiliates with which I am employed, and their successors ("RGH").

1. **Facts and Background.** I understand and agree that:

   a. RGH is engaged in the business of selling, servicing and conducting other activities related to waste management and recycling. RGH continuously develops new designs and methods, and develops improvements to existing designs and methods. RGH also develops and maintains information regarding all of these activities as well as its costs, profits, customer lists, supplier lists and other matters. In this Agreement, the phrase "Business of RGH" includes any and/or all of the items listed in this paragraph.

   b. RGH's success depends in part upon keeping its Confidential Information secret. It has been or may be necessary for RGH to make Confidential Information of its own, or of others with which it has business relations, available to me during my employment.

   c. In exchange for my employment or continued employment, compensation and benefits, and the opportunities provided by RGH, I promise to abide by the terms of this Agreement.

2. **Confidential Information.** In this Agreement, "Confidential Information" means all trade secrets of RGH and all proprietary information concerning the Business of RGH obtained by me during my employment which RGH does not communicate to the general public. Confidential Information includes information given to RGH by others under conditions of confidence, and may include marketing, sales or financial information given to me by RGH.

3. **Promise to Not Disclose Confidential Information.** During and after my employment, I will not disclose any Confidential Information to any person or use any Confidential Information except as required for RGH's benefit in the ordinary course of business. I will promptly advise RGH if I become aware of the unauthorized disclosure or use of Confidential Information. I further agree to take reasonable measures to prevent the disclosure of Confidential Information to unauthorized persons.

4. **Prior Employment.** In the course of my employment at RGH, I will not use any information which is trade secret or proprietary in nature which RGH does not have the right to use and which I gained knowledge of during my prior employment.

5. **Intellectual Property.**

   a. In this Agreement, Intellectual Property means all ideas, inventions, improvements, formulas, processes, know-how, data, research, and techniques, as well as all associated patents or benefits, which are related to the Business of RGH and which I conceive while employed by RGH (during working hours or any other time) and within one year after my employment ends. It also includes all trade secrets, trademarks, service marks, copyrights, designs, computer programs, or any other form of intellectual property related to the Business of RGH. It also includes anything from which RGH derives actual or potential economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. In this Agreement, "person" includes firm, corporation and organization.

   b. All Intellectual Property will be RGH's exclusive property without consideration other than my regular compensation. I will disclose all Intellectual Property in writing to my immediate superior promptly after I conceive of it. I hereby assign all Intellectual Property to RGH, and during and after my employment I will do all lawful acts necessary or advisable to place with RGH the exclusive ownership of all Intellectual Property. RGH will pay or reimburse reasonable expenses which are necessary for me to comply with this Paragraph 5(b).

   c. If no schedule is attached to this Agreement, I promise that I have not conceived any inventions prior to my employment which are excluded from this Agreement. If I conceived any inventions prior to my employment which are excluded from this Agreement, they are listed on the attached Schedule A.

6. **Return of Confidential Information.** When my employment with RGH ends, I will return to RGH all original documents, and all reproductions of these documents, that contain Confidential Information, including computer files and databases. I also agree that RGH, at its sole discretion, may notify any new employer of my rights and obligations under this Agreement.

7. **Non-Solicitation of Members.** While employed by RGH and for one year following the end of my employment with RGH, I will not, directly or indirectly, contact any RGH employee for the purpose of soliciting, recruiting or urging him/her to leave RGH, or otherwise interfere with such employees employment relationship with RGH.

8. **Non-Solicitation of Business Contacts**. While employed by RGH and for one year following the end of my employment with RGH, I will not, directly or indirectly, either alone or in concert with others, (1) take any action that is designed or intended to have the effect of discouraging any of RGH's customers or users of RGH services with which I have had contact or about which I have Confidential Information from maintaining their business relationship with RGH; (2) take any action to encourage, solicit, or recruit any consultants, independent contractor, supplier, vendor or other business contact of RGH with which I have had contact or about which I have Confidential Information to terminate their business relationship with RGH; (3) accept any business from any of RGH's customers or users of RGH products and/or services with which I have had contact or about which I have Confidential Information; or (4) conduct any business with any consultant, independent contractor, vendor, supplier or other business contact of RGH with which I have had contact or about which I have Confidential Information.

9. **Term.** This Agreement will be effective as of its date or the first day of my employment, whichever occurs first. It will continue in full effect after the end of my employment.

10. **At-Will Employment.** Nothing in this Agreement will change the nature of my employment with RGH from being at-will. I understand that RGH has the right to end my employment for any reason or no reason, and with or without cause or prior notice.

11. **Change in Responsibilities.** I understand that my job responsibilities with RGH may change from time to time. I agree that this Agreement will cover any such change in responsibilities.

12. **Breach of Agreement.** I understand and agree that a breach by me of any of my obligations under this Agreement will cause RGH to suffer irreparable harm. Accordingly, I understand and agree that if I breach any of these obligations, RGH has the right, among other things, to seek and obtain an injunction prohibiting me from breaching any such obligations.

13. **General.** All provisions of this Agreement are severable. If any part is held invalid, the remainder will remain in effect. RGH may, at any time, enforce any or all provisions of this Agreement and exercise all its rights and remedies, regardless of any prior waiver, breach, or failure to enforce same. This is the entire agreement between RGH and me, and all prior understandings are replaced by and merged into this Agreement. No modification of this Agreement will be valid unless it is in writing and signed by both RGH and me.

14. **Applicable Law.** This Agreement will be interpreted and enforced according to the law of the state in which I am employed. I agree that I will pay all costs and expenses, including reasonable attorney fees, incurred by RGH in enforcing any of my obligations under this Agreement.

I have read and understand this Agreement.

Signed at ATLANTA, GEORGIA this 9th day of NOVEMBER, 2015.
(City, State)

[signature]
Employee Signature

AMAN MALHOTRA
Employee Name (Printed)

_______ RGH officer's initials if Schedule A is attached.

# EXHIBIT J

**By E-Mail Delivery**

Aman Malhotra

**Re: Confidential Separation Agreement and General Release**

Dear Aman,

The purpose of this letter is to advise you that Rubicon Technologies, LLC (the "Company") has made the decision to restructure its workforce. On July 15,2025 you were notified of this decision. As a result, your employment status will be updated effective September 19, 2025 (the "Separation Date"). We regret the termination of your employment, and we can assure you that this has been a difficult decision for us to make.

You are eligible for separation pay and benefits, provided you execute the attached Confidential Severance Agreement and General Release ("Agreement") in a timely manner and abide by its terms. Among other things, the Agreement includes a release of any and all claims (except claims for workers' compensation, unemployment compensation, and vested retirement and welfare benefits) arising out of any alleged violation of your rights occurring before you execute the attached Agreement.

Because the Agreement affects important rights, you are advised to consult with an attorney of your choosing before you sign it. You have fourteen (14) days to review and sign the Agreement. Of course, you need not take the entire fourteen (14) days period to review and sign the Agreement. If you choose to sign the Agreement, you must execute the Agreement within the fourteen (14)-day consideration period and promptly return it to me. This letter and the Agreement will be sent to you via DocuSign for execution, if you choose to sign the Agreement.

Regardless of whether you sign the Agreement, you will be paid your regular compensation through your last day of employment with the Company.

Company property, such as your laptop computer, must be returned within five calendar (5) days of your Separation Date. You will be provided with instructions on how to process your equipment return via FedEx. Please coordinate the return of your property with HR@Rubicon.com. Please note that failure to return your Company property may delay full payment of your final compensation, as permitted by applicable state law.

You may receive additional documents that contain useful information relating to your departure. You may receive further information from the Company through your personal email account, so kindly make sure that we have an accurate and updated personal email address.

We regret that your job has been adversely affected. We appreciate your service to the Company and wish you the best of success in your job search. If you have any questions about this offer, please feel free to contact me at any time.




JossLynn Castor
VP Human Resources
JossLynn.Castor@Rubicon.com

Enclosures: Confidential Separation Agreement and General Release

September 19, 2025

**By E-Mail Delivery**

Aman Malhotra

**Re: Confidential Separation Agreement and General Release**

Dear Aman,

This Confidential Separation Agreement and General Release (the "Agreement") will confirm the arrangements we have discussed concerning your separation of employment from Rubicon Technologies, LLC (the "Company"). It constitutes our entire understanding regarding the terms of your separation.

Regardless of whether you execute this Agreement, you will receive your regular pay through your Separation Date.

1. **Separation of Employment.** The Company gave you notice July 15, 2025, that your last day of employment with the Company will be September 19, 2025 (your "Separation Date"). As of your Separation Date, you will be relieved of all further duties and responsibilities and are no longer authorized to transact business or incur any expenses, obligations, or liabilities on behalf of the Company. However, you agree to be available to respond to future inquiries or reasonable requests for assistance from us related to matters arising during your employment with the Company.

2. **Post-Separation Benefits**. In exchange for your executing this Agreement and abiding by its terms, the Company will provide you with separation pay ("Separation Pay") in the gross amount of Forty Thousand Dollars and No Cents ($40,000), less legally required withholdings, any amounts you owe the Company as of your Separation Date (if permitted under state law), and any other deductions you may authorize. This gross amount represents two (2) weeks of separation pay for each year of service capping at $40,000.00. The Company will pay your Separation Pay in installments in accordance with the Company's usual payroll practices. The first installment of separation pay will be paid on the Company's first regular payroll date after the Effective Date of this Agreement (as defined in Paragraph 22 below).

You are solely responsible for any and all tax obligations or other obligations under federal and/or state law pertaining to the receipt of the additional compensation in this Release, and you hereby agree to hold the Company and Insperity and their respective affiliates harmless from any and all liability relating to such obligations.

Your group health insurance coverage will terminate at 11:59 p.m. on September 30, 2025. After that date, you will be eligible to continue your group health insurance coverage at your own expense in accordance with the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). Information regarding your COBRA rights will be provided to you by mail. Please provide the Company with your current U.S. mail address if you have not already done so to be sure that you receive your COBRA notice. All other benefit coverages provided by the Company will cease on your Separation Date.

You acknowledge that some or all of the separation benefits described above are not required by the Company's policies and procedures and constitute value to which you are not already entitled. Your entitlement to the benefits listed above shall not be affected by your obtaining employment with another employer after your Separation Date.

You will not be eligible to participate in or receive any other employment benefits after your Separation Date, other than what is specifically set forth above. No further amounts shall be due or owed to you from the Company for or in any way relating to or connected with your employment with the Company.

3. **Cooperation.** In addition to the other obligations under this Agreement, and in exchange for the Separation Pay set forth in Section 2 herein and without requiring any additional consideration, you agree that after your Separation Date, you will cooperate with the Company regarding any pending or subsequently-filed litigation, proceeding, charge, claim or other disputed item involving the Company or any of its parent companies, subsidiaries or affiliates, or their respective present and former shareholders, directors, officers, trustees, employees, owners, representatives, agents and attorneys, that relates to any matter that is alleged to have occurred, in whole or in part, during the time when you were employed by the Company.

4. **Return of Property.** You agree that you will not retain or destroy, and will return to the Company within five calendar (5) days of your Separation Date, all Company property in your possession or control, including, but not limited to, all keys, vehicles, access cards, credit cards, parking permits, computer and computer equipment such as laptop computers and printers, electronic equipment, cell phones and similar handheld devices, and other items or equipment provided to you by the Company for use during your employment, together with all written or recorded (whether electronically or otherwise) materials or documents made or provided to you during the course of employment and part of your duties and responsibilities for the Company, including materials or documents containing the Company's confidential information and those located in your personal devices or e-mail accounts. You agree to return all electronic equipment and devices without deleting, wiping, or otherwise destroying information found on such equipment or devices. You further agree to return immediately any such items you may hereafter discover in your possession. You agree to cooperate with counsel for the Company to confirm that you are not in possession of any Company property or Confidential Information and will execute an affidavit confirming as much if requested by the Company or the Company's counsel.

5. **Non-Disparagement.** You agree not to make, publish, or communicate any oral or written statement or take any other action that disparages the Company or its management or practices, that damages the Company's good reputation, goodwill, or interests, or that impairs its normal, ongoing business operations. You agree that, unless compelled to do so by law, you will not pursue, assist, or participate in any Claim (as defined in Paragraph 8 below) brought by any third party against the Company or any Releasee (as defined in Paragraph 8 below). This paragraph does not in any way restrict or impede you from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, as provided in Paragraph 9.

However, nothing in this Agreement is intended to or does in any way: (i) prevent you from discussing or disclosing information about unlawful acts in the workplace, such as harassment (including sexual harassment), discrimination, sexual assault, or any other conduct that you have reason to believe is unlawful; (ii) waive any rights which cannot be waived by agreement; (iii)

prevent or restrict you from exercising your rights under Section 7 of the National Labor Relations Act (to the extent you are deemed to have such rights under applicable law), including the right to discuss your terms and conditions of employment; or (iv) prevent you from otherwise disclosing information as permitted or required by law.

6. **Confidential Information.** You agree that you will not copy, remove, or in any way use, disclose, or give to others any of the Company's or any of its customers' "Confidential Information." The Company's "Confidential Information" means any and all nonpublic knowledge, data, or information of the Company or any of its related or affiliated entities that is valuable to the Company or which the Company has received from third parties under obligations of confidentiality, as well as any and all confidential information, proprietary information, and trade secrets belonging to the Company or its related or affiliated entities. You agree that you have obtained no title to any Confidential Information, and that as between the Company and you, the Company retains all Confidential Information as its sole property. Confidential Information may or may not qualify as a trade secret under applicable law but is nonetheless covered by this Agreement and should be kept confidential. Confidential Information includes both information disclosed by the Company to you, and information developed or learned by you during the course of your employment with the Company. Confidential Information includes, but is limited to, business plans and/or marketing plans, business strategies, business methods, specific databases (i.e., information of any type organized in a manner that facilities retrieval, including but not limited to data and files stored in the cloud or other customer database), financial projections, sales data and projections, confidential information shared by the Company's business partners, suppliers, vendors, contractors, and customers, personal information of employees or customers, technical or nontechnical data, computer files, designs, drawings and specifications, a formula (including cost and/or pricing formula), pattern (including pricing and discount history), compilation, program, device, method (including cost and/or pricing methods and operating methods), technique, process, financial data, or list of actual or potential customers or suppliers. Confidential Information does not include data or information that has been: (i) voluntarily disclosed to the public by the Company, except where such public disclosure has been made by you without authorization from the Company; (ii) which has been independently developed and disclosed by others; or (iii) which has otherwise entered the public domain through lawful means. This paragraph shall not bar you from complying with any subpoena or court order, provided that so long as it is consistent with applicable law, you shall at the earliest practicable date provide a copy of the subpoena or court order to the General Counsel of the Company.

You acknowledge that a breach or threatened breach of the terms of this confidentiality provision by you would result in material and irreparable injury to the Company, and that it would be difficult or impossible to establish the full monetary value of such damage. Therefore, the Company shall be entitled to injunctive relief in the event of your breach or threatened breach of any of the terms contained in this provision concerning Confidential Information.

The undertakings in this provision regarding confidentiality shall survive the termination of other arrangements in this Agreement. Any confidentiality agreement that you signed at the outset of your employment with the Company or during your employment with the Company shall remain in full force and effect according to its terms after your Separation Date. To the extent the confidentiality provisions in this Agreement are more protective of the Company's Confidential Information than the confidentiality agreement you signed at the outset of your employment or during your employment with the Company, the more protective provisions of this Agreement shall govern.

Notwithstanding the foregoing, notice is hereby provided that, in accordance with the Defend Trade Secrets Act of 2016, you are immune from liability and shall not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret (as that term is defined in the Defend Trade Secrets Act of 2016) that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney if such disclosure (a) is made solely for the purpose of reporting or investigating a suspected violation of law or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade secrets to the individual's attorney and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

7. **Effect of This Agreement on Certain Other Agreements.** Nothing in this Agreement is intended to or does terminate any agreement you may previously have entered into with the Company relating to post-termination obligations by you. You acknowledge and agree that any such agreement is valid and enforceable and shall remain in full force and effect. To the extent this Agreement provides greater protection to the Company interests with respect to such matters than any such pre-existing agreements, the more protective provisions of this Agreement shall be controlling.

8. **Release of Claims.** Except for any claims you may have for workers' compensation benefits, unemployment compensation benefits, vested retirement benefits, or nonforfeitable health care, disability, or other similar welfare benefits (which are not released by this Agreement) and in further consideration of the benefits we have agreed to provide you, you do hereby release and forever discharge the Company, any co-employer or joint employer, and each of its and/or their respective parent companies, related entities, subsidiaries, divisions, predecessors, successors, and assigns (including, but not limited to their benefit plans and programs and any administrators of such benefit plans and programs), and all of their present and former officers, directors, agents, shareholders, attorneys, trustees, insurers, and employees (hereinafter collectively referred to as the "Releasees") from any and all claims, liabilities, agreements, damages, losses, or expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, whether known or unknown, that you have, may have had, or may later claim to have had against any of them for personal injuries, losses or damage to personal property, breach of contract (express or implied), breach of any covenant of good faith (express or implied), or any other losses or expenses of any kind (whether arising in tort or contract or by statute) resulting from anything that has occurred prior to the date you execute this Agreement (hereinafter "Claim" or "Claims").

This release includes, but is not limited to, any Claims for back pay, front pay, liquidated damages, compensatory damages, punitive damages, or any other losses or other damages to you or your property resulting from any claimed violation of local, state, or federal law, including, for example (but not limited to), Claims arising under Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. § 2000e *et seq*. ; 42 U.S.C. § 1981; the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*.; Title II of the Genetic Information Nondiscrimination Act of 2008, 42 U.S.C. § 2000ff *et seq*.; the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq*.; the Employee Retirement Income Security Act of 1974, 29 U.S.C.

§ 1001 *et seq*.; the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq*.; the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*.; and any other Claims under federal, state, or local statutory or common law, including but not limited to all applicable laws identified on Exhibit A hereto. The foregoing release of Claims expressly includes a waiver of any right to recovery for the Claims released herein in any and all private causes of action and/or charges and in any and all complaints filed with, or by, any governmental agency and/or other person or tribunal except as otherwise provided in this Agreement. This Agreement does not, however, waive rights or claims that may arise after the date you sign it below.

The Company agrees that it will neither intentionally contest nor appeal any award of unemployment benefits to you in the state in which you were employed. You understand, however, that if questioned by the state unemployment commission regarding any unemployment claim you may choose to file, the Company must respond truthfully to any such requests for information and provide material facts to the full extent required by law. The unemployment commission, not the Company, will decide whether you are entitled to benefits.

For the purpose of implementing a full and complete release and discharge of the Releasees, you expressly acknowledge that this Agreement is intended to include in its effect, without limitation, all Claims that you do not know or suspect to exist in your favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of any such Claim or Claims. You expressly waive and relinquish all rights and benefits that you may have under any state or federal statute or common law principle that would otherwise limit the effect of this Agreement to Claims known or suspected prior to the date you execute this Agreement and do so understanding and acknowledging the significance and consequences of such specific waiver.

You understand that by executing this Agreement, you are giving up any claims you may have at that time against the Releasees for such things as employment discrimination and wrongful discharge, among others, regardless of whether you had ever asserted such claims before your execution of this Agreement and regardless of whether you knew you had such claims before your execution of this Agreement. You are not, however, giving up any claims against the Releasees that are expressly excluded from the scope of this "Release of Claims" provision, and you are not giving up any rights or claims based on events (such as actions by the Releasees) that occur after you execute this Agreement.

9. **Cooperation with Government Agencies.** Nothing in this Agreement (or any other policy, plan, or program of the Company) is intended to, or shall be deemed to, prohibit or restrict you in any way from communicating directly with, reporting to, cooperating with, responding to any inquiry from, or providing testimony before, the Securities and Exchange Commission, FINRA, the National Labor Relations Board, or any other self-regulatory organization, or any other federal or state regulatory authority, or governmental agency or entity, regarding any possible securities violation or other possible violation of law or this Agreement or its underlying facts and circumstances. In addition, nothing in this Agreement is intended, or shall be deemed, to interfere with your ability to file a charge or complaint with the Equal Employment Opportunity Commission or any other federal, state, or local government agency or commission, including those agencies responsible for enforcing equal opportunity laws or limit your ability to participate in any investigation or proceeding conducted by any such agency or commission. Moreover, you are not required to provide advance notice to, or have prior authorization from, the

Company in order to engage in any of the foregoing activity referenced in this Paragraph. Without prior authorization of the Chief Executive Officer of the Company, however, the Company does not authorize you to disclose to any third party (including any government official or any attorney you may retain) any communication that is covered by the Company's attorney-client or other privilege. You further acknowledge and agree that the consideration paid to you under this Agreement represents full and complete satisfaction of any monetary recovery against any of the Releasees that could be sought by or awarded to you in any judicial, administrative, or arbitral proceeding with respect to any claim released under this Agreement and that you will not be able to obtain any monetary relief or any other remedy, including costs or attorneys' fees in connection with any proceeding initiated or maintained by the EEOC or any state or local government agency responsible for enforcing equal employment opportunity laws. For the avoidance of doubt, this Agreement does not limit your eligibility to receive an award out of monetary sanctions collected by any government agency as provided by applicable whistle-blower programs.

10. **Acknowledgements and Affirmations.** You acknowledge and represent that the Company has paid all salary, wages, bonuses, business expense reimbursement, commissions and any and all other benefits due to you as of the Separation Date. You affirm that you have not filed, caused to be filed, or are not presently a party to any claim, complaint, or action against the Company in any forum or form. You furthermore affirm that you have no known workplace injuries or occupational diseases and have been provided and/or have not been denied any leave requested under the Family and Medical Leave Act. You further affirm that you represent and warrant that you have disclosed all wrongful, tortious, or criminal action, if any are known or suspected to have been committed by the Company or its agents.

11. **Covenant Not to Sue.** You agree that, except to the extent such right may not be waived by law or as otherwise provided in Paragraph 9, you will not commence any legal action or lawsuit or otherwise assert any legal claim seeking relief for any Claim released or waived under the Release of Claims provision above.

12. **Consequences of Breach.** You agree that you will indemnify and hold the Releasees harmless from any loss, cost, damage, or expense (including attorneys' fees) incurred by them arising out of your breach of any portion of this Agreement. You also understand that your entitlement to and retention of the benefits we have agreed to provide you herein are expressly conditioned upon your fulfillment of your promises herein. Should you breach this Agreement, or any other agreement between you and the Company, and you agree, to the extent permitted or required by law, immediately to return or repay the amounts you have received from the Company in excess of $100.00 upon your breach and the Company shall immediately cease all future installments of the Separation Pay.

13. **Governing Law and Interpretation.** This Agreement shall be governed and conformed in accordance with the laws of the state where you primarily performed services for the Company without regard to its conflict of laws' provisions.

14. **Non-Admission.** This Agreement shall not in any way be construed as an admission by the Company that it has acted wrongfully with respect to you or any other person, or that you have any rights whatsoever against the Company.

15. **Severability.** The provisions of this Agreement, and all portions thereof, are severable, and if any provision of this Agreement shall be found invalid or unenforceable, in whole or in part, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, or shall be deemed excised from this

Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

16. **Successors.** This Agreement shall be binding upon, enforceable by and inure to the benefit of your personal or legal representatives, executors, administrators, successors, heirs, distributees, devises and legatees, and the Company and any successor(s) to all or substantially all of the business and/or assets of the Company. Neither this Agreement, nor any of the obligations or benefits provided hereunder, may be assigned by you. This Agreement, including any of the obligations and benefits provided hereunder, may be assigned by the Company.

17. **Amendment.** Any amendment to this Agreement shall be made in writing and signed by the parties hereto.

18. **Waiver.** No claim or right arising out of a breach or default under this Agreement can be discharged by a waiver of that claim or right unless the waiver is in writing signed by the party hereto to be bound by such waiver. A waiver by either party hereto of a breach or default by the other party of any provision of this Agreement shall not be deemed a waiver of future compliance therewith and such provision shall remain in full force and effect.

19. **Consideration Period.** You have fourteen (14) days to consider this Agreement. If you decide to accept the benefits offered herein, you must sign this Agreement and return it to the Company (Attention: JossLynn Castor, Vice President Human Resources, E-mail: josslynn.castor@rubicon.com) on or after your Separation Date and before the 15th day after you received it. The Agreement will be sent to you via DocuSign for execution, if you choose to sign the Agreement. This Agreement shall become effective (the "Effective Date") on the date you execute it. If you do not wish to accept the terms of this Agreement, you do not have to do anything.

20. **Revocation Rights**. For a period of up to and including seven (7) days after the date you sign this Agreement, you may revoke it entirely. No rights or obligations contained in this Agreement shall become enforceable until the seven-day revocation period has expired without revocation. If you decide to revoke the Agreement, you must deliver to the Company (Attention: JossLynn Castor, Vice President Human Resources, E-mail: josslynn.castor@rubicon.com), a signed notice of revocation on or before midnight of the last day of this seven-day period. Upon exercise of your right of revocation, this Agreement shall be cancelled and void, and neither you nor the Company shall have any rights or obligations arising under it. Failure to revoke within the seven (7) day revocation period will result in the release of claims being permanent.

21. **Confidentiality.** You will keep the existence of this Agreement, its terms, and any amount paid hereunder completely confidential and will not disclose the existence, terms, or any amount paid under this Agreement to anyone other than your attorney, immediate family members, or financial advisors, all of whom you agree will be bound to keep its terms confidential or will make disclosures only as required by law.

However, nothing in this Agreement is intended to or does in any way: (i) prevent you from discussing or disclosing information about unlawful acts in the workplace, such as harassment (including sexual harassment), discrimination, sexual assault, or any other conduct that you have reason to believe is unlawful; (ii) waive any rights which cannot be waived by agreement; (iii) prevent or restrict you from exercising your rights under Section 7 of the National Labor Relations

Act (to the extent you are deemed to have such rights under applicable law), including the right to discuss your terms and conditions of employment, the existence of this Agreement, its terms, and any amount paid hereunder, to the extent related to the exercise of Section 7 rights; or (iv) prevent you from otherwise disclosing information as permitted or required by law.

22. **Effective Date.** This Agreement shall become effective (the "Effective Date") on the eighth day after the date you execute it below, unless it is earlier revoked by you pursuant to the provisions set forth in the "Revocation Rights" section of this Agreement.

23. **Acknowledgments.** If the terms of this Confidential Separation Agreement and General Release correctly set forth our agreement, please so indicate by signing in the appropriate space below. Your signature will be an acknowledgment that: no other promise or agreement of any kind has been made to you by the Company to cause you to execute this Agreement; you have read this entire Agreement, including Exhibit A; you have been provided at least fourteen (14) days to review and consider this Agreement; you were advised and hereby are advised to consult with an attorney before accepting this Agreement and have been given the opportunity to have this Agreement reviewed by an attorney; you understand the meaning and application of each and every provision of this Agreement; the only consideration for your signature is as indicated above; and you fully understand and accept this Agreement, you are not coerced into signing it, and you signed it knowingly and voluntarily because it is satisfactory to you with the intent of being bound by each and every provision of this agreement. You acknowledge that if you sign this Agreement prior to the expiration of 14 days, you have done so voluntarily and knowingly. You should deliver the timely executed Release to JossLynn Castor, Vice President Human Resources within five (5) days of the date you sign it.

Any modifications to this Release do not become part of this Release unless expressly agreed to in writing by you and the Company.

This Release was presented to Aman Malhotra on September 19, 2025.

I have carefully read the above Confidential Separation Agreement and General Release, understand the meaning and intent thereof, and voluntarily agree to its terms on this date.

ACCEPTED AND AGREED TO:

DocuSigned by:
4F439F48EA2E4DA...
Aman Malhotra

10/3/2025 | 9:52 AM PDT
Date

Rubicon Technologies, LLC

Signed by:
JossLynn Castor
03C219DE7E6F4F0...
By: JossLynn Castor
Its: VP Human Resources

10/3/2025 | 1:47 PM EDT
Date

**EXHIBIT A**

**NON-EXHAUSTIVE LIST OF SPECIFIC STATE STATUTORY CLAIMS INCLUDED AMONG RELEASED CLAIMS**

**CALIFORNIA**

- California Family Rights Act, Cal. Gov't Code § 12945.1 *et seq.*;
- California Pregnancy Disability Leave Law, Cal. Gov't Code § 12945;
- California Fair Employment and Housing Act, Cal. Gov't Code § 12900 *et seq.*;
- California Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.*;
- California Statutory Provisions Regarding the Confidentiality of AIDS Information, Cal. Health & Safety Code § 120775 *et seq.*;
- California Confidentiality of Medical Information Act, Cal. Civ. Code § 56 *et seq.*;
- California Equal Pay Law, Cal. Lab. Code § 1197.5;
- California Whistleblower Protection Law, Cal. Lab. Code § 1102.5 to 1104;
- California WARN law, Cal. Lab. Code §§ 1400 to 1408;
- California Wage Payment Laws, Cal. Lab. Code §§ 1182.11 to 1182.12;
- California Compensation Law, Cal. Lab. Code §§ 200 *et seq.*, to the extent waivable;

**FLORIDA**

- Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.*;
- Florida Private-Sector Whistleblower Act, Fla. Stat. § 448.101 *et seq.*;
- Florida Statutory Provision Regarding Retaliation/Discrimination for Filing a Workers' Compensation Claim, Fla. Stat. § 440.205;
- Florida Equal Pay Act, Fla. Stat. § 725.07;
- Florida Omnibus AIDS Act, Fla. Stat. § 760.50;
- Florida Wage Payment Law, Fla. Stat. §§ 448.01, 448.08;
- Florida Wage Discrimination Law, Fla. Stat. § 448.07;
- Florida False Claims Act, Fla. Stat. § 68.081;
- Florida Military Service Leave Laws, Fla. Stat. § 250.481 *et seq.*;

**GEORGIA**

- Georgia AIDS Confidentiality Act, Ga. Code Ann. §24-9-47;
- Georgia Equal Pay Act (Sex Discrimination in Employment), Ga. Code Ann. §34-5-1 *et seq.*;
- Georgia Equal Employment for Persons with Disabilities Code, Ga. Code Ann. §346A-1 *et seq.*;
- Georgia Minimum Wage, Recordkeeping and Payday statutes, Ga. Code Ann. §§ 34-4-3, 34-2-11 and 34-8-2;
- Sex Discrimination in Employment Act, Ga. Code Ann. § 34-5-3 *et seq.*;

**NEW JERSEY**

- New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-12 *et seq.*; N.J. Admin. Code § 12:67-1.3.;
- New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2;
- New Jersey Family Leave Act, N.J. Stat. Ann. § 34:11B-9;

- New Jersey State Wage and Hour Law, N.J. Stat. Ann. § 34:11-56a *et seq.*;
- New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19-1-34:198;
- New Jersey Equal Pay Law, N.J. Stat. Ann. § 34:11-56.6;
- New Jersey Genetic Privacy Act, N.J. Stat. Ann. § 17B:30-12;
- New Jersey Security and Financial Empowerment Act ("NJ SAFE Act"), N.J. Stat. Ann. § 34:11C-1 *et seq.*;
- New Jersey WARN Act, N.J. Stat. § 34:21-1, 21-2;

**NORTH CAROLINA**

- North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.1 *et seq.*;
- North Carolina Lawful Use of Lawful Products Law, N.C. Gen. Stat. § 92-28.2;
- North Carolina Persons With Disabilities Protection Act, N.C. Gen. Stat. § 168A-1 *et seq.*;
- North Carolina Communicable Disease Law, N.C. Gen. Stat. § 130A, § 130A-148(i);
- North Carolina Discrimination on the Basis of Sickle Cell Trait Law, N.C. Gen. Stat. § 95-28.1;
- North Carolina Genetic Testing and Genetic Information Law, N.C. Gen. Stat. § 9528.1A;
- North Carolina Retaliatory Employment Discrimination Law, N.C. Gen. Stat. § 95240 *et seq.*;
- North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.1 *et seq.*;

**TEXAS**

- Texas Commission on Human Rights Act, Tex. Lab. Code Ch. 21.001 *et seq.*;
- Texas Disability Discrimination Law, as amended, Tex. Hum. Res. Code Ann. § 121.001 *et seq.*;
- Texas Payment of Wages Laws, Tex. Lab. Code Ch. 61;
- Texas Minimum Wage Act, Tex. Labor Code Ann. §§ 62.001 to 62.205;
- Texas Equal Pay Law, Tex. Gov't Code Ann. § 659.001;
- Texas Hazard Communication Act, Tex. Health & Safety Code Ann. § 502.017(c).

# EXHIBIT K

# Non-Disclosure, Non-Solicitation and Confidentiality Agreement

This Agreement ("**Agreement**") is made and entered into on 3/14/2016 (the "**Effective Date**"), by and between Rubicon Global Holdings, LLC, a Delaware limited liability company ("**Company**"), and **Ryan Brown**, an individual whose address is **1050 Lenox Park Blvd NE Apt 11302 Brookhaven, GA 30319-5848** and whose personal email address is rbrowny6@gmail.com ("**Employee**", and along with Company, the "**Parties**" to this Agreement).

**WHEREAS**, the Parties have entered into an at-will Employer/Employee relationship;

**WHEREAS**, the Parties recognize Company's substantial interest and investment in its "Confidential Information" (as defined below and pursuant to Georgia law) concerning the Company's business as well as confidential information concerning the business of the Company's Affiliates, successors, assigns, subsidiaries, prospective customers, customers, consultants, licensors, licensees, vendors, and other business associates (hereinafter collectively called "**Third Parties**"), including customer lists, sales and service data, trade secrets and other confidential information concerning the processes, products and activities of the Company and Third Parties;

**WHEREAS**, Employee has or will have access to Confidential Information, and the Company's success depends in part upon keeping its Confidential Information secret;

**NOW, THEREFORE**, in consideration of Employee's employment or continued employment with Company, future training, access to Confidential Information, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the covenants and agreements herein contained, the Parties hereby agree as follows:

1. At-Will Employment. Employee acknowledges and agrees that his or her employment by Company is at-will and may be terminated at any time for any or no reason by Company. This Agreement is not a contract or agreement of continuing employment for any duration or at any rate. Employee covenants and agrees that he or she will not terminate his or her employment with Company without providing Company less than fourteen (14) days' prior written notice of such termination. Employee acknowledges and agrees that such notice by Employee is necessary for Company to protect its legitimate interests in relationships with customers, vendors and other employees and that Company will be damaged if such prior written notice is not provided. The date on which Employee's employment with Company terminates is the "**Termination Date**".

2. Non-Disclosure of Confidential Information and Trade Secrets. Employee has or will become familiar with Confidential Information, and Employee acknowledges that the

continued success of Company depends upon the use and protection of Confidential Information. Employee agrees that at all times during Employee's employment by Company and thereafter, Confidential Information (a) will be kept confidential by Employee, (b) without limiting the foregoing, will not be disclosed by Employee to any Person except with the specific prior written consent of Company in its discretion, and (c) will be used by Employee solely in the course of, and consistent with, Employee's performance of his or her duties for Company. Employee shall take all reasonable and appropriate steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft. For purposes of this Agreement, "**Confidential Information**" shall mean any and all trade secrets, financial information and other information considered by Company as being confidential and concerning the business and affairs of Company, including but not limited to:

(a) product specifications, proposed or potential product specifications, product designs, proposed or potential product designs, drawings, any inventions, discoveries, improvements, machines, devices, processes, designs, projects, mixtures, compounds, inventions, whether patentable or not, product testing techniques, product testing processes, transportation routes, marketing and service methods or techniques, formulae, designs, styles, specifications, data bases, computer programs (whether in source code or object code), know-how, strategies, data, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, purchasing, accounting, engineering, marketing, merchandising, selling, or financing information, as well as any other information, however documented, that is a trade secret of Company within the meaning set forth in O.C.G.A. § 10-1-761;

(b) information concerning the business and affairs of Company including, but not limited to, historical financial statements, financial projections and budgets, customer preferences or spending, historical and projected sales, capital spending budgets and plans, business plans, the names and background of key personnel, pay rates or salaries of employees or managers, personnel training and techniques and materials, and sales techniques and materials of Company, however documented;

(c) notes, analyses, compilations, studies, summaries, and other material prepared by or for Company containing or based, in whole or in part, on any information included in the foregoing;

(d) any information acquired by Employee in the course of or incident to his or her employment relating to or regarding the names of customers or prospective customers of Company or Third Parties, the sales or service data of Company or Third Parties, or any data or information concerning the business or activities of Company or Third Parties; and

(e) any non-public matters of any business, personal or other nature of or related in any way to: (i) Company's employment practices or policies applicable to its

employees, contractors, or agents; (ii) Lane B. Moore, or any member of the Moore family or any related trust or business entity currently existing or which existed in the past or which exists in the future (collectively, "**Moore**"); (iii) Nathaniel Ryan Morris, Jane Marion Mosbacher Morris, any member of the Morris family or any related trusts or business entity currently existing or which existed in the past or which exists in the future (collectively, "**Morris**"); (iv) any Affiliate of or any entity created by Moore or Morris; or (v) any matters of any business, personal or other nature of or related in any way to a Board Member or any officer of Company.

Confidential Information shall not include any information that Employee demonstrates was or became generally known or available to the public other than as a result of an unauthorized or unlawful disclosure directly or indirectly by Employee.

3. Board Members. Employee acknowledges that he or she may have access to, and that there may be disclosed to Employee, information of a confidential, non-public, proprietary and/or trade secret nature that has great value to a Board Member because such information is not generally known to business competitors or to the general public (the "**Board Confidential Information**"). Board Confidential Information does not include information that is in, or has entered, the public domain through no fault of Employee. Employee will hold Board Confidential Information in confidence and will not use or disclose Board Confidential Information to anyone.

4. Communications. During Employee's service with Company, and thereafter in perpetuity, and without in any way limiting the provisions of Section 2 and Section 3 above:

(a) Employee shall keep confidential and never disclose, use, misappropriate, or confirm or deny the veracity of, any statement or comment concerning the Board, a Board Member, Confidential Information, Board Confidential Information, Moore, Morris, Company, or any of their respective Affiliates;

(b) Employee shall refrain from giving or participating in any interview or statement regarding or related to the Board, a Board Member, Moore, Morris, Company, or any of their respective Affiliates, or any matter which concerns, relates to, or involves any Confidential Information or Board Confidential Information;

(c) If Employee is requested by any Person, media representative, or journalist to give an interview or statement, Employee is obligated to refrain from disclosing, confirming, or denying the veracity of any information or question presented to Employee regarding the Board, a Board Member, Moore, Morris, Company, or any of their respective Affiliates, or any matter which concerns, relates to, or involves any Confidential Information or Board Confidential Information. In response to any such requests, Employee shall immediately reject the request, issue only a "no comment" statement, and immediately advise Company's Chief Risk Officer, Michael Heller, of the request and the details and circumstances surrounding the request; and

(d) Employee shall not, directly or indirectly, defame, disparage, make any statement, or take any action that would tend to cast a negative light upon or injure the personal, professional, or business reputation of any of the Board, a Board Member, Moore, Morris, Company, or any of their respective Affiliates, including, without limitation to: (1) to any member of the general public; or (2) to any current or former officer, director, manager or employee of the Company; or (3) to any member of the press or other media or in any website publication or social media outlet.

(e) Employee acknowledges Company is actively engaged in the solicitation of customer accounts and, from time to time, additional investment capital, all of which is directly tied to the success of the Company. The Company's ability to successfully solicit customers and investment capital is heavily dependent upon the Company's goodwill and good reputation. Employee acknowledges that any malicious, false or defamatory remarks concerning the Company, or any other breach any of Sections 4(a) through 4(d) above, would damage the Company's goodwill and good reputation, which would cause significant financial damage that would be difficult to value. Thus, any breach of Sections 4(a) through 4(d) above shall cause Employee to be liable to Company for liquidated damages in the amount of One Million Dollars ($1,000,000.00). Employee acknowledges and agrees that this payment is not a penalty and it a reasonable pre-estimation of damages caused by such breach. Notwithstanding the foregoing, Employee acknowledges that, in the event of a breach any of Sections 4(a) through 4(d) above, Company's damages may far exceed the One Million Dollars ($1,000,000.00) liquidated damages amount specified herein. Accordingly, if Company can prove actual, compensatory, consequential, punitive or other damages in excess of the liquidated damages amount, Company may elect to pursue the actual, compensatory, consequential, punitive or other damages instead of liquidated damages.

5. <u>Legally Required Disclosure of Confidential Information or Board Confidential Information.</u> Employee may only disclose Confidential Information or Board Confidential Information if such disclosure is required in response to a valid subpoena, court order or other valid judicial, administrative or regulatory process, and even then, the Confidential Information or Board Confidential Information may only be disclosed to the minimum extent necessary to comply with the subpoena, court order or other valid judicial, administrative or regulatory process, and the disclosure may only be made after the entry of a confidentiality and protective order which is suitable to protect the Confidential Information and Board Confidential Information. If Employee receives any demand, legal or otherwise, to produce Confidential Information or Board Confidential Information, Employee agrees to notify Scott Augustine, counsel for the Company, at the address of 191 Peachtree Street, N.E., Thirty-Fourth Floor, Atlanta, Georgia 30303, within two (2) business days of receipt of the demand or other legal document requiring Employee to produce this information. Even if Employee is subject to a valid subpoena, court order or other valid judicial, administrative or regulatory process, Employee agrees to object to producing the Confidential Information or Board Confidential Information, state that Employee is subject to an agreement prohibiting Employee from disclosing the Confidential Information and Board

Confidential Information, refuse to discuss the contents of the Confidential Information and/or Board Confidential Information unless ordered to do so by a court of competent jurisdiction, and provide Company with a sufficient opportunity to intervene and move to protect the secrecy of its Confidential Information and/or Board Confidential Information

6. Administrative Agencies. Nothing in this Agreement prevents Employee from participating in an investigation or proceeding conducted by the Equal Employment Opportunity Commission, the National Labor Relations Board, or any other federal, state, or local agency charged with the enforcement of any laws. Nothing in this Agreement is intended to interfere with Employee's rights under the National Labor Relations Act.

7. Non-Solicitation. For a period of two (2) years after the Termination Date, Employee will not, directly or indirectly, for any reason, for Employee's own account, or on behalf of or together with any other Person:

(a) Solicit, contact, call upon, or attempt to communicate with, any Person who performed services for Company during the twelve (12) month period prior to the Termination Date to terminate his/her engagement with Company; or

(b) Solicit, contact, call upon, or attempt to communicate with, any customer or customer prospect of Company, or any representative of the same, with whom Employee had Material Contact during Employee's employment with Company, to the extent such solicitation, contact, or communication is with a view toward the sale or provision of any activities, products or services that are competitive with the Business of Company.

8. Return of Property. All files, records, memoranda, notes, or other documents relating to the business of Company, as well as any laptop, cell phone, or other device provided by Company to Employee for use on behalf of Company, whether prepared by Employee or otherwise coming into his possession, and whether constituting Confidential Information, Board Confidential Information, or otherwise, in any and all forms and media, including, without limitation, all letters, memoranda, reports, notes, notebooks, books of account, data, drawings, prints, plans, specifications, and all other documents or writings, including those documents or writings on electronic data storage devices, and all copies thereof containing or relating to such information, shall be immediately delivered to Company and not retained by Employee upon the termination of Employee's service with Company, or upon Company's request, and shall at all times be and remain the sole and exclusive property of Company. Additionally, Employee agrees, within twenty-four (24) hours after the Termination Date, to turn over to Company all of Company's property which is stored on Employee's personal devices, including, but not limited to, personal cellular telephones, laptop computers or other computer, iPad, tablet computer or electronic device. Employee agrees that Employee will tender possession of the personal devices, whatever they may be, to Company so that Company's property can be extracted and so that the Employee's personal devices can be wiped clean of Company property, all Confidential

Information, and all Board Confidential Information. Employee agrees to cooperate in this process. Company agrees to return Employee's personal devices to Employee within seven (7) business days.

9. Intellectual Property. With respect to Intellectual Property made or conceived by Employee while employed by Company, whether or not during the hours of his or her service with Company or with the use or assistance of Company's Facilities, Materials, or Personnel, either solely or jointly with others, without royalty or any other consideration to Employee therefor:

(a) Employee shall inform Company promptly and fully of all such Intellectual Property by written reports, setting forth in detail the procedures employed and the results achieved. Employee shall submit a report promptly after completion of any studies or research projects, whether or not in Employee's opinion a given project has resulted in any Invention;

(b) Employee hereby assigns and agrees to assign to Company all of his or her right to and title and interest in all Intellectual Property, including Inventions, and to applications for United States and foreign letters patent and United States and foreign letters patent granted upon such Inventions and to all copyrightable material related thereto;

(c) Employee agrees for himself or herself, and his or her heirs, personal representatives, successors, and assigns, upon request of Company, at all times to do such acts, such as giving testimony in support of Employee's inventorship, and to execute and deliver promptly to Company such papers, instruments, and documents, without expense to him, as from time to time may be necessary or useful in the Company's opinion to apply for, secure, maintain, reissue, extend, or defend the Company's worldwide rights in the Intellectual Property or in any or all U.S. letters patent and in any and all letters patent in any country foreign to the United States, so as to secure to the Company the full benefits of the Inventions or discoveries and otherwise to carry into full force and effect the text and the intent of the assignment set out in Section 9(b) above; and

(d) Employee warrants and represents to Company that he or she is not subject to any agreement or policy inconsistent with the Agreement regarding Intellectual Property set forth herein. Employee agrees not to conduct any research or other work subject to this Agreement other than at Company's Facilities.

10. No-Shop. Notwithstanding any provision of this Agreement creating greater rights, Company shall have the royalty-free right to use in its business, and to make, have made, use, sell, and import products, processes, and services derived from any inventions, discoveries, concepts, and ideas, whether or not patentable, including but not limited to processes, methods, formulae, techniques, as well as improvements thereof and know-how related thereto, as well as trade secrets, trademarks, trade dress and copyrights that are not Intellectual Property as defined herein, but that are made or conceived by Employee during his or her service with Company or with the use or assistance of Company's Facilities, Materials, or Personnel.

11. Enforcement; Additional Acknowledgements. Because Employee's services are unique and because Employee has access to Confidential Information, the Parties hereto agree that, in the event of a breach by Employee of any of the provisions of this Agreement, Company and its Affiliates would suffer irreparable harm and money damages would be an inadequate remedy therefor, and in addition and supplementary to other rights and remedies, Company shall be entitled to specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction in order to enforce or prevent any violations of the provisions hereof.

12. Survival. All provisions in this Agreement shall survive the Termination Date.

13. Notices. Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by certified first class mail (postage prepaid and return receipt requested), sent by overnight courier service (with a tracking number and charges prepaid) or, if to Employee only, by electronic mail, to the recipient at the address below indicated:

If to Company:
Rubicon Global Holdings, LLC
5909 Peachtree Dunwoody Road, Ste. 200
Atlanta, GA 30328
Attn: Michael Heller, Personal & Confidential

If to Employee:
**Ryan Brown**
**1050 Lenox Park Blvd NE Apt 11302**
**Brookhaven, GA 30319-5848**

or such other address or to the attention of such other persons as the recipient party shall have specified by prior written notice to the sending party. Any notice under this Agreement shall be deemed to have been given when so personally delivered, five (5) days after deposit in the U.S. mail, or the next business day if sent for overnight delivery.

14. Definitions. For the purposes of this Agreement, the following terms have the meanings set forth below:

(a) "**Affiliate**" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where control means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise.

(b) "**Board**" means the Board of Managers of Company.

(c) "**Board Member**" means a member of the Board or a member of the Advisory Board, as the case may be.

(d) "**Business**" means activities, products, or services of the type conducted, authorized, offered, or provided by Company or its Affiliates within two (2) years prior to the Termination Date.

(e) "**Company's Facilities, Materials, or Personnel**" means facilities, materials, or personnel owned, leased, occupied, or controlled by Company, or any of its successors and assigns, and any of present or future Affiliate, as well as the facilities, materials, or personnel of third parties rented, leased, or otherwise hired by Company for the conduct of aspects of the business of Company.

(f) "**Intellectual Property**" means trade secrets, trademarks, trade dress, copyrights, inventions, discoveries, concepts, and ideas, whether patentable or not, including but not limited to processes, methods, formulae, software, techniques, as well as improvements thereof or know-how related thereto concerning any present or prospective activities of Company, or any of its successors and assigns, and any present or future Affiliate, with which Employee becomes acquainted as a result of his engagement by Company.

(g) "**Invention**" means inventions, discoveries, concepts, and ideas, whether patentable or not, including but not limited to processes, methods, formulae, software, techniques, as well as improvements thereof or know-how related thereto concerning any present or prospective activities of Company, or any of its successors and assigns, and any present or future Affiliate, with which Employee becomes acquainted as a result of his employment with Company.

(h) "**Material Contact**" has the same meaning as provided in O.C.G.A. § 13-8-51.

(i) "**Person**" means an individual, a company, a corporation, an association, a partnership, a joint venture, a limited liability company or partnership, an unincorporated trade or business enterprise, a trust, an estate, or a government (national, regional or local) or an agency, instrumentality or official thereof.

(j) "**Territory**" means the geographic territories of every city, county and state (or similar political subdivision) in which Company does business at any time during the employment relationship between Employee and Company.

15. Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein. The Parties agree that a court of competent jurisdiction making a determination of the invalidity or unenforceability of any term or provision of this Agreement shall

have the power to reduce the scope, duration or area of any such term or provision, to delete specific words or phrases from any such term or provision, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

16. Complete Agreement. This Agreement and those documents expressly referred to herein embody the complete agreement and understanding between the Parties and supersedes and preempts any prior understandings or agreements by or between the Parties, written or oral (including, those based on prior conduct), regarding the subject matter of this Agreement.

17. Insperity Employment Agreement. To the extent it is not inconsistent with this Agreement, Employee's obligations to Company under his or her prior agreement with Insperity, which was executed for the benefit of Company, shall survive and become part of this Agreement.

18. Counterparts. This Agreement may be executed in separate counterparts (including by means of facsimile and electronic transmission in portable document format (pdf) or other electronic transmission), each of which is deemed to be an original and all of which taken together shall constitute one and the same agreement.

19. Affiliates, Successors and Assigns. This Agreement shall inure to the benefit of and be enforceable by Company and its successors and assigns, and may be assigned by Company or its successors or assigns without the consent of Employee (without causing a termination of Employee's employment). Moore, Morris, the Board, Board Members, and each of their respective Affiliates, are third-party beneficiaries of and have the right to enforce the terms and provisions of Section 2, 3 and 4 of this Agreement. Thus, any breach of Sections 4(a) through 4(d) above shall cause Employee to be liable to the aggrieved party for liquidated damages in the amount of One Million Dollars ($1,000,000.00). Employee acknowledges and agrees that this payment is not a penalty and it a reasonable pre-estimation of damages caused by such breach. Notwithstanding the foregoing, Employee acknowledges that, in the event of a breach any of Sections 4(a) through 4(d) above, the aggrieved party's damages may far exceed the One Million Dollars ($1,000,000.00) liquidated damages amount specified herein. Accordingly, if the aggrieved party can prove actual, compensatory, consequential, punitive or other damages in excess of the liquidated damages amount, the aggrieved party may elect to pursue the actual, compensatory, consequential, punitive or other damages instead of liquidated damages.

20. Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF GEORGIA WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PROVISIONS THEREOF. THE TRADE SECRETS AND CONFIDENTIAL INFORMATION PROTECTED BY THIS AGREEMENT SHALL BE SUBJECT TO PROTECTION AND SEAL TO THE FULL EXTENT CONTEMPLATED BY THE LAWS OF THE STATE OF GEORGIA.

21. Mandatory Choice of Judicial Forum. WITH RESPECT TO ANY SUIT, ACTION, OR OTHER PROCEEDING ARISING FROM OR RELATING TO THIS AGREEMENT, COMPANY AND EMPLOYEE HEREBY IRREVOCABLY AGREE TO THE EXCLUSIVE PERSONAL JURISDICTION AND VENUE IN FEDERAL COURT OR THE STATE COURTS WITHIN FULTON COUNTY, GEORGIA.

22. Waiver of Jury Trial. AS A SPECIFICALLY BARGAINED FOR INDUCEMENT FOR EACH OF THE PARTIES TO ENTER INTO THIS AGREEMENT (AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL), EACH PARTY EXPRESSLY WAIVES, TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE MATTERS CONTEMPLATED HEREBY.

23. Corporate Opportunity. At all times prior to the Termination Date, Employee shall submit to Company all business, commercial and investment opportunities or offers presented to Employee or of which Employee becomes aware which relate to the Business of Company or its Affiliate ("**Corporate Opportunities**"). At all times prior to the Termination Date, unless approved by the Board, Employee shall not accept or pursue, directly or indirectly, any Corporate Opportunities.

24. Construction. The Parties agree that all Parties participated in the preparation and negotiation of this Agreement and that no provision in this Agreement shall be construed against any Party as the drafter thereof.

25. Employee's Cooperation. While employed by Company and thereafter, Employee shall reasonably cooperate with Company, at Company's sole expense, in any internal investigation, any administrative, regulatory or judicial investigation or proceeding or any dispute with a third party as reasonably requested by Company or any Affiliate (including, without limitation, Employee being available during normal business hours to Company or its Affiliates upon reasonable notice for interviews and factual investigations, appearing at Company's request to give testimony without requiring service of a subpoena or other legal process, volunteering to Company all pertinent information and turning over to Company all relevant documents which are or may come into Employee's possession, all at times and on schedules that are reasonably consistent with Employee's other permitted activities and commitments); provided that after the Termination Date, such activities shall be subject to the payment by Company of reasonable compensation for the time and services of Employee.

26. Amendment and Waiver. The provisions of this Agreement may be amended and waived only with the prior written consent of the Parties, and no course of conduct or course of dealing or failure or delay by any Party hereto in enforcing or exercising any of the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement or be deemed to be an implied waiver of any provision of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement under seal on the date first written above.

COMPANY:

Rubicon Global Holdings, LLC, a Delaware limited liability company

By:________________________(SEAL)
Name:________________________
Title:________________________

EMPLOYEE:

________________________(SEAL)

# EXHIBIT L

# Non-Disclosure, Non-Solicitation and Confidentiality Agreement

This Agreement ("**Agreement**") is made and entered into on 11/30/2016 (the "**Effective Date**"), by and between Rubicon Global Holdings, LLC, a Delaware limited liability company ("**Company**"), and Taylor Wall, an individual whose address is 5401 Pickens Road Powder Springs and whose personal email address is taylor.wall@rubiconglobal.com ("**Employee**", and along with Company, the "**Parties**" to this Agreement).

**WHEREAS**, the Parties have entered into an at-will Employer/Employee relationship;

**WHEREAS**, the Parties recognize Company's substantial interest and investment in its "Confidential Information" (as defined below and pursuant to Georgia law) concerning the Company's business as well as confidential information concerning the business of the Company's Affiliates, successors, assigns, subsidiaries, prospective customers, customers, consultants, licensors, licensees, vendors, and other business associates (hereinafter collectively called "**Third Parties**"), including customer lists, sales and service data, trade secrets and other confidential information concerning the processes, products and activities of the Company and Third Parties;

**WHEREAS**, Employee has or will have access to Confidential Information, and the Company's success depends in part upon keeping its Confidential Information secret;

**NOW**, **THEREFORE**, in consideration of Employee's employment or continued employment with Company, future training, access to Confidential Information, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the covenants and agreements herein contained, the Parties hereby agree as follows:

1. At-Will Employment. Employee acknowledges and agrees that his or her employment by Company is at-will and may be terminated at any time for any or no reason by Company. This Agreement is not a contract or agreement of continuing employment for any duration or at any rate. Employee covenants and agrees that he or she will not terminate his or her employment with Company without providing Company less than fourteen (14) days' prior written notice of such termination. Employee acknowledges and agrees that such notice by Employee is necessary for Company to protect its legitimate interests in relationships with customers, vendors and other employees and that Company will be damaged if such prior written notice is not provided. The date on which Employee's employment with Company terminates is the "**Termination Date**".

2. Non-Disclosure of Confidential Information and Trade Secrets. Employee has or will become familiar with Confidential Information, and Employee acknowledges that the

continued success of Company depends upon the use and protection of Confidential Information. Employee agrees that at all times during Employee's employment by Company and thereafter, Confidential Information (a) will be kept confidential by Employee, (b) without limiting the foregoing, will not be disclosed by Employee to any Person except with the specific prior written consent of Company in its discretion, and (c) will be used by Employee solely in the course of, and consistent with, Employee's performance of his or her duties for Company. Employee shall take all reasonable and appropriate steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft. For purposes of this Agreement, "**Confidential Information**" shall mean any and all trade secrets, financial information and other information considered by Company as being confidential and concerning the business and affairs of Company, including but not limited to:

(a) product specifications, proposed or potential product specifications, product designs, proposed or potential product designs, drawings, any inventions, discoveries, improvements, machines, devices, processes, designs, projects, mixtures, compounds, inventions, whether patentable or not, product testing techniques, product testing processes, transportation routes, marketing and service methods or techniques, formulae, designs, styles, specifications, data bases, computer programs (whether in source code or object code), know-how, strategies, data, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, purchasing, accounting, engineering, marketing, merchandising, selling, or financing information, as well as any other information, however documented, that is a trade secret of Company within the meaning set forth in O.C.G.A. § 10-1-761;

(b) information concerning the business and affairs of Company including, but not limited to, historical financial statements, financial projections and budgets, customer preferences or spending, historical and projected sales, capital spending budgets and plans, business plans, the names and background of key personnel, pay rates or salaries of employees or managers, personnel training and techniques and materials, and sales techniques and materials of Company, however documented;

(c) notes, analyses, compilations, studies, summaries, and other material prepared by or for Company containing or based, in whole or in part, on any information included in the foregoing;

(d) any information acquired by Employee in the course of or incident to his or her employment relating to or regarding the names of customers or prospective customers of Company or Third Parties, the sales or service data of Company or Third Parties, or any data or information concerning the business or activities of Company or Third Parties; and

(e) any non-public matters of any business, personal or other nature of or related in any way to: (i) Company's employment practices or policies applicable to its

employees, contractors, or agents; (ii) Nathaniel Ryan Morris, Jane Marion Mosbacher Morris, any member of the Morris family or any related trusts or business entity currently existing or which existed in the past or which exists in the future (collectively, "**Morris**"); (iii) any Affiliate of or any entity created by Morris; or (iv) any matters of any business, personal or other nature of or related in any way to a Board Member or any officer of Company.

Confidential Information shall not include any information that Employee demonstrates was or became generally known or available to the public other than as a result of an unauthorized or unlawful disclosure directly or indirectly by Employee.

3. Board Members. Employee acknowledges that he or she may have access to, and that there may be disclosed to Employee, information of a confidential, non-public, proprietary and/or trade secret nature that has great value to a Board Member because such information is not generally known to business competitors or to the general public (the "**Board Confidential Information**"). Board Confidential Information does not include information that is in, or has entered, the public domain through no fault of Employee. Employee will hold Board Confidential Information in confidence and will not use or disclose Board Confidential Information to anyone.

4. Communications. During Employee's service with Company, and thereafter in perpetuity, and without in any way limiting the provisions of Section 2 and Section 3 above:

(a) Employee shall keep confidential and never disclose, use, misappropriate, or confirm or deny the veracity of, any statement or comment concerning the Board, a Board Member, Confidential Information, Board Confidential Information, Morris, Company, or any of their respective Affiliates;

(b) Employee shall refrain from giving or participating in any interview or statement regarding or related to the Board, a Board Member, Morris, Company, or any of their respective Affiliates, or any matter which concerns, relates to, or involves any Confidential Information or Board Confidential Information;

(c) If Employee is requested by any Person, media representative, or journalist to give an interview or statement, Employee is obligated to refrain from disclosing, confirming, or denying the veracity of any information or question presented to Employee regarding the Board, a Board Member, Morris, Company, or any of their respective Affiliates, or any matter which concerns, relates to, or involves any Confidential Information or Board Confidential Information. In response to any such requests, Employee shall immediately reject the request, issue only a "no comment" statement, and immediately advise Company's Chief Risk Officer, Michael Heller, of the request and the details and circumstances surrounding the request; and

(d) Employee shall not, directly or indirectly, defame, disparage, make any statement, or take any action that would tend to cast a negative light upon or injure the personal, professional, or business reputation of any of the Board, a Board Member, Morris, Company, or any of their respective Affiliates, including, without limitation to: (1) to any member of the general public; or (2) to any current or former officer, director, manager or employee of the Company; or (3) to any member of the press or other media or in any website publication or social media outlet.

(e) Employee acknowledges Company is actively engaged in the solicitation of customer accounts and, from time to time, additional investment capital, all of which is directly tied to the success of the Company. The Company's ability to successfully solicit customers and investment capital is heavily dependent upon the Company's goodwill and good reputation. Employee acknowledges that any malicious, false or defamatory remarks concerning the Company, or any other breach any of Sections 4(a) through 4(d) above, would damage the Company's goodwill and good reputation, which would cause significant financial damage that would be difficult to value. Thus, any breach of Sections 4(a) through 4(d) above shall cause Employee to be liable to Company for liquidated damages in the amount of One Million Dollars ($1,000,000.00). Employee acknowledges and agrees that this payment is not a penalty and it a reasonable pre-estimation of damages caused by such breach. Notwithstanding the foregoing, Employee acknowledges that, in the event of a breach any of Sections 4(a) through 4(d) above, Company's damages may far exceed the One Million Dollars ($1,000,000.00) liquidated damages amount specified herein. Accordingly, if Company can prove actual, compensatory, consequential, punitive or other damages in excess of the liquidated damages amount, Company may elect to pursue the actual, compensatory, consequential, punitive or other damages instead of liquidated damages.

5. Legally Required Disclosure of Confidential Information or Board Confidential Information. Employee may only disclose Confidential Information or Board Confidential Information if such disclosure is required in response to a valid subpoena, court order or other valid judicial, administrative or regulatory process, and even then, the Confidential Information or Board Confidential Information may only be disclosed to the minimum extent necessary to comply with the subpoena, court order or other valid judicial, administrative or regulatory process, and the disclosure may only be made after the entry of a confidentiality and protective order which is suitable to protect the Confidential Information and Board Confidential Information. If Employee receives any demand, legal or otherwise, to produce Confidential Information or Board Confidential Information, Employee agrees to notify Scott Augustine, counsel for the Company, at the address of 191 Peachtree Street, N.E., Thirty-Fourth Floor, Atlanta, Georgia 30303, within two (2) business days of receipt of the demand or other legal document requiring Employee to produce this information. Even if Employee is subject to a valid subpoena, court order or other valid judicial, administrative or regulatory process, Employee agrees to object to producing the Confidential Information or Board Confidential Information, state that Employee is subject to an agreement prohibiting Employee from

disclosing the Confidential Information and Board Confidential Information, refuse to discuss the contents of the Confidential Information and/or Board Confidential Information unless ordered to do so by a court of competent jurisdiction, and provide Company with a sufficient opportunity to intervene and move to protect the secrecy of its Confidential Information and/or Board Confidential Information

6. Administrative Agencies. Nothing in this Agreement prevents Employee from participating in an investigation or proceeding conducted by the Equal Employment Opportunity Commission, the National Labor Relations Board, or any other federal, state, or local agency charged with the enforcement of any laws. Nothing in this Agreement is intended to interfere with Employee's rights under the National Labor Relations Act.

7. Non-Solicitation. For a period of two (2) years after the Termination Date, Employee will not, directly or indirectly, for any reason, for Employee's own account, or on behalf of or together with any other Person:

(a) Solicit, contact, call upon, or attempt to communicate with, any Person who performed services for Company during the twelve (12) month period prior to the Termination Date to terminate his/her engagement with Company; or

(b) Solicit, contact, call upon, or attempt to communicate with, any customer or customer prospect of Company, or any representative of the same, with whom Employee had Material Contact during Employee's employment with Company, to the extent such solicitation, contact, or communication is with a view toward the sale or provision of any activities, products or services that are competitive with the Business of Company.

8. Return of Property. All files, records, memoranda, notes, or other documents relating to the business of Company, as well as any laptop, cell phone, or other device provided by Company to Employee for use on behalf of Company, whether prepared by Employee or otherwise coming into his possession, and whether constituting Confidential Information, Board Confidential Information, or otherwise, in any and all forms and media, including, without limitation, all letters, memoranda, reports, notes, notebooks, books of account, data, drawings, prints, plans, specifications, and all other documents or writings, including those documents or writings on electronic data storage devices, and all copies thereof containing or relating to such information, shall be immediately delivered to Company and not retained by Employee upon the termination of Employee's service with Company, or upon Company's request, and shall at all times be and remain the sole and exclusive property of Company. Additionally, Employee agrees, within twenty-four (24) hours after the Termination Date, to turn over to Company all of Company's property which is stored on Employee's personal devices, including, but not limited to, personal cellular telephones, laptop computers or other computer, iPad, tablet computer or electronic device. Employee agrees that Employee will tender possession of the personal devices, whatever they may be, to Company so that Company's property can be extracted and so that the

Employee's personal devices can be wiped clean of Company property, all Confidential Information, and all Board Confidential Information. Employee agrees to cooperate in this process. Company agrees to return Employee's personal devices to Employee within seven (7) business days.

9. Intellectual Property. With respect to Intellectual Property made or conceived by Employee while employed by Company, whether or not during the hours of his or her service with Company or with the use or assistance of Company's Facilities, Materials, or Personnel, either solely or jointly with others, without royalty or any other consideration to Employee therefor:

(a) Employee shall inform Company promptly and fully of all such Intellectual Property by written reports, setting forth in detail the procedures employed and the results achieved. Employee shall submit a report promptly after completion of any studies or research projects, whether or not in Employee's opinion a given project has resulted in any Invention;

(b) Employee hereby assigns and agrees to assign to Company all of his or her right to and title and interest in all Intellectual Property, including Inventions, and to applications for United States and foreign letters patent and United States and foreign letters patent granted upon such Inventions and to all copyrightable material related thereto;

(c) Employee agrees for himself or herself, and his or her heirs, personal representatives, successors, and assigns, upon request of Company, at all times to do such acts, such as giving testimony in support of Employee's inventorship, and to execute and deliver promptly to Company such papers, instruments, and documents, without expense to him, as from time to time may be necessary or useful in the Company's opinion to apply for, secure, maintain, reissue, extend, or defend the Company's worldwide rights in the Intellectual Property or in any or all U.S. letters patent and in any and all letters patent in any country foreign to the United States, so as to secure to the Company the full benefits of the Inventions or discoveries and otherwise to carry into full force and effect the text and the intent of the assignment set out in Section 9(b) above; and

(d) Employee warrants and represents to Company that he or she is not subject to any agreement or policy inconsistent with the Agreement regarding Intellectual Property set forth herein. Employee agrees not to conduct any research or other work subject to this Agreement other than at Company's Facilities.

10. No-Shop. Notwithstanding any provision of this Agreement creating greater rights, Company shall have the royalty-free right to use in its business, and to make, have made, use, sell, and import products, processes, and services derived from any inventions, discoveries, concepts, and ideas, whether or not patentable, including but not limited to processes, methods,

formulae, techniques, as well as improvements thereof and know-how related thereto, as well as trade secrets, trademarks, trade dress and copyrights that are not Intellectual Property as defined herein, but that are made or conceived by Employee during his or her service with Company or with the use or assistance of Company's Facilities, Materials, or Personnel.

11. Enforcement; Additional Acknowledgements. Because Employee's services are unique and because Employee has access to Confidential Information, the Parties hereto agree that, in the event of a breach by Employee of any of the provisions of this Agreement, Company and its Affiliates would suffer irreparable harm and money damages would be an inadequate remedy therefor, and in addition and supplementary to other rights and remedies, Company shall be entitled to specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction in order to enforce or prevent any violations of the provisions hereof.

12. Survival. All provisions in this Agreement shall survive the Termination Date.

13. Notices. Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by certified first class mail (postage prepaid and return receipt requested), sent by overnight courier service (with a tracking number and charges prepaid) or, if to Employee only, by electronic mail, to the recipient at the address below indicated:

If to Company:
Rubicon Global Holdings, LLC
950 East Paces Ferry Rd., Suite 1900
Atlanta, GA 30326
Attn: Michael Heller, Personal & Confidential

If to Employee:
[To Employee's address first above written]

or such other address or to the attention of such other persons as the recipient party shall have specified by prior written notice to the sending party. Any notice under this Agreement shall be deemed to have been given when so personally delivered, five (5) days after deposit in the U.S. mail, or the next business day if sent for overnight delivery.

14. Definitions. For the purposes of this Agreement, the following terms have the meanings set forth below:

(a) "**Affiliate**" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where control means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise.

(b) "**Board**" means the Board of Managers of Company.

(c) "**Board Member**" means a member of the Board or a member of the Advisory Board, as the case may be.

(d) "**Business**" means activities, products, or services of the type conducted, authorized, offered, or provided by Company or its Affiliates within two (2) years prior to the Termination Date.

(e) "**Company's Facilities, Materials, or Personnel**" means facilities, materials, or personnel owned, leased, occupied, or controlled by Company, or any of its successors and assigns, and any of present or future Affiliate, as well as the facilities, materials, or personnel of third parties rented, leased, or otherwise hired by Company for the conduct of aspects of the business of Company.

(f) "**Intellectual Property**" means trade secrets, trademarks, trade dress, copyrights, inventions, discoveries, concepts, and ideas, whether patentable or not, including but not limited to processes, methods, formulae, software, techniques, as well as improvements thereof or know-how related thereto concerning any present or prospective activities of Company, or any of its successors and assigns, and any present or future Affiliate, with which Employee becomes acquainted as a result of his engagement by Company.

(g) "**Invention**" means inventions, discoveries, concepts, and ideas, whether patentable or not, including but not limited to processes, methods, formulae, software, techniques, as well as improvements thereof or know-how related thereto concerning any present or prospective activities of Company, or any of its successors and assigns, and any present or future Affiliate, with which Employee becomes acquainted as a result of his employment with Company.

(h) "**Material Contact**" has the same meaning as provided in O.C.G.A. § 13-8-51.

(i) "**Person**" means an individual, a company, a corporation, an association, a partnership, a joint venture, a limited liability company or partnership, an unincorporated trade or business enterprise, a trust, an estate, or a government (national, regional or local) or an agency, instrumentality or official thereof.

(j) "**Territory**" means the geographic territories of every city, county and state (or similar political subdivision) in which Company does business at any time during the employment relationship between Employee and Company.

15. Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision

of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein. The Parties agree that a court of competent jurisdiction making a determination of the invalidity or unenforceability of any term or provision of this Agreement shall have the power to reduce the scope, duration or area of any such term or provision, to delete specific words or phrases from any such term or provision, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

16. Complete Agreement. This Agreement and those documents expressly referred to herein embody the complete agreement and understanding between the Parties and supersedes and preempts any prior understandings or agreements by or between the Parties, written or oral (including, those based on prior conduct), regarding the subject matter of this Agreement.

17. Insperity Employment Agreement. To the extent it is not inconsistent with this Agreement, Employee's obligations to Company under his or her prior agreement with Insperity, which was executed for the benefit of Company, shall survive and become part of this Agreement.

18. Counterparts. This Agreement may be executed in separate counterparts (including by means of facsimile and electronic transmission in portable document format (pdf) or other electronic transmission), each of which is deemed to be an original and all of which taken together shall constitute one and the same agreement.

19. Affiliates, Successors and Assigns. This Agreement shall inure to the benefit of and be enforceable by Company and its successors and assigns, and may be assigned by Company or its successors or assigns without the consent of Employee (without causing a termination of Employee's employment). Morris, the Board, Board Members, and each of their respective Affiliates, are third-party beneficiaries of and have the right to enforce the terms and provisions of Section 2, 3 and 4 of this Agreement. Thus, any breach of Sections 4(a) through 4(d) above shall cause Employee to be liable to the aggrieved party for liquidated damages in the amount of One Million Dollars ($1,000,000.00). Employee acknowledges and agrees that this payment is not a penalty and it a reasonable pre-estimation of damages caused by such breach. Notwithstanding the foregoing, Employee acknowledges that, in the event of a breach any of Sections 4(a) through 4(d) above, the aggrieved party's damages may far exceed the One Million Dollars ($1,000,000.00) liquidated damages amount specified herein. Accordingly, if the aggrieved party can prove actual, compensatory, consequential, punitive or other damages in excess of the liquidated damages amount, the aggrieved party may elect to pursue the actual, compensatory, consequential, punitive or other damages instead of liquidated damages.

20. Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF GEORGIA WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PROVISIONS THEREOF. THE TRADE SECRETS AND CONFIDENTIAL INFORMATION PROTECTED BY THIS AGREEMENT SHALL BE SUBJECT TO PROTECTION AND SEAL TO THE FULL EXTENT CONTEMPLATED BY THE LAWS OF THE STATE OF GEORGIA.

21. Mandatory Choice of Judicial Forum. WITH RESPECT TO ANY SUIT, ACTION, OR OTHER PROCEEDING ARISING FROM OR RELATING TO THIS AGREEMENT, COMPANY AND EMPLOYEE HEREBY IRREVOCABLY AGREE TO THE EXCLUSIVE PERSONAL JURISDICTION AND VENUE IN FEDERAL COURT OR THE STATE COURTS WITHIN FULTON COUNTY, GEORGIA.

22. Waiver of Jury Trial. AS A SPECIFICALLY BARGAINED FOR INDUCEMENT FOR EACH OF THE PARTIES TO ENTER INTO THIS AGREEMENT (AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL), EACH PARTY EXPRESSLY WAIVES, TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE MATTERS CONTEMPLATED HEREBY.

23. Corporate Opportunity. At all times prior to the Termination Date, Employee shall submit to Company all business, commercial and investment opportunities or offers presented to Employee or of which Employee becomes aware which relate to the Business of Company or its Affiliate (“**Corporate Opportunities**”). At all times prior to the Termination Date, unless approved by the Board, Employee shall not accept or pursue, directly or indirectly, any Corporate Opportunities.

24. Construction. The Parties agree that all Parties participated in the preparation and negotiation of this Agreement and that no provision in this Agreement shall be construed against any Party as the drafter thereof.

25. Employee’s Cooperation. While employed by Company and thereafter, Employee shall reasonably cooperate with Company, at Company’s sole expense, in any internal investigation, any administrative, regulatory or judicial investigation or proceeding or any dispute with a third party as reasonably requested by Company or any Affiliate (including, without limitation, Employee being available during normal business hours to Company or its Affiliates upon reasonable notice for interviews and factual investigations, appearing at Company’s request to give testimony without requiring service of a subpoena or other legal process, volunteering to Company all pertinent information and turning over to Company all relevant documents which are or may come into Employee’s possession, all at times and on schedules that are reasonably consistent with Employee’s other permitted activities and

commitments); provided that after the Termination Date, such activities shall be subject to the payment by Company of reasonable compensation for the time and services of Employee.

26. Amendment and Waiver. The provisions of this Agreement may be amended and waived only with the prior written consent of the Parties, and no course of conduct or course of dealing or failure or delay by any Party hereto in enforcing or exercising any of the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement or be deemed to be an implied waiver of any provision of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement under seal on the date first written above.

COMPANY:

Rubicon Global Holdings, LLC, a Delaware limited liability company

DocuSigned by:

By: ______________ (SEAL)
8A9FD2EF4C294F7...
Name: Michael Heller
Title: Chief Risk Officer

EMPLOYEE:

DocuSigned by:
Taylor Wall
______________ (SEAL)
BB7B8402E9CD443...

# EXHIBIT M




# Taylor Wall · 3rd

Account Executive at OneWaste

OneWaste

Atlanta Metropolitan Area · Contact info

2,230 followers · 500+ connections

Follow | Message | Visit my website | ···

## People who follow Taylor also follow

**Brad Jacobs**
Chairman and CEO, QX...
131,015 followers
+ Follow

**Codie A. Sanchez**
Founder, Entrepreneur, ...
Followed by Isamu, Kennan ...
+ Follow

**John Roulac**
Founder & CEO Coco ...
Followed by Chelsea
+ Follow

## About

As Account Executive, I serve as the primary business partner to executive decision-makers, responsible for driving both top and bottom line growth across a national portfolio. I build and deliver strategic programs that achieve real reliability, real efficiency, and real accountability. All by reducing cost, optimizing operations, and ... more

## Activity

+ Follow

2,230 followers

Posts | Comments | Images

**Taylor Wall** • 3rd+
Account Executive at OneWaste
Visit my website
2d •

Waste has never had a hype video. Crazy, right? We had to fix that.
... more

**OneWaste**
Learn more
2d • Edited •

We made an AI hype video for waste management. Someone had to.
... more



Who's Gary?

9 — 1 repost

**Taylor Wall** • 3rd+
Account Executive at OneWaste
Visit my website
1w •

5 properties. 5 haulers. 5 invoices. 5 different guys named "your account rep." 0 of them answering the
... more

**OneWaste**
Learn more
1w •

Your properties don't have a waste problem. They have a vendor problem.
... more



**Property Management**
onewaste.com

35 — 1 repost

Show all →

## Experience

**Account Executive**
OneWaste · Full-time
Jul 2026 - Present · 2 mos
Atlanta, Georgia, United States · Remote
Program Management Professional, Program Implementation and +1 skill

**Account Executive**

The Wilmington Group · Full-time
Apr 2026 - Present · 5 mos
Atlanta, Georgia, United States · Remote

**Program Management, Account Management and +2 skills**

### Rubicon
9 yrs 6 mos

#### Director, Key Accounts
Full-time
Mar 2021 - Mar 2026 · 5 yrs 1 mo
Atlanta Metropolitan Area

#### Key Account Manager
Full-time
Dec 2018 - Mar 2021 · 2 yrs 4 mos

• Responsible for growing top line with customers through identifying and capturing Share of Wallet
• Responsible for growing bottom line through mix change and profit improvement actions… more

#### Customer Success Lead
Oct 2016 - Dec 2018 · 2 yrs 3 mos

### Johnny's N.Y. Style Pizza
8 yrs 3 mos

#### Co Owner
Aug 2014 - Sep 2016 · 2 yrs 2 mos

Responsibilities include fulfilling the role of Operating Manager and Hiring Manager.Operational mo
responsibilities include Inventory Management, Cash Control, Staff Training, Scheduling, Conductingre

#### Operations Manager
Jan 2010 - Jul 2014 · 4 yrs 7 mos
Dallas, Georgia

#### Lead Line Cook
Jul 2008 - Jan 2010 · 1 yr 7 mos
Dallas, Georgia

## Education

### Georgia Highlands College
Business Administration, Management and Operations
2009 – 2013

East Paulding High School
2005 – 2009

## Licenses & certifications

ServSafe
National Restaurant Association

## Skills (43)

### Waste Management

Account Executive at OneWaste

Endorsed by 1 person in the last 6 months

1 endorsement

### Program Management Professional

Account Executive at OneWaste

Endorsed by 1 person in the last 6 months

1 endorsement

Show all →

## Recommendations

Received (1) Given

**Grace L.** · 3rd
Program Management and Product Operations
April 28, 2020, Grace worked with Taylor but on different teams

I had the pleasure of working with Taylor during my tenure at Rubicon. In a fast growing organization, it's easy to let things fall through the cracks, but that was never the case with Taylor. He always made sure his customers were in the forefront of all that he did, listened to their needs, and provided a best in class experience for each and every one of of his customers. With his genuine heart for service, Taylor would be a great asset to any organization.

## Languages

English

## Interests

Top Voices | Companies | Groups | Newsletters | Schools



**Gary Vaynerchuk** · 3rd
Chairman – VaynerX, CEO – VaynerMedia, Creator – VeeFriends
5,995,398 followers

+ Follow



**Jay Parsons** · 2nd
Rental Housing Economist (Apartments, SFR), Speaker and Author
127,099 followers

+ Follow

Show all →

## Causes

Disaster and Humanitarian Relief • Economic Empowerment • Education • Environment • Health • Human Rights

# EXHIBIT N



**Taylor Wall** • 3rd+

Account Executive at OneWaste

Visit my website

4w •

+ Follow

Today's a big one for me.

I've been part of the team building OneWaste and today it officially launches.

I'm proud of what we've built. A program that streamlines waste and recycling operations, so businesses can stop juggling multiple vendors, signing endless contracts, and sitting on hold waiting for someone to help. Just one partner, doing it right.

We show up for our customers the same way we show up at home. That's not a tagline, it's the standard behind everything we're building here.

Check out the full announcement below, and if you're managing waste across multiple locations, I'd love to talk. 👇

**OneWaste**

Learn more

4w • Edited •

+ Follow

Today, we're launching OneWaste.

... more






68 · 12 comments • 1 repost

Like · Comment · Repost · Send

Add a comment... GIF

Most relevant

**Ryan Brown** • 3rd+ · 1mo · Follow
Account Executive at OneWaste

Love you my dude! Excited to work alongside such a legend, but even more so one of my best friends! The level of commitment and tenacity you bring to the table is second to none.

5 1

**Taylor Wall** Author 1mo
Account Executive at OneWaste

Ryan Brown right back at you brother!!

1

**Juli Taylor "The Trash Lady"** • 3rd+ 2d Follow
Chief Executive Officer for Sort Line Consulting and Design Companies

Congrats to you and your team Taylor Wall

1 1

Some replies may not be displayed in the **Most relevant** view. To see these replies, select **Most recent**.

**Jen Clough** • 3rd+ 1mo Follow
Strategic Growth Leader | National Account Relationships

Yesssss!!! go get em OneWaste!

1

**Alvin Lawson** • 3rd+ 3w Follow
Rubicon Global

The man! The myth! The legend!!!!! Congratulations bro!

Load more

# EXHIBIT O




# Ryan Brown · 3rd

Account Executive at OneWaste

OneWaste

Atlanta Metropolitan Area · Contact info

500+ connections

Message | + Follow | ···

## Activity

+ Follow

645 followers

Posts | Comments | Images

Ryan Brown reposted this ···

**Circularity Hub**

1d •

The Plastic Recycling Reality

... more




**Ryan Brown** • 3rd+ ···

Account Executive at OneWaste

2d •

Still chasing invoices, vendors, and "Gary"?

... more

**OneWaste**

Learn more

2d • Edited •

We made an AI hype video for waste management. Someone had to.

... more




374 17 comments • 80 reposts



Who's Gary?

15

Show all →

## Experience

### Account Executive at OneWaste
OneWaste · Full-time
Jul 2026 - Present · 2 mos
Atlanta, Georgia, United States · Remote

Program Implementation, Program Management and +2 skills

### Account Executive
Wilmington Paper - The Program™
Mar 2026 - Present · 6 mos

Program Management, Account Management and +3 skills

### Director of Key Accounts
Rubicon
Jun 2014 - Feb 2026 · 11 yrs 9 mos

## Skills (8)

### Waste Management
Account Executive at OneWaste at OneWaste

### Sustainability

Account Executive at OneWaste at OneWaste

Show all →

## Interests

Top Voices Companies Groups Newsletters



**Jennifer Morris** · 3rd

CEO @ The Nature Conservancy | Leading bold efforts to scale conservation for people and nature.

145,894 followers

+ Follow

# EXHIBIT P

Outlook

## (No subject)

**From** Ryan Brown <ryan.brown@rubicon.com>
**Date** Wed 11/12/2025 1:51 PM
**To** Ryan Brown <ryan.brown@rubicon.com>; Ryan Brown <rbrowny6@gmail.com>

1 attachment (53 KB)
Rubicon Implementation Project Plan_2022.07.xlsx;

**Ryan Brown**
Account Director
Ryan.Brown@rubicon.com




DISCLAIMER: This e-mail message and all corresponding e-mail messages, including all attachments, contains confidential information. Do not forward, copy, distribute or otherwise relay the messages or their content to any individual without first contacting the Legal Department or the original sender.

# EXHIBIT Q

[redacted] [redacted]

---

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

**From:** Taylor Wall <twall@wilmingtonpaper.com>
**Sent:** Wednesday, June 10, 2026 11:51 AM

**To:** [redacted]; Tom Owston <towston@wilmingtonpaper.com>; Ryan Brown <ryan.brown@wilmingtonpaper.com>; [redacted]

Thank you – I will send an email now to them all.

Taylor Wall
Account Executive

**The Wilmington Group**
35 Waterview Blvd. | Suite 302 | Parsippany, NJ 07054
678-772-4339
twall@wilmingtonpaper.com

**WilmingtonPaper.com**

---

[redacted]>
**Sent:** Wednesday, June 10, 2026 11:50 AM
**To:** Taylor Wall <twall@wilmingtonpaper.com>; [redacted] Tom Owston <towston@wilmingtonpaper.com>; Ryan Brown <ryan.brown@wilmingtonpaper.com>; [redacted]
**Subject:** [EXTERNAL] RE: [External] RE: Time Sensitive - T0846 Audit with Wilmington Paper

Taylor,

Good morning, these are our contact for service below either one will be able to assist

Chasity Smith chasitysmith@gflenv.com
Candynce Sills csills@gflenv.com
Cassandra Whittington cassandra.whittington@gflenv.com

[redacted]

**From:** Taylor Wall <twall@wilmingtonpaper.com>
**Sent:** Wednesday, June 10, 2026 11:19 AM
**To:** [redacted] Tom Owston <towston@wilmingtonpaper.com>; Ryan Brown <ryan.brown@wilmingtonpaper.com>; [redacted]
**Subject:** [redacted]
**Importance:** High

This is the first time you received an email from this sender (twall@wilmingtonpaper.com). Exercise caution when clicking links, opening attachments or taking further action, before validating its authenticity.

Hi [redacted],

Below is the request, please let us know if you can provide the best GFL contact we can coordinate this haul with.

Store Information : [redacted]
Audit Location : [redacted]
Request: GFL to bring the compactor on **6/23/2026** and bring it to the [redacted] above and dump it at a dock door for Wilmington to audit the contents

Please let me know if you have a great contact I can coordinate with!

Thanks,
Taylor

Taylor Wall
Account Executive

**The Wilmington Group**
35 Waterview Blvd. | Suite 302 | Parsippany, NJ 07054
678-772-4339
twall@wilmingtonpaper.com

**WilmingtonPaper.com**

<image001.png>

**From:** [redacted]
**Sent:** Wednesday, June 10, 2026 11:13 AM
**To:** [redacted] Ryan Brown <ryan.brown@wilmingtonpaper.com>; [redacted] Taylor Wall <twall@wilmingtonpaper.com>

**Cc:** [redacted]
**Subject:** [redacted]

Hi [redacted],

Thank you, but that was not the ask. Please provide Wilmington with contact information for a good point of contact at GFL.

@Taylor Wall @Ryan Brown please jump in here and continue the conversation

Best,
[redacted]

[redacted]

*****Summer Hours: Please note our office closes on Fridays at 1pm, starting on May 22nd through September 4th*****

---

[redacted]

**This Message Is From an External Sender**
This message came from outside your organization.

[redacted]

---

**From:** [redacted]
**Sent:** Wednesday, June 10, 2026 10:08 AM
**To:** [redacted] Tom Owston <towston@wilmingtonpaper.com>; Ryan Brown <ryan.brown@wilmingtonpaper.com>; [redacted]
**Subject:** [redacted]
**Importance:** High

Good Morning [redacted]

Thank you for your continued support on the 2026 waste audits. Wilmington Paper, copied here, is asking for assistance in gathering a point of contact from GFL to help coordinate the T0846 audit. Please communicate with them to provide the information.

Thanks and let me know if you have any questions.

Best,
[redacted]

[redacted]

[redacted]

[redacted]

**Disclaimer**
The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

**Disclaimer**
The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.